## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| WINNIE JACKSON, JARRETT "JAY" JACKSON, CELINA VASQUEZ, DUANE BRAXTON, NADIA BHULAR, AMJAD BHULAR, CHERYL MILLS-SMITH, and RICHARD CANADA,<br><br>        Plaintiffs,<br><br>v.<br><br>TARRANT COUNTY, TEXAS; TARRANT COUNTY COMMISSIONERS COURT; TIM O'HARE, in his official capacity as Tarrant County Judge,<br><br>        Defendants. | No. 4:25-cv-00587-O |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Pursuant to 42 U.S.C. § 1983 and 52 U.S.C. § 10301, Plaintiffs Winnie Jackson, Jarrett "Jay" Jackson, Celina Vasquez, Duane Braxton, Nadia Bhular, Amjad Bhular, Cheryl Mills-Smith, and Richard Canada bring this action against Defendants Tarrant County, Texas; Tarrant County Commissioners Court, and Tim O'Hare, in his official capacity as Tarrant County Judge, and allege as follows:

## INTRODUCTION

1.    On the day he cast the deciding vote to redraw Tarrant County's commissioner precinct map, County Judge Tim O'Hare said in an NBC 5 interview: "The policies of Democrats continue to fail Black people over and over and over, but

many of them keep voting them in. It's time for people of all races to understand the Democrats are a lost party, they are a radical party, it's time for them to get on board with us and we'll welcome them with open arms."

2.      A government official casting the deciding vote in favor of a map that reduces from two to one the number of majority-minority districts cannot have as *even one iota* of his purpose the fact that "many of them"—referring to Black voters—choose different candidates than he would prefer. A political subdivision cannot redraw district boundaries along racial lines because the government official casting the deciding vote thinks that "[i]t's time for people of all races" to start agreeing with his views. And a political subdivision cannot redraw district boundaries along racial lines because "[i]t's time for *them*," *i.e.*, Black voters and voters of "all races," "to get on board" with his policy views.

3.      The Fourteenth and Fifteenth Amendments and the Voting Rights Act prohibit this blatant and open purpose to dilute voting strength on account of race. It is unusual in this era—and startling—to encounter such a directly- and openly-stated racially dilutive purpose from a government official.

4.      This cannot be cloaked in the label "partisan gerrymandering." Judge O'Hare openly explained his purpose on the day of the vote: he disagrees with how Black people in Precinct 2 were casting their ballots and so voted to redraw the lines so they could no longer elect their preferred candidate to the Commissioners Court.

5.       This sordid episode began on April 2, 2025, when Tarrant County entered into a contract with the Public Interest Legal Foundation ("PILF"), an Alexandria, Virginia legal and policy organization, to strategize and manage a mid-

2

decade redistricting of the County's commission precincts. PILF attorney Joe Nixon led the project. With Defendants' approval, PILF subcontracted with Adam Kincaid, a Virginia mapdrawer, to draw potential maps, including the map ultimately adopted by the Commission.

6.    The map that Mr. Kincaid drew (in Virginia) at the direction of Judge O'Hare, which was adopted by the Commissioners Court on June 3, 2025 ("Map 7"), gerrymanders the County to eliminate one of the two existing majority-minority precincts and instead pack the bulk of the County's minority voters into a single precinct while cracking others across the remaining three precincts. Map 7 surgically moves minority voters from District 2 to District 1 while just as carefully moving Anglo voters from District 1 to District 2. The resulting map—in a county in which the majority of residents are non-Anglo—has three Anglo-majority precincts and one majority-minority precinct.

7.    In addition, Map 7 also disenfranchises over 150,000 people of voting age in Tarrant County who were next entitled to vote for a commissioner candidate in the November 2026 election by moving them from an even-numbered precinct to an odd-numbered precinct. These voters are denied their right to vote in the 2026 election and their right to vote is abridged by forcing them to wait six years (from 2022 until 2028) to participate in the election of commissioners, who are elected to four-year terms. This disenfranchisement falls starkly along racial lines. Black voters and Latino voters are both disproportionately disenfranchised compared to Anglo voters, who are disproportionately unaffected. While Map 7 disenfranchises just 5% of Tarrant County's Anglo adults, it disenfranchises 19% of the County's Black adults

3

and 12% of its Latino adults. Black adults are thus four times more likely than Anglo adults to be disenfranchised under Map 7 and Latino adults are over twice as likely to be disenfranchised than Anglo adults.

8.    This racially discriminatory mid-decade redistricting process was not necessitated by any population imbalance among the precincts—the overall population deviation was below 2 percent—well below 10 percent deviation permissible for local government bodies. Instead, the County Judge, Tim O'Hare— who in his 2022 campaign said, "if you're a Republican officeholder and you haven't been called a racist, then you probably haven't done a thing"—pushed through the map with the goal of defeating one of the two Black commissioners and preventing minority voters from electing their preferred candidates—or even casting a ballot in the election in which they were otherwise entitled to vote.

9.    The scheme violates Section 2 of the Voting Rights Act and the First, Fourteenth, and Fifteenth Amendments. The Court should enjoin Defendants from implementing this unlawful map.

