# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

WINNIE JACKSON, *et al.*,

        Plaintiffs,

v.

TARRANT COUNTY, TEXAS, *et al.*,

        Defendants.

CIVIL ACTION NO. 4:25-cv-00587-O

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Mark P. Gaber (admitted *pro hac vice*)
DC Bar No. 988077
MARK P. GABER PLLC
P.O. Box 34481
Washington, DC 20043

Chad W. Dunn
TX Bar No. 24036507
BRAZIL & DUNN, LLP
1900 Pearl Street
Austin, TX 78705

George (Tex) Quesada
TX Bar No. 16427750
Sean J. McCaffity
TX Bar No. 24013122
SOMMERMAN, MCCAFFITY, QUESADA
 & GEISLER, L.L.P.
3811 Turtle Creek Blvd, Suite 1400
Dallas, TX 75219

Jesse Gaines
TX Bar No. 07570800
LAW OFFICE OF JESSE L. GAINES
Post Office Box 50093
Fort Worth, TX 76105

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................................ ii

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 2

   I.   Commissioners Court structure ........................................................................ 2

   II.  2021 Tarrant County redistricting process ....................................................... 2

   III. 2025 Tarrant County redistricting .................................................................. 4

ARGUMENT ................................................................................................................. 8

   I.   Plaintiffs are likely to succeed on their disenfranchisement claims. ................... 8

      A. Plaintiffs are likely to prevail on their Section 2 claim. ............................... 8

      B. Plaintiffs are likely to succeed on their First and Fourteenth Amendment
         disenfranchisement claims. ...................................................................... 12

   II.  Plaintiffs are likely to prevail on their intentional racial vote dilution claims. ...... 16

      A. Judge O'Hare's comments are direct evidence of intentional racial vote dilution........ 18

      B. The *Arlington Heights* factors support a finding of intentional racial vote dilution. .... 19

         1. Map 7 has a discriminatory effect by diminishing the voting strength of Black
           and Latino voters and increasing the voting strength of Anglo voters. .................. 19

         2. The historical evidence supports an inference of discriminatory intent.................... 20

         3. The sequence of events and procedural and substantive deviations support an
           inference of intentional discrimination. .................................................... 21

         4. Contemporary statements reveal a discriminatory purpose.................................. 23

   III. Plaintiffs will be irreparably harmed if Map 7 is not enjoined. ......................... 23

   IV. The balance of equities weights in favor of an injunction. ................................ 24

CONCLUSION ............................................................................................................ 25

CERTIFICATE OF SERVICE ....................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. South Carolina State Conference of NAACP*, 602 U.S. 1 (2024) ............................ 16

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ................................................................................. 15

*Arizona State Legislature v. Arizona Independent Redistricting Commission*,
    576 U.S. 787 (2015) .................................................................................................................. 11

*Bartlett v. Strickland*, 556 U.S. 1 (2009) (plurality) ..................................................................... 18

*Brnovich v. Democratic National Committee*, 594 U.S. 647 (2021) ............................... 8, 9, 10, 11

*BST Holdings v. OSHA*, 17 F.4th 604 (5th Cir. 2021) ............................................................. 24, 25

*Charles H. Wesley Educational Foundation, Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005) .......... 25

*Cooper v. Harris*, 581 U.S. 285 (2017) ................................................................................... 16, 19

*Deerfield Medical Center v. City of Deerfield Beach*,
    661 F. 2d 328 (5th Cir. Unit B Nov. 1981) .............................................................................. 24

*DeLeon v. Perry*, 975 F. Supp. 2d 632 (W.D. Tex. 2014) ............................................................. 24

*Dollinger v. Jefferson County Commissioners Court*,
    335 F. Supp. 340 (E.D. Tex. 1971) .......................................................................................... 13

*Donatelli v. Mitchell*, 2 F.3d 508 (3d Cir. 1993) .......................................................................... 13

*G & V Lounge, Inc. v. Michigan Liquor Control Commission*,
    23 F.3d 1071 (6th Cir. 1994) .................................................................................................... 25

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ................................................................................ 24

*Ingebretsen v. Jackson Public School District*, 88 F.3d 274 (5th Cir. 1996) ............................... 24

*In re Khanoyan*, 637 S.W.3d 762 (Tex. 2022) ......................................................................... 13, 14

*League of United Latin American Citizens v. Abbott*,
    601 F. Supp. 3d 147 (W.D. Tex. 2022) .................................................................................... 16

*League of Women Voters of North Carolina v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) .................................................................................................... 24

*Mader v. Crowell*, 498 F. Supp. 226 (M.D. Tenn. 1980) .............................................................. 13

*Mayor & Council of Tucson v. Royal*, 510 P.2d 394 (Ariz. App. Div. 2 1973) ............................ 13

*Pate v. El Paso County*, 337 F. Supp. 95 (W.D. Tex. 1970) .......................................................... 13

*Pereira v. Town of North Hampstead*, 682 F. Supp. 3d 234 (E.D.N.Y. 2023) ............................. 13

*Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017) ......................................................... 17, 20

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979) .......................... 17, 19

*Petteway v. Galveston County*, 698 F. Supp. 3d 991 (S.D. Tex. 2023) ................................... 21, 22

*Republican Party of Oregon v. Keisling*, 959 F.2d 144 (9th Cir. 1992) ....................................... 12

*Rogers v. Lodge*, 458 U.S. 613 (1982) ...................................................................... 16

*Rucho v. Common Cause*, 588 U.S. 684 (2019) ................................................... 11, 15

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .............................................................. 9

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (*en banc*) .......................... 16, 17, 18, 20

*Vidal v. Elster*, 602 U.S. 286 (2024) ..................................................................... 15

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977) ........................................................................... 17, 18, 19, 20

**Constitutional Provisions**

U.S. Const. amend. XIV § 1 ................................................................................ 24

U.S. Const. amend. XV § 1 ................................................................................. 24

Tex. Const. art. 5, § 18(b) .................................................................................... 2

Tex. Const. art. 5, § 18(d) ............................................................................... 2, 13

Tex. Const. art. 16, § 64 ................................................................................. 2, 13

**Statutes**

52 U.S.C. § 10301(a) ........................................................................................... 8

52 U.S.C. § 10301(b) ................................................................................... 8, 10, 12

# INTRODUCTION

On the day he cast the deciding vote to reduce from two to one the number of majority-minority commissioner precincts, Tarrant County Judge Tim O'Hare said the following in a television interview: "The policies of Democrats continue to fail Black people over and over and over, but many of them keep voting them in. It's time for people of all races to understand the Democrats are a lost party, they are a radical party, it's time for them to get on board with us and we'll welcome them with open arms." App. 16.