## PARTIES

10.    Plaintiff Winnie Jackson is an African-American citizen of the United States and registered voter residing in Tarrant County, Texas. She resides in majority-minority Precinct 1 in the preexisting map ("Benchmark Map") and majority-Anglo Precinct 4 in the newly enacted Map 7. Plaintiff Winnie Jackson regularly votes in local elections, including County Commission elections, and fully intends to vote in future elections for County Commission.

11. Plaintiff Jarrett "Jay" Jackson is an African-American citizen of the United States and registered voter residing in Tarrant County, Texas. He resides in majority-minority Precinct 1 in the Benchmark Map and majority-Anglo Precinct 2 in the newly enacted Map 7. Plaintiff Jarrett "Jay" Jackson regularly votes in local elections, including County Commission elections, and fully intends to vote in future elections for County Commission.

12. Plaintiff Celina Vasquez is a Latina citizen of the United States and registered voter residing in Tarrant County, Texas. She resides in majority-minority Precinct 2 in the Benchmark Map and majority-Anglo Precinct 2 in the newly enacted Map 7. Plaintiff Celina Vasquez regularly votes in local elections, including County Commission elections, and fully intends to vote in future elections for County Commission.

13. Plaintiff Duane Braxton is an African-American citizen of the United States and registered voter residing in Tarrant County, Texas. He resides in majority-minority Precinct 2 in the Benchmark Map and majority-Anglo Precinct 3 in the newly enacted Map 7. Plaintiff Duane Braxton regularly votes in local elections, including County Commission elections, and fully intends to vote in future elections for County Commission. Prior to the adoption of Map 7, Plaintiff Duane Braxton was next entitled to vote for County Commissioner in November 2026; under Map 7 he will be disenfranchised and unable to vote until November 2028.

14. Plaintiff Nadia Bhular is a Latina citizen of the United States and registered voter residing in Tarrant County, Texas. She resides in majority-minority Precinct 2 in the Benchmark Map and majority-minority Precinct 1 in the newly

enacted Map 7. Plaintiff Nadia Bhular regularly votes in local elections, including County Commission elections, and fully intends to vote in future elections for County Commission. Prior to the adoption of Map 7, Plaintiff Nadia Bhular was next entitled to vote for County Commissioner in November 2026; under Map 7 she will be disenfranchised and unable to vote until November 2028.

15.    Plaintiff Amjad Bhular is a southeast Asian citizen of the United States and registered voter residing in Tarrant County, Texas. He resides in majority-minority Precinct 2 in the Benchmark Map and majority-minority Precinct 1 in the newly enacted Map 7. Plaintiff Amjad Bhular regularly votes in local elections, including County Commission elections, and fully intends to vote in future elections for County Commission. Prior to the adoption of Map 7, Plaintiff Amjad Bhular was next entitled to vote for County Commissioner in November 2026; under Map 7 he will be disenfranchised and unable to vote until November 2028.

16.    Plaintiff Cheryl Mills-Smith is an African-American citizen of the United States and registered voter residing in Tarrant County, Texas. She resides in majority-minority Precinct 2 in the Benchmark Map and majority-minority Precinct 1 in the newly enacted Map 7. Plaintiff Mills-Smith regularly votes in local elections, including County Commission elections, and fully intends to vote in future elections for County Commission. Plaintiff Mills-Smith was next entitled to vote for County Commissioner in November 2026; under Map 7 she will be disenfranchised and unable to vote until November 2028.

17.    Plaintiff Richard Canada is a citizen of the United States and registered voter residing in Tarrant County. He resides in Precinct 2 in the Benchmark Map

and Precinct 1 in the newly enacted Map 7. Plaintiff Canada regularly votes in local elections, including County Commission elections, and fully intends to vote in future elections for County Commission. Plaintiff Canada was next entitled to vote for County Commissioner in November 2026; under Map 7 he will be disenfranchised and unable to vote until November 2028.

18.     Defendant Tarrant County, Texas, is a political and geographical subdivision of the State of Texas.

19.     Defendant Tarrant County Commissioners Court is the governing body of Tarrant County, and it consists of four commissioners elected from single-member precincts and a County Judge elected countywide.

20.     Defendant Tim O'Hare, in his official capacity as Tarrant County Judge, is the elected, presiding officer of the Tarrant County Commissioners Court.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction under 28 U.S.C. §§ 1343 and 1357, 42 U.S.C. § 1983, and 52 U.S.C. § 10301 *et seq.* to hear this actions' claims for equitable relief. This Court also has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws and Constitution of the United States. This Court also has general jurisdiction to grant the declaratory and injunctive relief requested by Plaintiffs under 28 U.S.C. §§ 2201 and 2202, the Declaratory Judgment Act, and Federal Rules of Civil Procedure 57 and 65.

22.     Jurisdiction over Plaintiffs' claim for costs and attorneys' fees is based upon Federal Rule of Civil Procedure 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e).