A government official may not, consistent with the Fourteenth and Fifteenth Amendments, cast the deciding vote to redraw district lines in a way that minimizes a racial group's voting power because he disapproves of how "Black people" cast their ballots and thinks that "people of all races" should change their views because "it's time for them to get on board with us." This is textbook intentional racial vote dilution, spoken out loud. It does not matter whether partisanship was some or even most of the motivation. The deciding vote was cast at least in part because of an intent to dilute voting power on account of race, and the resulting map is unconstitutional.

But the map fails even before reaching the intentional racial vote dilution question because it shifts over 150,000 adults from even- to odd-numbered precincts without any population equality or other legitimate justification. By doing so, the map disenfranchises a large swath of voters who were otherwise eligible to vote for commissioner in 2026. These voters must now wait six, rather than four, years to participate in electing commissioners. This disenfranchisement does not affect Tarrant County voters equally. Instead, it disproportionately targets Black and Latino voters. Black Tarrant County adults are three to four times more likely to be disenfranchised than Anglo adults, and Latino adults are two to three times more likely to be disenfranchised than Anglo adults. This racially disparate disenfranchisement violates Section 2 of the Voting Rights Act. It likewise

violates the First and Fourteenth Amendments. Governments may not redraw maps with staggered term elections in a way that causes a particular group to experience disenfranchisement in this manner. Yet the County's map does exactly that, both in its targeting of Black and Latino voters and Democratic voters. Treating similarly situated voters unequally in this manner violates the Fourteenth Amendment. And targeting voters of a particular political party for disenfranchisement is viewpoint discrimination in violation of the First Amendment. Neither a desire for "Black people" to "get on board" with the decisionmaker's views nor a desire to engage in partisan gerrymandering constitutes a sufficient government interest to unequally disenfranchise voters in this manner.

The County's map should be enjoined.

## FACTUAL BACKGROUND

### I. Commissioners Court structure

Under the Texas Constitution, Commissioners Courts—which consist of four commissioners elected from precincts and the County Judge—are the governing body of Texas counties. Tex. Const. art. 5, § 18(b). Commissioners are elected in staggered elections and they "shall hold [] office for four years and until [a] successor shall be elected and qualified." *Id.*; *see also* Tex. Const. art. 16, § 64. The Texas Constitution provides that even if redistricting causes commissioners to no longer reside in the precinct from which they were elected, commissioners "shall serve in the precinct to which each was elected or appointed for the entire term to which each was elected or appointed, even though the change in boundaries places the person's residence outside the precinct for which he was elected or appointed." Tex. Const. art. 5, § 18(d).

### II. 2021 Tarrant County redistricting process

The 2020 Census revealed that Tarrant County's population grew by over 300,000 since 2010, with a total population of 2,110,640. App. 2. The County's Anglo population decreased,

with its non-Anglo population entirely responsible for the growth—making the County majority-minority by total population. App. 2.

In 2021, the Tarrant County Commissioners Court retained the Austin, Texas law firm Bickerstaff, Heath, Delgado, Acosta LLP ("Bickerstaff") to assess the need for redistricting of the commissioner precincts following the 2020 Census. App. 10. On September 28, 2021, the Commissioners Court approved Order 136431 adopting neutral redistricting criteria. App. 11, 174-75.

Bickerstaff reported that the four precincts in effect at the time ("Benchmark Map") had just a 1.97% overall population deviation. App. 11, 119. On November 2, 2021, the Commissioners Court approved an Order retaining the existing precinct boundaries. App. 13, 176-77. That approval came after the Commissioners Court heard from some members of the public who supported a different configuration that would have combined Tarrant County's minority population largely into a single precinct. The proponent, former Rep. Bill Zedler, commented that his proposal "accounts for growth of minority communities and attempts to include them within common districts." App. 13. Bickerstaff attorney Mr. Heath warned the Commissioners Court that the proposal violated several adopted redistricting criteria and "moves a substantial minority population out of district 2 and into district 1" and raises "questions under the Voting Rights Act." App. 13. That map is shown below on the left, with the darker shading reflecting proposed Precinct

1, where the minority population is concentrated. On the right is the 2011 map that was readopted instead.

**Rejected 2021 Proposal**                    **Readopted 2011 Map**

 

App. 12.

### III. 2025 Tarrant County redistricting

On April 2, 2025, the Commissioners Court voted 3-2 to approve a contract with the Virginia-based Public Interest Legal Foundation ("PILF") to assist in conducting a mid-decade redistricting of the commissioner precincts. App. 13. PILF attorney Joe Nixon presented to the Commission just once, at its May 6, 2025 meeting, and in response to questions from Black Commissioner Alisa Simmons regarding PILF's prior work, Mr. Nixon told Commissioner Simmons that he was "embarrassed for [her]." App. 14. While a public meeting was conducted in each precinct between May 13 and May 21, 2025, all four meetings occurred before the final two map options—Maps 6 and 7—were publicly released on the County's website. App. 14-15. PILF attorneys refused to address the public at any public meetings. App. 15. This stood in stark contrast to prior redistricting cycles, where Bickerstaff attorneys conducted the public input process and spoke regularly with members of the public at them. App. 10-11, 13. Instead, at the May 20, 2025

commissioners meeting, Commissioner Simmons had her staff present to the Commissioners Court, including by showing how the proposed maps would pack minority voters into a single super-majority precinct and create three Anglo-majority precincts. App. 15.