23.    This Court has personal jurisdiction over Defendants—residents of this District.

24.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants are residents of this District and a substantial part of the events or omissions giving rise to the claim occurred here.

## FACTS

### *2011 and 2021 Tarrant County Redistricting*

25.    The 2020 Decennial Census reported Tarrant County, Texas as a majority-minority county with a total population of 2,110,640, an increase from 2010 of more than 300,000. White not Hispanics ("Anglos") made up 42.2 percent, Hispanic or Latino 30.5 percent, Black alone 19.3 percent, and Asian/other 8 percent. Over the decade, the growth of the minority population was significantly greater than that of the Anglos. Hispanics increased by over 137,000, Blacks increased by over 82,000, and Asian/others by over 110,000. The Anglo population in Tarrant County decreased by more than 32,000.

26.    According to the 2020 Census, Tarrant County's voting age population is 46.9% Anglo, 26.3% Hispanic, and 16.4% Black.

27.    The governing body of Tarrant County is a Commissioners Court made up of a presiding County Judge who is elected county-wide to a four-year term and four Commissioners who are elected in single-member precincts (districts) to four-year terms staggered with elections in two commissioner precincts each election cycle.

28.    The Benchmark Map's boundaries were configured in 2011 ("Benchmark Map"). The Commissioners Court at that time was made up of four Republicans and one Democrat. The Benchmark Map is shown below:



29.    Precincts 2, 3, and 4 were majority Anglo districts at the time they were adopted. Precinct 1 was a majority-minority district, as it had been for several decades.

30.    Precincts 3 and 4 continued to elect Republican Commissioners through the decade.

31.    Precinct 1 continued to elect a Black Democratic Commissioner through the decade.

32.    In Precinct 2, Anglo-preferred incumbent Andy Nguyen was re-elected in 2014. During a 2016 campaign event, Mr. Nguyen stated: "If being called a racist is the price I have to pay to preserve America, I am willing to pay 100-fold."

33.     In 2018, the growing and politically cohesive minority population in Precinct 2 succeeded in electing their candidate of choice, Black Democrat Devan Allen. Commissioner Allen did not seek reelection in 2022. Black Democrat Alisa Simmons was elected to the seat in the 2022 election, defeating Anglo-preferred former Commissioner Andy Nguyen.

34.     The ability of the minority population in Precinct 2 to elect their candidate of choice was further confirmed in the 2020 elections when the precinct was carried by Joe Biden in the Presidential race and African American Democrat Vance Keyes in the County Sheriff's race.

35.     In 2021, following receipt of the 2020 Census, the Commissioners Court conducted a full redistricting process. The legal firm Bickerstaff, Heath, Delgado, Acosta LLP—an Austin, Texas-based law firm—was retained to provide counsel and an analysis of population growth, demographic changes, and voting rights obligations. Redistricting criteria were adopted. The County had hired the same firm in 2011, which facilitated a redistricting process that likewise included the adoption of redistricting criteria.

36.     The demographic analysis revealed that while Tarrant County's population had increased significantly, the growth was even across the county. The total population deviation among the four commissioner precincts was less that 2 percent, well within the 10 percent allowable deviation.

37.     The analysis also confirmed that the existing boundaries complied with other state and federal laws.

10

38.    Following the legal analysis and the adoption of criteria, the Commissioners Court engaged in an extensive process over several weeks—notwithstanding the compressed timeframe caused by the delayed Census data release—that included public input from hearings, town hall meetings, and other fora.

39.    After deliberation and consideration of alternative maps, the Court voted with a 4-1 bipartisan majority to adopt the existing boundaries to serve as the Commissioners Court map for the decade.

40.    The Benchmark Map includes two districts (Precincts 1 and 2) that are majority-minority and elect the minority candidate of choice, and two districts (Precincts 3 & 4) that elect the Anglo-preferred candidate.

41.    The Benchmark Map's precincts are geographically centered in the County's four quadrants and are compact.

### Racially Divisive Tenure of County Judge Tim O'Hare

42.    In 2022, incumbent Tarrant County Judge, Anglo Republican Glen Whitley, did not run for re-election and was replaced by Anglo Republican Tim O'Hare.

43.    While winning county-wide over Black Democrat, Deborah Peoples, O'Hare lost to Peoples in both Commissioner Districts 1 and 2.

44.    O'Hare has a noted history of divisive actions against minority citizens.

45.    As a city councilman and Mayor in the small Dallas County City of Farmers Branch, O'Hare led an aggressive anti-immigrant effort that included passing a city resolution blocking undocumented immigrants from being able to

secure housing in Farmers Branch. A federal lawsuit filed on behalf of minority plaintiffs ultimately resulted in a judgment against Farmers Branch costing the city more than $6 million.

46.    While serving as the Tarrant County Republican Party Chair, O'Hare formed an alliance with True Texas Project, an extremist organization based in Tarrant County that has been identified as an anti-government hate group by the Southern Christian Leadership Conference. Its leaders made comments following the mass killings of Hispanics in El Paso justifying the actions of the shooter.