On June 3, 2025—just days after Maps 6 and 7 were released—the Commissioners Court held its vote. This was so even though Judge O'Hare had said on April 2 that he intended the maps to be available for public consideration for two to two-and-half weeks prior to the vote. App. 13, 16. When Commissioner Simmons requested that PILF lawyers come to the meeting room and be available for questions in a public setting—something that Bickerstaff attorneys had done in prior cycles—Judge O'Hare responded that PILF had said they would not present publicly and "you don't have subpoena power to make them come out here." App. 15. Shortly after, Judge O'Hare threatened to have all members of the public removed from the meeting if anyone made noise. App. 15. The Court voted 3-2 to reject a proposal to postpone the vote until the public had an opportunity to review Map 7, and then voted 3-2 to adopt Map 7, effective immediately. App. 15.

Map 7 is shown below on the left. On the right is Map 7 with racial demographics shown, with increasing shares of minority population from blue to green to orange. App. 58.



<strong><u>Map 7</u></strong>           <strong><u>Map 7 Racial Demographics</u></strong>

The racial effect of Map 7 is stark. Substantial numbers of Black and Latino voters were shifted out of Precinct 2 into Precinct 1, with substantial number of Anglo voters shifted from Precinct 1 to Precinct 2. App. 3. As a consequence, Map 7 has just one majority-minority precinct (Precinct 1), while the Benchmark Map had two majority-minority precincts. App. 5. Map 7 is substantially similar to the map the Commissioners Court rejected in 2021 following warnings from legal counsel about its potentially unlawful treatment of minority voters and its violation of redistricting criteria the County had followed for decades.

The voting age population of those moved from even- to odd-numbered precincts is 153,581. App. 3. The voters who are shifted from even-numbered precincts to odd-numbered precincts—including Plaintiffs Duane Braxton, Cheryl Mills-Smith, Richard Canada, Nadia Bhular, and Amjad Bhular—were last eligible to vote for commissioner in 2022 and, until the adoption of Map 7, had the right to vote for commissioner in the November 2026 election. App. 206-215. Under Map 7, they are denied the right to vote for commissioner in 2026 and will instead not be able to vote for commissioner until November 2028—six years after they last cast ballots.

Demographically, the voting age population of Tarrant County as a whole is 46.9% Anglo, 17.9% Black, and 26.3% Latino. App. 3. By contrast, just 25.7% of the voting age population shifted from an even- to an odd-numbered precinct is Anglo, 31.2% is Black, and 31.9% is Latino. App. 3. Thus, only 5.3% of Tarrant County's adult Anglo population (1 out of 20 Anglo adults) will be denied the right to vote for commissioner in 2026, while 17.0% of the county's adult Black population (1 out of 6 Black adults) and 11.8% of the county's adult Latino population (1 out of 8 Latino adults) will be. App. 3. Map 7 thus makes Black adults between three and four times more likely than Anglo adults to be denied the right to vote for commissioner in 2026, and Latino adults between two and three times more likely than Anglo adults.

The 2025 process departed both procedurally and substantively from prior Tarrant County redistricting processes. Unlike in 2011 and 2021, when a written legal and policy analysis regarding redistricting from Bickerstaff was publicly provided, no such written analysis from PILF was made public. App. 14-17, 75-113, 118-72. In both 2011 and 2021, the Commission adopted neutral redistricting criteria to guide the line drawing, but none was adopted in 2025. App. 14, 114-16, 173-75. The 2011 process proceeded methodically over the course of several months. App. 8-10. The 2020 Census redistricting data was delayed because of the COVID pandemic, with the data released at the end of August 2021 rather than April. App. 10. As a consequence, the 2021 redistricting process proceeded on a more expedited timeline than the 2011 process, with Bickerstaff retained on August 17, 2021. App. 10. Bickerstaff presented its initial assessment on September 28, 2021, at which time the Commission unanimously adopted neutral redistricting criteria to guide the process. App. 10-11. Even though expedited, six public meetings and two public mapdrawing sessions were held during the 2021 process. App. 12.

The 2025 process stands in stark contrast. Mid-decade redistricting (in the absence of prior litigation) is exceedingly unusual, both in Tarrant County, in Texas, and nationwide. App. 13. The process was rushed—with just two months from start to finish. In 2021 the delayed Census data caused expedition; no such neutral explanation exists here. Only four public input meetings were held prior to the June 3 meeting at which Map 7 was adopted—all before Map 7 was even publicly released. App. 14-15. PILF refused to present publicly beyond an initial appearance, while Bickerstaff managed and participated publicly in the process in prior cycles. App. 15. At the June 3, 2025 Commissioners meeting at which Map 7 was adopted, Republican Commissioner Manny Ramirez commented: "I've heard a lot about the process; and I will agree with a lot of what folks

have said. I think the process, it had flaws. It could have been a lot more comprehensive." App. 16.

On the day of the vote, Judge O'Hare—who cast the deciding vote to adopt Map 7—sat for an interview with NBC 5 and said the following: "The policies of Democrats continue to fail Black people over and over and over, but many of them keep voting them in. It's time for people of all races to understand the Democrats are a lost party, they are a radical party, it's time for them to get on board with us and we'll welcome them with open arms." App. 16.

## ARGUMENT

### I.    Plaintiffs are likely to succeed on their disenfranchisement claims.

Plaintiffs are likely to succeed on their VRA Section 2 and constitutional claims regarding the disenfranchisement of over 150,000 Tarrant County adults who were eligible to vote for commission in November 2026 but are no longer following the adoption of Map 7.

#### A.    Plaintiffs are likely to prevail on their Section 2 claim.

Plaintiffs are likely to prevail on their Section 2 disenfranchisement claim. Section 2 provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any . . . political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a). A violation is established if,

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the . . . political subdivision are not equally open to participation by members of a class of citizens [on account of race] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b).