47.    While campaigning for County Judge, O'Hare was recorded saying, "if you're a Republican office holder and you haven't been called a racist, then you probably haven't done a thing."

48.    After becoming County Judge, O'Hare encouraged the questioning of the 2020 election results and the competence of the Tarrant County Elections Office, led by Hispanic Heider Garcia. Garcia's office had been rated highly. Republican Secretary of State, John Scott, praised Garcia saying, "If you were building a prototype for an election administrator, you would just copy Heider Garcia."

49.    O'Hare ultimately forced the resignation of Garcia, who had been harassed and threatened.

50.    As part of his effort to close early voting sites in locations convenient to students and minority citizens, O'Hare scheduled the vote at a time when both Black members of the County Commission, Roy C. Brooks in Precinct 1 and Alisa Simmons in Precinct 2, were out of town.

51.    While presiding as County Judge, O'Hare made the following comment to Black Commissioner Alisa Simmons in an open Commissioners Court meeting in April, 2024: "I'm the one talking now, so you'll sit there and be quiet and listen to me talk."

52.    Longtime Black Precinct 1 Commissioner Roy Brooks did not seek re-election in 2024. His former aide, Roderick Miles, a Black man, was elected and is the current Precinct 1 Commissioner.

53.    The most recent American Community Survey of citizen voting age population ("CVAP") confirms that, under the Benchmark Map, Precincts 1 and 2 are majority minority CVAP, while Precincts 3 and 4 are majority Anglo CVAP:

### 2025 Mid-Decade Redistricting and
### Retention of Virginia-Based PILF and Adam Kincaid

54.    On April 2, 2025, Judge Tim O'Hare initiated a mid-decade redistricting of the Tarrant Commissioner Precincts with the proposal that Virginia-based PILF be retained to provide advice and facilitate redrawing precinct boundaries.

55.    The Commission approved retaining PILF on a 3-2 vote with Commissioners Alisa Simmons and Roderick Miles voting "no."

56.    PILF provided no written population or legal analysis of Tarrant County Commissioner Precinct boundaries.

57.    No criteria for conducting a redistricting process were proposed or voted upon. Adopting criteria is common in the redistricting process in Texas and elsewhere.

58.    This was in stark contrast to the 2021 Tarrant County redistricting process, where the Commission adopted a Resolution on September 28, 2021, setting forth nine criteria: (1) adhering to identifiable geographic boundaries, (2) maintaining communities of interest and avoiding splitting neighborhoods, (3) avoiding the splitting of voting precincts in a way that creates practical election administration issues, (4) basing any new map on the existing commissioner precincts, (5) having an overall population deviation that does not exceed 10 percent, (6) having compact and contiguous precincts, (7) giving consideration to preserving incumbent-constituency relations, (8) avoiding racial gerrymandering, and (9) complying with the Voting Rights Act. Similar criteria were adopted for the 2011 redistricting process, where the same Texas-based law firm hired in 2021 was retained.

59.    An extremely expedited timeline was ordered by County Judge calling for a vote on new maps by June 3, 2025, just two months following initiation of the process. This timeline is more compressed than the redistricting timelines that were necessitated by the COVID pandemic in 2021, where Census data was released in late August and redistricting maps were required to be enacted by Texas counties by mid-November 2021. Yet Tarrant County had no delayed-Census data or pandemic to blame for its compressed time schedule for its unnecessary mid-decade redistricting.

60.    PILF contracted with Adam Kincaid, a Virginia-based mapdrawer to configure maps.

61.    PILF attorney Joe Nixon led the redistricting process. At the May 6, 2025 Commissioners Court meeting, responding to questions by Commissioner

Simmons about PILF's prior cases, Mr. Nixon said "I have never once had anyone say anything what you just said publicly, and I am embarrassed for you for having said those things about me."

62.    PILF initiated one remote meeting separately with Commissioners Simmons and Miles prior to proposed maps being released. No demographic analysis nor legal justification for new maps were provided. They were asked only what changes they wanted to the map.

63.    On May 5, 2025, only a month after initiating the process, PILF released five proposed maps drastically reconfiguring the two majority-minority districts, Precincts 1 and 2. Two additional maps were released on May 28, 2025 ("Map 6") and May 29, 2025 ("Map 7"). The maps were drawn by Mr. Kincaid in Virginia.

64.    The proposed maps were made public on the Tarrant County website with relatively crude depictions showing little geographic detail, including only basic election results and posted shapefiles.

65.    No demographic information accompanied the maps online or has been released from PILF or the County – no breakdown of the number of people moved from one district to another, no demographic breakdown by race or any other factor, and no analysis of the effect on city boundaries or other communities of interest.

66.    Commissioner Simmons submitted a written request for population and demographic details and specifically asked to speak with or otherwise communicate with the map drawer. She repeated the request to Judge O'Hare and Mr. Nixon with PILF. Her repeated requests were ignored.

67.    While neither PILF, the mapdrawer Mr. Kincaid, nor Judge O'Hare have disclosed or made public any data for any proposed map beyond topline election results, O'Hare stated to media that other extensive data was used to configure the maps. He confirmed to a local news affiliate that there was a broad range of data considered: "They're looking at all sorts of things," he said. "It's a very comprehensive look. The demographer, I think, is one of the top demographers in the country. The lawyers – this is what they do for a living."