The Supreme Court has held that Section 2 "applies to a broad range of voting rules, practices, and procedures," *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 674 (2021),

including the configuration of districts, *see Allen v. Milligan*, 599 U.S. 1, 38 (2023), the "outright denial" of the right to vote, *Brnovich*, 594 U.S. at 660, and "abridgement" of the right to vote through "time, place, or manner voting rules," *id.* at 667, 674. Section 2 *vote dilution* cases challenge "the dispersal of [a minority group] into districts in which they constitute an ineffective minority of voters or . . . the concentration of [a minority group] into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986). Here, Plaintiffs do not raise a Section 2 vote *dilution* claim but rather contend that the adoption of Map 7 has denied or abridged their right to vote on account of race because it has disproportionately disenfranchised Black and Latino voters of their right to vote in the November 2026 election—forcing them to wait six rather than four years to cast a ballot for commissioner.

In *Brnovich*, the Supreme Court explained that the *Gingles* test for vote dilution cases— along with its analysis of various "Senate Factors" in assessing the totality of circumstances—does not govern the analysis of claims that a State or political subdivision has denied or abridged the right to vote through actions affecting the time, place, and manner of voting. 594 U.S. at 672-73. Instead, the Supreme Court has identified five "important circumstances" that courts should consider. *Id.* at 669. First, "the size of the burden imposed is highly relevant" and "[m]ere inconvenience cannot be enough to demonstrate a violation of § 2." *Id.* Second, "the degree to which a voting rule departs from what was standard practice when § 2 was amended in 1982 is a relevant consideration." *Id.* at 669-70. Third, "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider." *Id.* at 671. Fourth, the availability of "multiple ways to vote" under the "entire system of voting" should be considered. *Id.* And fifth, "the strength of the state interest served by a challenged voting rule is

also an important factor that must be taken into account." *Id.* at 671-72. The Supreme Court identified prevention of fraud as a strong state interest in *Brnovich*. *Id.* at 672.

Defendants' adoption of Map 7 violates Section 2 because it results in the November 2026 election for commissioners not being "equally open" in that it causes substantially greater disenfranchisement of Black and Latino voters compared to Anglo voters. 52 U.S.C. § 10301(b).

*First*, the size of the burden is great. The affected voters are entirely stripped of their right to vote for a commissioner candidate in the November 2026 election. Unlike all other voters, they must wait six years—rather than four—to have a say in who will be their commissioner. This goes far beyond "[m]ere inconvenience," *Brnovich*, 594 U.S. at 668, because Defendants have not made it *more difficult* for these people to vote in the November 2026 commissioner election. Rather, they have eliminated their right to vote in that election. And this disenfranchisement affects many voting-age residents—over 150,000. App. 3.

*Second*, as Dr. Cortina explains, *see* App 13, mid-decade redistricting is exceedingly uncommon—especially when it is 1) not necessitated by any population imbalance and 2) not in response to a court injunction. That rarity holds true both today and when Section 2 was amended in 1982. *See Brnovich*, 594 U.S. at 669-70.

*Third*, the size of the disparity on members of different racial groups is stark. Black voters are between three and four times more likely than Anglo voters to be disenfranchised under Map 7—with just one in twenty Tarrant County Anglo voters disenfranchised (5.3%) compared to one in six Tarrant County Black voters (17.0%). App. 3. Black voters account for 31.2% of the disenfranchised voters despite accounting for 17.9% of the County's voting age population. App. 3. That contrasts to Anglo voters, who comprise 46.9% of the County's voting age population yet are just 25.7% of those disenfranchised by Map 7. App. 3. The raw differential is likewise extreme.

There are 8,408 more disenfranchised Black adults than Anglo adults, even though Tarrant County has 456,901 more Anglo adults than Black adults. App. 3-4.

The disparity is likewise great between Latino voters and Anglo voters. Latino voters are between two and three times more likely than Anglo voters to be disenfranchised. App. 3-4. There are 9,473 more disenfranchised Latino adults than Anglos adults, even though Tarrant County has 324,121 more Anglo adults than Latino adults. App. 3-4.

*Fourth*, there are no alternatives—other than moving to a new commissioner precinct—for the affected voters to cast a ballot in the November 2026 commissioner election. *See Brnovich*, 594 U.S. at 671. They are entirely shut out of the November 2026 election in which they were otherwise eligible to participate.

*Fifth*, Defendants' interest is exceedingly weak and arbitrary. Defendants have put forward two public explanations for the adoption of Map 7. On the day of the vote, Judge O'Hare—who cast the deciding vote—explained that "many of them [*i.e.*, 'Black people']" choose candidates he disapproves of and that it was "time for people of all races" to "get on board" with his preferred candidates. App. 16. As Plaintiffs explain below, Judge O'Hare's statement is direct evidence of intentional racial vote dilution and renders Map 7 unconstitutional. Prior to Judge O'Hare's racial comments, Defendants had sought to assert that Map 7 was exclusively motivated by partisanship. But a desire to engage in partisan gerrymandering is likewise an insufficient governmental interest to warrant disenfranchising voters in a racially discriminatory manner. *See, e.g.*, *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 791 (2015) ("Partisan gerrymanders . . . are incompatible with democratic principles." (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 292 (2004) (plurality)) (cleaned up). While federal courts lack Article III jurisdiction to enjoin a map based on a partisan vote *dilution* theory, *see Rucho v. Common Cause*, 588 U.S. 684 (2019), political

11

subdivisions cannot assert an interest in partisan gerrymandering to justify *disenfranchising* voters in a racially discriminatory manner.

Finally, Judge O'Hare's comments expressing disagreement with "Black people[s']" "representatives of [] choice," 52 U.S.C. § 10301(b), and his assertion that "it's time for people of all races . . . to get on board" with his preferred candidates, App. 16, weighs heavily in the totality of circumstances analysis in favor of finding a Section 2 violation. Map 7's disproportionate disenfranchisement of Black and Latino voters violates Section 2, and Defendants' Order adopting Map 7 should therefore be enjoined.[1]

### B. Plaintiffs are likely to succeed on their First and Fourteenth Amendment disenfranchisement claims.

Plaintiffs are likely to succeed on their First and Fourteenth Amendment disenfranchisement claims. By disenfranchising over 150,000 Tarrant County adults, Map 7 infringes on Plaintiffs' right to vote in manner that treats them unequally from similarly situated voters, in violation of the First and Fourteenth Amendments.