68.    During the April 2, 2025 meeting of the Commissioners Court, Commissioner Simmons raised concerns regarding PILF's past work, and Judge O'Hare responded, "I don't answer to you." He also threatened to have a member of the public removed from the hearing.

69.    All of the proposed maps, including the adopted Map 7, destroy the relatively compact features of Precincts 1 and 2, intertwining them to remove large minority neighborhoods in Precinct 2 and placing them into Precinct 1, while removing Anglo neighborhoods from Precinct 1 and placing them in Precinct 2.

70.    Under Map 7, Precinct 2 has become an Anglo majority district in which the ability of minority citizens to elect their candidate of choice is eliminated.

71.    The minority population in Precinct 1 was substantially increased, diluting the voting strength of minorities in an already performing district.

72.    Major economic and cultural landmarks were removed from Precinct 1 including the historic Black neighborhood of Lake Como, Texas Christian University, and the entire Downtown Fort Worth sector.

73.    Under the Benchmark Map, Precinct 1 has over 160 miles of County roads maintained and serviced. Under the proposed maps, nearly all of these road miles are removed.

74.    Anglo-controlled Precincts 3 and 4 underwent relatively minor changes under Map 7 apart from being awarded cultural landmarks and economic assets removed from Precincts 1 and 2.

75.    Only four public community meetings were held, and all four were held barely three weeks after the first five proposed maps were released and before the last two proposed maps were made public. Map 7, which was ultimately adopted, was among the two not available for any of the public community meetings. Map 7 was released only three days before it was adopted at the June 3, 2025 meeting.

76.    PILF refused requests from both Commissioners Miles and Commissioner Simmons to attend and/or help answer public questions and provide information at the public meetings held in their districts. Mr. Nixon responded to Commissioner Simmons' request that he attend her community meeting by saying that he feared for his safety if he attended the gathering of Tarrant County voters in her precinct.

77.    During the meeting in Commissioner Miles's Precinct, a PILF lawyer was present in the back of the room and then outside the room but would not come to the front of the room when that was requested.

78.    At the Commissioners Court meeting on May 29, 2025, again neither Mr. Nixon nor any other representative from PILF was available to provide additional

17

information on the maps or to answer questions posed by Commissioners Simmons and Miles.

79.     The City Councils from the two largest cities in the Tarrant County - Fort Worth and Arlington (both majority minority cities) – passed resolutions calling on the Commissioners Court to end consideration of new maps until following the 2030 Census, each citing concerns of voting rights violations.

80.     At the request of Commissioners Simmons and Miles, the University of California in Los Angeles Voting Rights Project conducted an analysis of the seven proposed maps and concluded, "Black and Latino voters demonstrate strong political cohesion, while White voters consistently vote as a bloc against minority-preferred candidates. The current enacted map supports two opportunity districts where minority voters have the ability to elect candidates of their choice. However, all seven proposed maps from the Public Interest Legal Foundation undermine this structure by concentrating minority voters into a single district, effectively diminishing their political influence elsewhere in the county."

### *Adoption of Map 7*

81.     On June 3, 2025, the Commissioners Court approved, in a 3-2 vote, an Order adopting Map 7, to take effect immediately. At the meeting, Commissioner Ramirez—who voted in favor of the map—commented: "I've heard a lot about the process; and I will agree with a lot of what folks have said. I think the process, it had flaws. I t could have been a lot more comprehensive."

82.     Map 7 is shown below:

**OPTION 7**



83.     Map 7 packs minority voters into Precinct 1—with a gerrymandered configuration that violates traditional districting principles—with the purpose being at least in part to dilute minority voting strength. The map is shown below overlaid over the racial composition of Tarrant County, revealing how Map 7 altered the Benchmark Map to pack minority voters into Precinct 1 (shifting minority voters out of Precinct 2) and remove Anglo voters from Precinct 1 so as to make it possible to convert Precinct 2 from a majority-minority precinct into an Anglo-majority precinct. Because it was impossible to pack all of the County's minority voters into a single precinct, the remaining minority population is cracked between the remaining three precincts where they are subsumed by large Anglo majorities.



84.     Because of the substantial changes to the map, over 300,000 persons of voting age are shifted between even- and odd-numbered precincts. Because the Commissioners' terms are staggered, this means that voters who were in even-numbered precincts would have been entitled to vote in the November 2026 election—four years after they last voted for Commissioner. But because over 150,000 persons of voting age are shifted from an even-numbered to an odd-numbered precinct, those people are disenfranchised by Map 7—denied the right to vote for a commissioner when they would be otherwise eligible to do so in 2026. Their right to vote is denied for 2026 and abridged in that it is delayed until 2028—six years after they last participated in electing candidates to a four-year term. Although this consequence may be lawful when the map requires redrawing after a fresh Census shows the map not to comply with the one person, one vote rule, this consequence is insufficiently

supported by a sufficiently weighty government interest when undertaken mid-decade, with a map within population deviation, and done so with no other justification for the change except race and a professed (and pretextual) claim that maximizing partisan advantage explained the action.