A number of courts have considered constitutional challenges to redistricting for staggered-term offices following the decennial Census. In adjudicating them, courts have emphasized that (1) the disenfranchisement necessarily results when maps are redistricted to equalize population and (2) the disenfranchisement would be unconstitutional if a particular group were unduly burdened. *See, e.g.*, *Republican Party of Oregon v. Keisling*, 959 F.2d 144, 145-46 (9th Cir. 1992) (observing that disenfranchisement is "inevitable consequence of redistricting following the [] census" and holding that temporary disenfranchisement does not violate the Fourteenth

---

[1] Plaintiffs do not assert a "coalition" Section 2 theory but instead allege that separate classes of Black voters and Latino voters are each disproportionately disenfranchised by Map 7 compared to Anglo voters in a manner that violates Section 2.

Amendment unless it "unduly burden[s] a particular group"); *Donatelli v. Mitchell*, 2 F.3d 508, 514 (3d Cir. 1993) (applying rational basis to claim where disenfranchisement did not affect "a discrete group of voters based on some personal characteristic"); *Pate v. El Paso Cnty.*, 337 F. Supp. 95, 96-97 (W.D. Tex. 1970), *summarily aff'd*, 400 U.S. 806 (1970) (rejecting facial and as-applied challenge to Texas Constitution's provision of staggered terms for county commissioners where redistricting was necessitated by population deviation and there was "no arbitrary and invidious discrimination" in who was disenfranchised following redistricting); *Mader v. Crowell*, 498 F. Supp. 226, 231 (M.D. Tenn. 1980) (finding no violation where disenfranchisement was in response to court order to equalize districts and there was "no evidence that the General Assembly made these shifts for invidious or discriminatory purposes"); *Pereira v. Town of N. Hampstead*, 682 F. Supp. 3d 234, 246 (E.D.N.Y. 2023) (noting that heightened scrutiny would apply if disenfranchisement were based upon suspect classification).

In *In re Khanoyan*, the Texas Supreme Court declined to adjudicate this issue regarding Harris County's commissioner precinct redistricting, concluding that the mandamus petition raised "a serious question" that "warrants . . . full consideration," but that the petitioners had delayed filing it, thus making it impossible to adjudicate before the impending election deadlines. 637 S.W.3d 762, 764, 769 (Tex. 2022).[2] In that case, the Texas Supreme Court observed that Harris

---

[2] Some courts have found disenfranchisement caused by redistricting staggered election seats to violate equal protection and ordered special elections for all seats. *See, e.g.*, *Dollinger v. Jefferson Cnty. Comm'rs Ct.*, 335 F. Supp. 340 (E.D. Tex. 1971); *Mayor & Council of Tucson v. Royal*, 510 P.2d 394, 400 (Ariz. App. Div. 2 1973). While special elections would alleviate Plaintiffs' disenfranchisement injury, here the most appropriate remedy is enjoining implementation of Map 7. Federal courts must minimize their intrusion on state policies in remedying federal constitutional violations. It is the state policy of Texas—enshrined in the Texas Constitution—that commissioners serve four-year terms and that redistricting cannot alter those terms. *See* Tex. Const. arts. 16 § 64 & art. 5, § 18(d). By contrast, Map 7 is a mid-decade redraw advanced by a *county* without any population equality justification and instead to advance racial and partisan goals. In this circumstance, the least intrusive remedy is enjoining implementation of Map 7.

County's map could not simply be enjoined because the preexisting map's population deviation would violate federal law. *Id.* at 766.

This case stands apart from prior cases addressing disenfranchisement resulting from the interaction of staggered-term offices with redistricting. First, Defendants did not redistrict the county commissioner precincts as a result of new Census data showing an unlawful population imbalance among the precincts. The overall population deviation is below 2% and the redistricting occurred in the middle of the decennial Census period. App. 11. The disenfranchisement caused by the adoption of Map 7 is therefore not an "inevitable consequence of redistricting following the [] census." *Keisling*, 959 F.2d at 145-46. There is therefore no need to balance two competing federal constitutional concerns—enforcement of the one-person, one-vote requirement on the one hand and federal constitutional concerns regarding disenfranchisement on the other. Nor is there any other proffered justification—such as making "maintenance of bridges and roads within a precinct . . . [more] efficient and effective." *In re Khanoyan*, 637 S.W.3d at 768 n.10. Second, unlike in all other cases to date, "a particular group [is] unduly burdened" by the disenfranchisement in this case. *Id.* As explained above, Black and Latino voters are substantially burdened as compared to Anglo voters, with Black voters in particular between three and four times more likely to experience disenfranchisement—with nearly one in six Tarrant County Black voters affected compared to just one in twenty Tarrant County Anglo voters. *See supra* Part I.A.

Moreover, even if one accepts Defendants' contention that partisanship motivated their decisionmaking, *contra infra* Part II, by vastly disproportionately disenfranchising Democrats in the November 2026 commissioner election versus Republicans, App. 4, Map 7 constitutes viewpoint discrimination in violation of the First Amendment and likewise violates the equal

protection clause.[3] While it is true that federal courts lack Article III jurisdiction to adjudicate claims that particular districts are partisan gerrymanders, *Rucho v. Common Cause*, 588 U.S. 684 (2019), that does not mean that they lack jurisdiction to enjoin government action that targets voters for *disenfranchisement* based upon their political beliefs, speech, and viewpoints, *see Vidal v. Elster*, 602 U.S. 286, 293 (2024) (noting that viewpoint discrimination is "particularly egregious form of content discrimination" (cleaned up)). Indeed, the Supreme Court has held that "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983). That is precisely what Map 7 does—and what Defendants *claim* it was intended to do. App. 4 (noting that 66.7% of disenfranchised voters cast ballot for 2022 Democratic gubernatorial candidate versus 47.3% of countywide voters doing so).