85.    The racial disparity among voters who are disenfranchised by being denied the right to vote in the 2026 commissioner election is stark. Anglos make up 47% of Tarrant County's voting age population, yet comprise just 24% of the voting age population disenfranchised by having their right to vote in the 2026 commissioner election eliminated. Just 5% of the County's Anglo voting age population—roughly 1 in 20 Anglo voters—experiences disenfranchisement for the 2026 election under Map 7.

86.    By contrast, African Americans make up 18% of Tarrant County's voting age population yet comprise 29% of the voting age population disenfranchised by having their right to vote in the 2026 commissioner election eliminated, with roughly 48,000 Black voters denied the right to vote for commissioner in 2026 under Map 7. That means that nearly 1 in 5 eligible Black voters in Tarrant County (19%) suffer disenfranchisement in the 2026 election under Map 7.

87.    Likewise, Latinos comprise 26% of Tarrant County's voting age population, yet comprise 30% of the voting age population disenfranchised by having their right to vote in the 2026 commissioner election eliminated. Under Map 7, 12% of Tarrant County's Latino voters suffer disenfranchisement in the 2026 election (49,325 adult Latinos).

88.    Under Map 7, Black Tarrant County voters are therefore four times more likely than Anglo Tarrant County voters to be disenfranchised in the 2026 election, and Latino Tarrant County voters are over twice as likely as Anglo Tarrant County voters to be disenfranchised in the 2026 election.

89.    Map 7 thus visits a literal denial of the right to vote on account of race in the 2026 commissioner elections as well as an abridgement of the right to vote on account of race by postponing voting in a racially discriminatory manner until 2028. Map 7 thus makes the "political processes leading to nomination or election . . . not equally open to participation" by 1) members of a class of Black citizens and 2) members of a class of Latino citizens. 52 U.S.C. § 10301(a) & (b).

90.    The size of the burden is severe—the affected voters are outright denied the right to cast a ballot for commissioner in 2026 that absent the imposition of Map 7 they would have been able to cast. In order to cast their ballot in 2026 as they were entitled prior to Map 7's imposition, the affected voters must *move* if they wish to vote.

91.    Defendants' mid-decade redistricting drastically departs from standard practice in 1982 when Section 2 was amended. County governments whose maps have balanced populations did not in 1982 engage in mid-decade redistricting in a manner that disenfranchises voters from casting ballots in a starkly racially disparate manner when the map being altered was in compliance with the one person, one vote requirement.

92.    Defendants have not proffered any legitimate or sufficient justification to warrant this racially discriminatory disenfranchisement scheme, particularly given that the Benchmark Map's precincts were not malapportioned

## CAUSES OF ACTION

### COUNT 1

*Vote Denial or Abridgment through Disenfranchisement*
*Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, 42 U.S.C. § 1983*

93.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

94.    Section 2 of the Voting Rights Act provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

95.    A violation is established if "based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens . . . in that its members have less opportunity to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

96.    The adopted Map 7 results in a denial or abridgment of the right of Plaintiffs and a class of Black voters and a class of Latino voters to vote on account of race because it disenfranchises them from voting in the November 2026 election for Commissioner, despite that being the year in which they were eligible to cast a

ballot before the adoption of Map 7. That denial or abridgment of the right to vote in the four-year cycle of Commissioner terms has a stark racial effect. Just 5% of Tarrant County's Anglo adults are affected while 19% of its Black and 12% of its Latino adults are disenfranchised.

97.    Defendants' map thus results in a denial or abridgment of the right to vote on account of race, and by disenfranchising a large class of Black voters and a large class of Latino voters, Defendants have created a situation in which the political process for nomination and election of Commissioners is not equally open and both Black and Latino voters have less opportunity to elect their candidate of choice in the November 2026 election than do Anglo voters.

98.    Moreover, mid-decade redistricting is exceedingly rare and has only been approved by the Supreme Court when done to replace a court-imposed map with a legislatively enacted map. It was not a common practice when Section 2 was last amended in 1982. And that is especially so for a map that is legally apportioned under the one-person, one-vote requirement.

99.    Defendants have no legitimate interest that is served by disproportionately disenfranchising Black and Latino voters. There is no population imbalance that needs to be remedied thus warranting movement of voters from even- to odd-numbered districts resulting in racially disparate disenfranchisement. No legitimate interest explains the stark racial disparity.

100.    Both Black voters and Latino voters in Tarrant County have suffered from past official discrimination in voting, and the effects of that discrimination persist. For example, Tarrant County's congressional districts adopted in 2011 were

found by a three-judge federal court to be intentionally discriminatory in violation of the Fourteenth Amendment. Another three-judge federal court conclude that the 2011 state senate map was intentionally racially discriminatory in its fragmentation of Black and Latino voters in Senate District 10 in Tarrant County. The United States Supreme Court affirmed a finding that the 2013 Texas legislature engaged in unconstitutional racial gerrymandering in configuring House District 90 in Tarrant County. In *Veasey v. Abbott*, the en banc Fifth Circuit affirmed a finding that Texas's voter ID law had racially discriminatory results in violation of Section 2, and remanded for a reweighing of evidence of discriminatory intent, concluding that there was sufficient evidence in the record to support a finding of intentional discrimination on remand—though that issue ultimately was ruled unnecessary to reach after the case was mooted by the adoption of remedial legislation.