The disenfranchisement resulting from Defendants' adoption of Map 7 violates the First and Fourteenth Amendments because it is not justified by a countervailing federal constitutional obligation to comply with the one-person, one-vote requirement or some other legitimate purpose and it targets particular groups for disenfranchisement—including via a suspect racial classification. Defendants have no compelling, let alone important or rational, interest warranting this disenfranchisement. It is entirely arbitrary.

---

[3] The Ninth Circuit in *Keisling* rejected the plaintiffs' First Amendment claim and instead adjudicated their Fourteenth Amendment claim. 959 F.2d at 145. Unlike in *Keisling*, however, here a particular group was targeted for their viewpoints and race. The former plainly implicates the First Amendment, a condition that was lacking in *Keisling*.

## II.     Plaintiffs are likely to prevail on their intentional racial vote dilution claims.

Plaintiffs are likely to prevail on their Fourteenth and Fifteenth Amendment claims that Map 7 was drawn at least in part for the purpose of diluting the voting strength of Black voters and Latino voters. Unlike a racial *gerrymandering* claim, *see Cooper v. Harris*, 581 U.S. 285, 291 (2017), a plaintiff alleging intentional racial vote dilution need not show that racial considerations were the predominant motivation for the map to be unconstitutional, *see Alexander v. S. Carolina State Conf. of NAACP*, 602 U.S. 1, 38-39 (2024) (noting that two claims are "analytically distinct" (cleaned up)). Rather, "'racial discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (*en banc*) (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)); *see League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 161-62 (W.D. Tex. 2022) ("*LULAC*") ("Plaintiffs may show intentional vote dilution merely by establishing that race was *part* of Defendants' redistricting calculus, but to show racial gerrymandering they must go further and prove that race *predominated* over other considerations such as partisanship.").

"[D]iscriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Rather, "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of [the Commissioners Court's] actions may be considered." *Brown*, 561 F.3d at 433. As the *en banc* Fifth Circuit has explained in holding that circumstantial evidence can prove intentional discrimination,

> [i]n this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence. To require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions. This approach would ignore the reality that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence.

*Veasey*, 830 F.3d at 230.

Although discriminatory purpose "implies more than intent as volition or intent as awareness of consequences," *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 379 (1979), the Supreme Court has explained that "the inevitability or foreseeability of consequences . . . bear[s] upon the existence of discriminatory intent," *id.* at 379 n.25. Where "the adverse consequences of a law upon an identifiable group" are clear, "a strong inference that the adverse effects were desired can reasonably be drawn." *Id.*; *see LULAC* 601 F. Supp. 3d at 160 ("[T]he decisionmaker need not explicitly spell outs its invidious goals—a court may sometimes infer discriminatory intent where an act has predictable discriminatory consequences.").

As the Supreme Court has explained, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). "The impact of the official action[,] whether it 'bears more heavily on one race than another," may provide an important starting point." *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). From there, the Court "set out five non-exhaustive factors to determine whether a particular decision was made with a discriminatory purpose: (1) "the historical background of the decision," (2) "the specific sequence of events leading up to the decision," (3) "departures from the normal procedural sequence," (4) "substantive departures," and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Veasey*, 830 F.3d at 231 (quotation marks omitted); *Arlington Heights*, 429 U.S. at 267-68. Plaintiffs claiming intentional discrimination "need not prove race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will toward minorities because of their race." *Perez v. Abbott*, 253 F. Supp. 3d 864, 948 (W.D. Tex. 2017).

In addition to showing that intentional racial vote dilution was *a* purpose, a plaintiff must also show that there was a resulting discriminatory effect. As the three-judge federal court adjudicating Texas's statewide redistricting lawsuit recently explained, the discriminatory effects prong of an intentional discrimination claim differs from the statutory test for discriminatory effects in a Section 2 vote dilution claim. "The intentional-vote-dilution analysis [] is derived from the Constitution, and the *Arlington Heights* framework deployed in that analysis states merely that effects are discriminatory when they 'bear[ ] more heavily on one race than another.'" *LULAC*, 601 F. Supp. 3d at 163 (quoting *Arlington Heights*, 429 U.S. at 266). A plaintiff thus need not show that a particular racial group could constitute the majority of a district. *See id.*; *see also Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality). ("[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments.").[4] The *LULAC* court found a discriminatory effect where a crossover state senate district in Tarrant County—senate district 10—was altered so that minority voters could no longer succeed in electing their preferred candidate. *LULAC*, 601 F. Supp. 3d at 169-70.

### A. Judge O'Hare's comments are direct evidence of intentional racial vote dilution.

Judge O'Hare's comments in an NBC 5 interview on the date he cast the deciding vote to adopt Map 7 are direct evidence of intentional racial vote dilution—the very type of statement that the en banc Fifth Circuit explained was "rare[]" in this "day and age." *Veasey*, 830 F.3d at 230. He said: "The policies of Democrats continue to fail Black people over and over and over, but many

---

[4] A "crossover" district is one in which Anglo voters are the majority but a sufficient number cross over to vote for the minority voters' preferred candidate to allow that candidate to prevail in the district.

of them keep voting them in. It's time for people of all races to understand the Democrats are a lost party, they are a radical party, it's time for them to get on board with us and we'll welcome them with open arms." App. 16. He expressed disapproval for the voting patterns of "Black people" and that it was "time for people of all races" to "get on board" with his preferred candidates. He did this in the context of explaining his vote in favor of Map 7, which reduced from two to one the number of precincts in which minority voters were a majority of eligible voters, and which disproportionately targets Black voters in particular for disenfranchisement in the November 2026 commissioner election. App. 16. Decreasing the number of majority-minority districts because the decisionmaker disagrees with who "Black people" choose to elect is as direct of evidence of intentional racial vote dilution as can be imagined. *See Feeney*, 442 U.S. at 279 (explaining it is intentionally discriminatory to act "at least in part 'because of,' not merely 'in spite of,' [] adverse effects upon an identifiable group"). That racial intent—unlawful even if it is just *one* part of the calculus—is constitutionally prohibited even if it is tied to an ultimate partisan political goal. *See Cooper*, 581 U.S. at 308 n.7 ("[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics.").