101.    Under the totality of circumstances, Black voters and Latino voters do not have an equal opportunity to elect their candidates of choice because the map results in a massive racial disparity in which voters are disenfranchised in the November 2026 election. Moreover, other direct and circumstantial evidence supports discriminatory purpose as a motivating factor behind the new plan, including the factors described in *Brnovich v. Democratic National Committee*, 594 U.S. 647 (2021).

## COUNT 2

*Unconstitutional Burden on the Right to Vote*
*First and Fourteenth Amendments to the United States Constitution*
*U.S. Const. amend. I & IV; 42 U.S.C. § 1983*

102.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

103.    Defendants' adoption of Map 7 places an undue burden on Plaintiffs' right to vote by needlessly disenfranchising them from being able to cast a ballot when they were otherwise next entitled to vote for County Commissioner in November 2026, and instead forcing them to await the November 2028 election.

104.    That burden is severe in that Plaintiffs are fully prevented from casting a ballot for this contest in the election in which they were next eligible, and instead forced to wait six rather than four years to participate in the election that decides the composition of the County's governing body.

105.    The burden is also discriminatory. As discussed above, Black voters and Latino voters are disproportionately burdened, while Anglo voters are disproportionately unburdened.

106.    Map 7 is not narrowly tailored to further a compelling government interest. The map was within equal population requirements—with just under a 2% overall population deviation. Defendants have asserted a pretextual partisan gerrymandering interest. But although federal courts lack Article III jurisdiction to adjudicate claims that a map is an unconstitutional partisan gerrymander, that does not make partisan gerrymandering a compelling interest that justifies the configuration of lines in a manner that disenfranchises over 150,000 voters from voting in the election in which they were next eligible to cast a ballot. "Partisan gerrymanders . . . are incompatible with democratic principles." *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 791 (2015) (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 292 (2004) (plurality)) (cleaned up). Such an interest is

entirely arbitrary, anti-democratic, and not a legitimate—let alone important or compelling—government interest sufficient to permit disenfranchising voters.

107.    Moreover, Defendants' purpose to dilute Black voting strength and Latino voting strength, illustrated by Judge O'Hare's comments in his NBC 5 interview on the day of the redistricting vote, is not a compelling interest.

108.    Nor are these important regulatory interests, even if strict scrutiny did not apply.

109.    Defendants' adoption of Map 7 treats similarly situated voters differently. It provides favorable treatment to some voters who were next eligible to vote in either November 2026 or November 2028 by affording them the right to vote for commissioner in November 2026. It treats other voters who were next eligible to vote in November 2026 unfavorably by forcing them to wait until November 2028.

110.    And it does so for no good reason. The map was not malapportioned, and neither a partisan purpose nor a racial purpose provides a sufficient justification for this unequal treatment of County residents.

111.    Moreover, the County's action unduly burdens a particular group—Black voters and Latino voters. But even under the County's (pretextual) framing, its action would unduly target Democratic voters. While the map cannot be challenged in federal court as a partisan gerrymander, that does not make it lawful to disenfranchise over 150,000 voters from voting in the next commissioner election because the County disagrees with their political views. It thus constitutes viewpoint discrimination in violation of the First Amendment.

## COUNT 3

### *Intentional Racial Discrimination*
### *Fourteenth Amendment to the U.S. Constitution*
### *U.S. Const. amend. XIV; 42 U.S.C §1983; 52 U.S.C. § 10301, et seq.*

112.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

113.    Map 7 and the process by which it was adopted violate the equal protection clause of the Fourteenth Amendment to the U.S. Constitution, which forbids state action for which a racially discriminatory intent or purpose is a motivating factor and which produce discriminatory results. This includes laws that use race as a means to gain political or partisan advantage.

114.    One of the motivating factors in the drawing and passage of Tarrant County's new redistricting plan was a racially discriminatory purpose. Specifically, the plan was drafted and passed in a process designed to be discriminatory, at least in part to minimize the political power of Black voters and Latino voters by limiting their ability to influence commissioner court elections to a single district out of four when minorities are the majority of residents in the County and just shy of half of eligible voters in Tarrant County. Judge O'Hare expressly stated on the day of the vote that he disagreed with Black voters' electoral choices, that they need to change how they vote, and that "all races" should agree with him politically.

115.    The map was likewise drawn to intentionally discriminate against both Black voters and Latino voters by vastly and disproportionately disenfranchising them from voting in the 2026 election for commissioner.

116.    The plan will also produce discriminatory results for Black voters and Latino voters—a fact Defendants were well aware of when drafting, passing, and beginning to implement the new maps.