**B.  The *Arlington Heights* factors support a finding of intentional racial vote dilution.**

Even in the absence of Judge O'Hare's express statement of a racially dilutive purpose, the *Arlington Heights* factors support a finding of intentional discrimination.

**1.  Map 7 has a discriminatory effect by diminishing the voting strength of Black and Latino voters and increasing the voting strength of Anglo voters.**

Map 7 "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (cleaned up). As discussed above, it does this first by disproportionately excluding Black and Latino voters from their right to vote for commissioner in 2026. Moreover, under the Benchmark

map, Anglo voters comprise the majority of eligible voters in two precincts, but under Map 7 that number increases to three. App. 5. Map 7 reduces from two to one the number of majority-minority precincts. App. 5. Because voting in Tarrant County is racially polarized, this means that Map 7 reduces the ability of minority voters to elect their preferred candidate from two to one precincts. App. 7. Indeed, a three-judge federal court found that the 2021 legislature's dismantling of senate district 10—which overlapped with the population at issue here—had a discriminatory effect for purposes of the *Arlington Heights* analysis. *See LULAC*, 601 F. Supp. 3d at 164.

### 2. The historical evidence supports an inference of discriminatory intent.

The historical context of redistricting of Tarrant County and Texas voting laws supports an inference of discriminatory intent. "In every decade since the statute was passed in 1965, federal courts have held that Texas violated the VRA." *Id.* at 170. "That includes the most recent redistricting cycle and, most damningly, the 2012 decision holding that, among other violations, Texas had engaged in intentional vote dilution by drawing SD 10" in Tarrant County. *Id.*; *see Veasey*, 830 F.3d at 239 (citing the 2012 decision regarding SD 10 in Tarrant County as a "contemporary example[ ] of State-sponsored discrimination"). All three federal judges adjudicating the 2011 congressional map's lawfulness agreed that its configuration of districts in Tarrant County was intentionally discriminatory. *Perez*, 253 F. Supp. 3d at 961; *id.* at 986 (Smith, J., dissenting) (disagreeing with majority regarding other parts of the state but concluding that DFW districts were the product of intentional discrimination); *id.* ("Relatively little about the 2011 Congressional redistricting passes the smell test as to DFW."); *id.* (noting the "unusual appendages added [in a Tarrant County district] from an adjoining, but demographically dissimilar, neighboring county"). Moreover, a predecessor version of Map 7 was rejected in the 2021 redistricting cycle after Bickerstaff advised the Commissioners Court that the map violated its redistricting criteria and was potentially unlawful because of the large number of minority voters

it shifted from Precinct 2 to Precinct 1. App. 12-13. And, as former Precinct 2 Commissioner Devan Allen testifies, she ran in 2018 in response to the incumbent commissioner announcing at a campaign rally: "If being called a racist is the price I have to pay to preserve America, I am willing to pay 100-fold." App. 217. As the *LULAC* court found regarding SD10, the "historical evidence weighs in favor of an inference of discriminatory intent." 601 F. Supp. 3d at 171.

### 3. The sequence of events and procedural and substantive deviations support an inference of intentional discrimination.

The sequence of events, together with the procedural and substantive departures from the norm, support an inference of intentional discrimination.[5] To begin, mid-decade redistricting—unprompted by an unlawful population deviation or a federal or state court order finding a legal violation in the existing map—is exceedingly unusual, whether nationally, in Texas, or in Tarrant County. App. 13. Moreover, the absence of any formally adopted redistricting criteria in 2025 notably departs from both the 2011 and 2021 Tarrant County redistricting processes, where neutral criteria were adopted to guide the map drawing and selection process. App. 8, 10, 14. The Resolution adopting the 2011 criteria noted that they would "assist the County in its efforts to comply with all applicable federal and state laws." App. 114. No such criteria were adopted in 2025. *See Petteway v. Galveston County*, 698 F. Supp. 3d 952, 991 (S.D. Tex. 2023), *reversed and remanded on other grounds*, 111 F.4th 596 (5th Cir. 2024) (en banc) ("[T]he commissioners court's failure to adopt redistricting criteria . . . is a deviation because the commissioners court had adopted criteria in prior years and other counties across the state have regularly adopted redistricting criteria."). This is particularly notable because when a predecessor-version of Map 7

---

[5] As the *LULAC* court noted, these factors "can be difficult to disentangle." *Id.* Because Texas open meetings laws limit the potential of "private meetings" of commissioners compared to redistricting by the legislature, Plaintiffs address these factors together here in relation to the "formal, public legislative process." *Id.*

was presented during the 2021 redistricting process, Attorney Bob Heath of Bickerstaff advised the Commissioners Court that the proposal violated several adopted redistricting criteria and could be unlawful given the substantial number of minorities it shifted from Precinct 2 to 1. App. 13.

Moreover, the 2025 process was rushed without any justification or explanation. It lasted just two months from the retention of PILF to the adoption of Map 7—a map that was publicly released just days before the final vote, contrary to Judge O'Hare's commitment to provide two to two-and-a-half weeks for the public to consider the adopted map. Unlike in *LULAC*, where the court found the rushed state legislative process to be explained by the Census delay caused by COVID, 601 F. Supp. 3d at 173, there is no such justification here. And there is no explanation for why map options were not publicly posted until just a month before the final vote—and in particular why Map 7 was not publicly released until just days before it was selected. *See Petteway*, 698 F. Supp. 3d at 992-93 (finding that COVID pandemic did not explain Galveston County's "rushed process" in which maps were not drawn until just a month before adoption). As was the case in *Petteway*, the failure to publicly release Map 7 until *after* public hearings had completed "prevented meaningful public comment" on the map. *Id.* at 992. But unlike *Petteway*, here there is not even a looming candidate filing deadline to explain the sprint to the finish line.