117.    Moreover, other direct and circumstantial evidence supports discriminatory purpose as a motivating factor behind the new plan, including the factors described in *Village of Arlington Heights v. Metropolitan Housing Development Corp*, 429 U.S. 252 (1977).

<u>COUNT 4</u>

*Intentional Racial Discrimination*
*Fifteenth Amendment to the U.S. Constitution*
*U.S. Const. amend. XV; 42 U.S.C §1983; 52 U.S.C. § 10301*

118.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

119.    Map 7 and the process by which it was adopted violate the Fifteenth Amendment to the U.S. Constitution, which forbids state action for which a racially discriminatory intent or purpose is a motivating factor and which produce discriminatory results. This includes laws that use race as a means to gain political or partisan advantage. Map 7 violates the Fifteenth Amendment by packing minority voters into a single precinct and cracking the remaining minority population across the other precincts in which they will be subsumed by Anglo voters, in order to dilute their voting strength on account of race. The map has the intended discriminatory effect, reducing from two to one the number of precincts in which minority voters can elect their candidate of choice. It likewise violates the Fifteenth Amendment because Map 7 was drawn to intentionally discriminate against both Black and Latino voters

by vastly and disproportionately disenfranchising them from voting in the 2026 election for commissioner.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.  Issue a declaratory judgment that Map 7 results in the denial or abridgment of the right of both Black voters and Latino voters to vote in the 2026 commissioner election on account of race by disproportionately shifting them from even-numbered to odd-numbered precincts, providing them less opportunity to participate in the political process leading to nomination and election of commissioners in the 2026 election, in violation of Section 2 of the Voting Rights Act;

2.  Issue a declaratory judgment that Map 7 imposes and undue burden on Plaintiffs' right to vote under the First and Fourteenth Amendments by imposing a severe burden through disenfranchising those otherwise eligible to vote for commissioner in November 2026, that Map 7 is not narrowly tailored to serve a compelling interest nor is it supported by an important governmental interest, and it imposes an undue burden on a particular group of minority voters and/or voters based upon their viewpoints;

3.  Issue a declaratory judgment that Map 7 intentionally discriminates against Black voters and Latino voters by disproportionately shifting them from even-numbered to odd-numbered precincts to minimize their ability to participate in the 2026 election compared to Anglo voters, in violation of the Fourteenth and Fifteenth Amendments;

30

4.   Issue a declaratory judgment that Map 7 unlawfully dilutes minorities' voting rights, through intentional racial discrimination in the configuration of precinct boundaries in violation of the Fourteenth and Fifteenth Amendments;

5.   Preliminarily and permanently enjoin Defendants from implementing the Tarrant County Commissioners Court Order adopting Map 7, including but not limited to by calling, holding, supervising, or certifying any elections under Map 7. Plaintiffs have no adequate remedy at law other than the judicial relief sought herein and unless Defendants are enjoined from using the adopted Commissioners Court plan, Plaintiffs will be irreparably injured by the continued violation of their constitutional and statutory rights;

6.   Declare that, as a result of the injunction against implementation of the Tarrant County Commissioners Court Order adopting Map 7, the Benchmark Map that preexisted the adoption of Map 7 is necessarily revived as the operative map of Tarrant County Commissioners precincts and that the Benchmark Map complies with federal equal population requirements;

7.   Retain jurisdiction over this matter and require all Defendants to subject future redistricting plans for preclearance review from this court under Section 3(c) of the VRA, 52 U.S.C. § 10302(c);

8.   Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to Fed. R. Civ. P. 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e);

9.   Grant an order retaining jurisdiction over this matter until the Defendants, their agents, employees, and those persons acting in concert with them have complied with all orders and mandates of this Court; and

10.   Grant such other and further relief as it deems is proper and just.


Dated: June 17, 2025                              Respectfully submitted,

                                                  */s/ Chad W. Dunn*
                                                  _____

Mark P. Gaber*                                    Chad W. Dunn
DC Bar No. 988077                                 TX Bar No. 24036507
MARK P. GABER PLLC                                BRAZIL & DUNN, LLP
P.O. Box 34481                                    1900 Pearl Street
Washington, DC 20043                              Austin, TX 78705
(715) 482-4066 Phone                              (512) 717-9822 Phone
mark@markgaber.com                                (512) 515-9355 Facsimile
                                                  chad@brazilanddunn.com
George (Tex) Quesada
TX Bar No. 16427750                               Jesse Gaines
Sean J. McCaffity                                 TX Bar No. 07570800
TX Bar No. 24013122                               LAW OFFICE OF JESSE L. GAINES
SOMMERMAN, MCCAFFITY, QUESADA                     Post Office Box 50093
  & GEISLER, L.L.P .                              Fort Worth, TX 76105
3811 Turtle Creek Blvd, Suite 1400               817-714-9988 Phone
Dallas, TX 75219                                  gainesjesse@ymail.com
(214) 720-0270 Phone
(214) 720-0184 Facsimile
quesada@textrial.com
smccaffity@textrial.com


*Admitted *pro hac vice*