Moreover, the County's failure to undergo a bidding process for outside redistricting counsel—despite choosing not to use Bickerstaff, which had been the County's counsel for the prior four decennial redistricting cycles—was a significant procedural departure. *Id.* (citing Galveston County's failure to have bids from redistricting counsel as procedural deviation). More startling was PILF's departure from the manner in which Bickerstaff undertook its task. While Bickerstaff managed the public input process and its counsel made substantive legal presentations to both the Commissioners Court and the public, PILF expressly refused to do so, with Mr. Nixon

claiming to fear for his life if he attended a public input meeting in majority-minority Precinct 2. App. 15. As former Commissioner Devan Allen, who attended the meeting, testifies: "This was absurd and insulting to the people of southeastern Tarrant County. It is hard not to see the racial undertone in Mr. Nixon's claim that he would be unsafe if he attended a public input session in a majority-minority community represented by a Black Commissioner." App. 219.

Substantively, the adopted map substantially departs from historical Tarrant County commissioner precinct redistricting, which has long divided the county primarily into quadrants. App. 16. Its similarity with the racially-motivated proposal that the Commissioners Court rejected following a warning from counsel in 2021 is especially telling. App. 12-13.

The sequence of events, together with procedural and substantive departures, support an inference of intentional discrimination.

### 4. Contemporary statements reveal a discriminatory purpose.

As discussed above, the contemporary statements of Judge O'Hare—on the day he cast the decisive third vote in favor of adopting Map 7—reveal that racial vote dilution was at least *one* factor in the adoption of the map. Judge O'Hare specifically and expressly stated that he disapproves of how "Black people" cast their ballots and thinks that it is time for "all races" to abandon their preferences and agree with him. App. 16. He made this statement in a television interview explaining his vote in favor of the map. It is difficult to imagine a stronger piece of discriminatory intent evidence.

## III. Plaintiffs will be irreparably harmed if Map 7 is not enjoined.

Map 7 causes substantial disenfranchisement—disproportionately affecting Black and Latino voters and those whose viewpoints the County disfavors. Likewise, it intentionally minimizes the ability of minority voters to elect their preferred candidates, at least in part because Judge O'Hare disagrees with the candidates elected by Black voters. As such, Plaintiffs will suffer

23

irreparable harm absent this Court's intervention. *BST Holdings v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("the loss of constitutional freedoms . . . 'unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 347 U.S. 373 (1976)); *see also, e.g.*, *Deerfield Med. Center v. City of Deerfield Beach*, 661 F. 2d 328, 338 (5th Cir. Unit B Nov. 1981) (finding that violations of fundamental rights are always irreparable); *DeLeon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. DeLeon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law.").

The right to be free from intentional racial discrimination in voting is a core constitutional right. *See* U.S. Const. amend. XIV § 1, U.S. Const. amend. XV § 1; *see also Gomillion v. Lightfoot*, 364 U.S. 339, 346 (1960) ("When a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment."). Defendants' imposition of Map 7 violates that right. This harm cannot be undone through monetary relief. *See Deerfield*, 661 F.2d at 338 (holding that where a fundamental right is "either threatened or in fact being impaired . . . mandates a finding of irreparable injury."); *see also League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress."). As such, the harm to Plaintiffs is irreparable. *Deerfield*, 661 F.2d at 338.

**IV.      The balance of equities weights in favor of an injunction.**

The balance of equities favors entry of an injunction. *See Ingebretsen v. Jackson Public School Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (holding that where an enactment is unconstitutional, "the public interest [is] not disserved by an injunction preventing its implementation."). Defendants lack any legitimate interest in enforcing a redistricting plan that violates Plaintiffs' statutory and constitutional rights to be free from discrimination. *See BST Holdings*, No. 21-60845

at *19 (finding that any interest that may be asserted in enforcing laws that infringe on constitutional freedoms is "illegitimate."). And the public interest in protecting Plaintiffs' constitutional rights to be free from discrimination outweighs any minimal burden to Defendants. *See De Leon*, 975 F. Supp. 2d at 665 ("[A] preliminary injunction preventing the enforcement of an unconstitutional law serves, rather than contradicts, the public interest."); *see also*, *e.g.*, *G & V Lounge, Inc. v. Michigan Liquor Control Commission*, 23 F.3d 1071 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Charles H. Wesley Educ. Fdn., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) ("[T]he . . . cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest.").

## CONCLUSION

For the foregoing reasons, the Court should enjoin implementation of Map 7.

Dated: June 27, 2025

Respectfully submitted,

*/s/ Mark P. Gaber*
Mark P. Gaber (admitted *pro hac vice*)
DC Bar No. 988077
MARK P. GABER PLLC
P.O. Box 34481
Washington, DC 20043
(715) 482-4066 Phone
mark@markgaber.com

George (Tex) Quesada
TX Bar No. 16427750
Sean J. McCaffity
TX Bar No. 24013122
SOMMERMAN, MCCAFFITY, QUESADA
 & GEISLER, L.L.P.
3811 Turtle Creek Blvd, Suite 1400
Dallas, TX 75219
(214) 720-0270 Phone
(214) 720-0184 Facsimile
quesada@textrial.com
smccaffity@textrial.com

*/s/ Chad W. Dunn*
Chad W. Dunn
TX Bar No. 24036507
BRAZIL & DUNN, LLP
1900 Pearl Street
Austin, TX 78705
(512) 717-9822 Phone
(512) 515-9355 Facsimile
chad@brazilanddunn.com

Jesse Gaines
TX Bar No. 07570800
LAW OFFICE OF JESSE L.
GAINES
Post Office Box 50093
Fort Worth, TX 76105
817-714-9988 Phone
gainesjesse@ymail.com

**CERTIFICATE OF SERVICE**

On June 27, 2025, I served the foregoing on counsel for Defendants, who have not yet entered an appearance in this case, via email as indicated below.

Craig M. Price
Assistant District Attorney – Chief of the Civil Division
Tarrant County District Attorney's Office
cmprice@tarrantcountytx.gov

Mark Kratovil
Assistant District Attorney
Tarrant County District Attorney's Office
mckratovil@tarrantcountytx.gov

*/s/ Mark P. Gaber*