**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

WINNIE JACKSON, JARRETT "JAY"
JACKSON, CELINA VASQUEZ, DUANE
BRAZTON, NADIA BHULAR, AMJAD
BHULAR, CHERYL MILLS-SMITH, and
RICHARD CANADA,

        *Plaintiffs*,

        v.                              Civil Case No. 4:25-cv-000587-O

TARRANT COUNTY, TEXAS;
TARRANT COUNTY COMMISSIONERS
COURT; TIM O'HARE, in his official
capacity as Tarrant County Judge,

        *Defendants*.

## <u>DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION AND FAILURE TO STATE A JUSTICIABLE CLAIM</u>

This Court should dismiss this case because it lacks subject-matter jurisdiction and Plaintiffs failed to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(1), and (6); *see Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) ("[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action").

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION .............................................................................................1

FACTUAL AND PROCEDURAL HISTORY .................................................2

STANDARD OF REVIEW ...............................................................................4

I.      Rule 12(b)(1).........................................................................................4

II.     Rule 12(b)(6).........................................................................................5

ARGUMENT .....................................................................................................6

I.      This Court lacks subject-matter jurisdiction .......................................6

        A.  Plaintiffs' complaint concerns a non-justiciable political question—partisan
            redistricting ..............................................................................6

        B.  Moving a voter from one staggered district to another does not constitute a
            constitutional injury ...............................................................11

II.     Plaintiffs failed to state a claim upon which relief can be granted ........15

        A.  Plaintiffs have not pleaded a claim under Section 2 of the VRA ...................15

            1.  A protected majority-minority district under *Gingles* is not implicated....15

        B.  Plaintiffs have failed to state facts supporting racial intent ...........................19

            1.  Plaintiffs have failed to make allegations of relevant evidence
                suggesting Map 7 was enacted with racial intent in violation of the
                Fifteenth Amendment ...............................................................19

            2.  Plaintiffs have failed to provide any evidence suggesting that Map 7
                was enacted for the purpose of vote dilution or racial gerrymandering
                under the Fourteenth Amendment ...........................................23

CONCLUSION.................................................................................................25

CERTIFICATE OF SERVICE .......................................................................27

ORDER .............................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott v. Perez*, 585 U.S. 579 (2018) ...................................................................................25

*Ala. Leg. Black Caucus v. Alabama*, 575 U.S. 254 (2015)......................................................24

*Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1 (2024) ....................6-7, 9-10, 20, 25

*Allen v. Milligan*, 599 U.S. 1 (2023).........................................................................................17

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023)............2

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................................................5, 16

*Avery v. Midland Cnty.*, 390 U.S. 474 (1968)...........................................................................12

*Baker v. Carr*, 369 U.S. 186 (1962)...........................................................................................7

*Barrera-Montenegro v. United States*, 74 F.3d 657 (5th Cir. 2010) .........................................4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................................5

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021)....................................... 12-14, 23

*C&C Inv. Props., L.L.C. v. Trustmark Nat'l Bank*, 838 F.3d 655 (5th Cir. 2016) ....................5

*Carr v. Brazoria Cnty.*, 341 F. Supp 155 (S.D. Tex. 1972)....................................................11

*Carr v. Brazoria Cnty.*, 468 F.2d 950 (5th Cir. 1972) .......................................................11, 14

*Consensys Software, Inc. v. SEC*, 749 F. Supp. 3d 736 (N.D. Tex. 2024) ...............................4

*Crawford v. Marion Cnty. Elec. Bd.*, 553 U.S 181 (2008) ......................................................14

*Dollinger v. Jefferson Cnty. Comm'rs Ct.*, 335 F. Supp. 340 (E.D. Tex. 1971).....................12

*Easley v. Cromartie*, 532 U.S. 234 (2001)......................................................................... 24-25

*Gaffney v. Cummings*, 412 U.S. 735 (1973) ..............................................................................8

*Ghedi v. Mayorkas*, 16 F.4th 456 (5th Cir. 2021)......................................................................5

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ............................................................................9

*Harding v. City of Dallas*, 948 F.3d 302 (5th Cir. 2020)........................................................23

*Heckman v. Williamson Cnty.*, 369 S.W. 3d 137 (Tex. 2012)..................................................11

*Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006 (5th Cir. 1998)...........8

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ...................................................................................6

*In re S. Recycling, L.L.C.*, 982 F.3d 374 (5th Cir. 2020).........................................................4

*Johnson v. DeGrandy*, 512 U.S. 997 (1994)....................................................................10, 23

*Kontrick v. Ryan*, 540 U.S. 443 (2004)....................................................................Cover Page

*Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010) ................5

*Lopez v. Abbott*, 339 F. Supp. 3d 589 (S.D. Tex. 2018) ........................................................24

*LULAC v. Abbott*, 604 F. Supp. 3d 463 (5th Cir. 2022) ........................................................24

*LULAC v. Abbott*, 601 F. Supp. 3d 147 (W.D. Tex. 2022).....................................................23

*LULAC v. Abbott*, 767 F. Supp. 3d 393 (W.D. Tex. 2025).......................................................9

*Miller v. Johnson*, 515 U.S. 900 (1995)........................................................6, 15, 20, 24

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) ................................................................8

*Papasan v. Allain*, 478 U.S. 265 (1986) .............................................................................5

*Pate v. El Paso Cnty.*, 337 F. Supp. 95 (W.D. Tex. 1970) ...................................................11

*Pate v. El Paso Cnty.*, 400 U.S. 806 (1970)........................................................................11

*Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017) ......................................................19

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ........................................................23

*Petteway v. Galveston Cnty.*, 111 F.4th 596 (5th Cir. 2024) .................................. 1, 14, 17-18

*Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471 (1997)............................................................20

*Rice v. Cayetano*, 528 U.S. 495 (2000)................................................................................22

*Rucho v. Common Cause*, 588 U.S. 684 (2019) ......................................................... 2, 7-8, 10

*Shelby County v. Holder*, 570 U.S. 529 (2013) ....................................................................1

*Sinkfield v. Kelley*, 531 U.S. 28 (2000)................................................................................24

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353 (5th Cir. 2004)......................5

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938 (5th Cir. 2011)......................7

*Stalley v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229 (11th Cir. 2008) ....................4

*Stockman v. FEC*, 138 F.3d 144 (5th Cir. 1998) ..................................................................4

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)........................................5

*Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) ...........................................8

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ............................................................... 13, 16-17

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009)....................................................17, 23

*Vanskiver v. City of Seabrook*, No. H-17-3365, 2018 U.S. Dist. LEXIS 11618 (S.D. Tex. Jan. 24, 2018) ..................................................................................................................................5

*Vieth v. Jubelirer*, 541 U.S. 267 (2004)..................................................................... 7-8

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .......................19

*White v. Regester*, 412 U.S. 755 (1973)...................................................................23


**Constitutional Provisions**

Tex. Const. art. V, § 18 ..................................................................................................2

U.S. Const. art. III ..........................................................................................................8


**Rules, Statutes, and Session Laws**

28 U.S.C. § 1331 ...........................................................................................................8

28 U.S.C. § 1343 ...........................................................................................................8

28 U.S.C. § 1357 ...........................................................................................................8

42 U.S.C. § 1983 .......................................................................................................3, 8

52 U.S.C. § 10301(a) .....................................................................................................3

52 U.S.C. § 10301(b) ........................................................................................3, 10, 16

Fed. R. Civ. P. 12(b)(1).................................................................................................4

Fed. R. Civ. P. 12(b)(6).................................................................................................5

Fed. R. Civ. P. 12(h)(3).................................................................................................4

SJR 4, 53rd Reg. Session ............................................................................................12

**INTRODUCTION**

Tarrant County adopted a redistricting plan that from conception to enactment was an unambiguous, explicit and unabashed effort to increase Republican power and decrease Democratic power on the Commissioners Court. Plaintiffs try to convert this partisan effort into a racially discriminatory scheme that would have federal courts sit as Article III legislatures. Plaintiffs seek to return to a long past jurisprudential era that the Supreme Court and the Fifth Circuit explicitly ended. Plaintiffs long for the time before the Supreme Court's holding in *Shelby County*, where any retrogression whatsoever of a minority officeholder was subjected to preclearance review and a Justice Department objection. *See generally Shelby County v. Holder*, 570 U.S. 529 (2013) (rendering the coverage triggers unconstitutional). Plaintiffs also fail to recognize the jurisprudential landscape changed profoundly in *Petteway v. Galveston Cnty.*, 111 F.4th 596 (5th Cir. 2024). Plaintiffs seek to protect a type of district that the Fifth Circuit held is not protected under Section 2 of the Voting Rights Act. Plaintiffs, seemingly unaware of the momentous impact of *Petteway*, even cite the statute, the 1982 Amendments to Section 2 of the Voting Rights Act (a results claim), that the Fifth Circuit terminated as a cause of action in these demographic circumstances. ECF No. 8, "*First Amended Complaint*" at 23. To add insult to injury, Plaintiffs repeatedly pirate language from Section 2's results jurisprudence by improperly alleging causes of action repeatedly rejected by the Supreme Court such as "a disparate impact" theory and a novel new cause of action not before recognized in the Fifth Circuit. Plaintiffs' claims may have had merit over a decade ago. Since then, the jurisprudential ground has shifted underneath them.

Plaintiffs' last remaining avenue of attack is alleging the Commissioners Court acted with a racial intent instead of the obvious and explicit effort to remake the Tarrant Commissioners court

1

to enjoy a 4 to 1 Republican advantage. Plaintiffs advance this intent claim only by implication through racially-saturated innuendo, conclusory allegations, and worn-out tropes.

Plaintiffs face two other extraordinary hurdles. First, because of the federalist arrangement, Tarrant County enjoys a strong presumption of legislative good faith, as discussed below. Second, reliance on thin circumstantial allegations of racial intent and a scattering of wildly out of context or irrelevant statements purporting to be evidence of racial intent to reverse tough political outcomes does not shift line drawing powers from the legislative body to the courts. *See Rucho v. Common Cause*, 588 U.S. 684, 718 (2019) ("partisan gerrymandering claims present political questions beyond the reach of federal courts [;] [f]ederal judges have no license to reallocate political power between the two major political parties"). For these reasons, this Court should grant this Motion to Dismiss.[1]

## FACTUAL AND PROCEDURAL HISTORY

Tarrant County is a political and geographic subdivision governed by the Tarrant County Commissioners Court—the body responsible for redistricting.[2] The Commissioners Court consists of one County Judge and four Commissioners who are elected to represent single-member precincts for four-years in staggered elections. *See* Tex. Const. art. V, § 18. The current boundaries

---

[1] Regarding subject matter jurisdiction, one court of appeals has denied Article III standing to private plaintiffs bringing Voting Rights Act (VRA) claims. While the Attorney General is the party expressly granted the power to bring suit under Section 2, only the Eighth Circuit has gone so far as to bar private party suits under Section 2. *See generally Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023) (holding that the VRA excludes all Plaintiffs except the United States Attorney General).

[2] According to the 2020 Decennial Census, Tarrant County has a population of 2,110,640 people, of which 42.2 percent are Anglo, 30.5 percent are Latino, 19.3 percent are Black, and 8 percent are Asian or other. *See* ECF No. 8, at 8.

2

were drawn in 2011 (pre-*Shelby County*). Currently, there are two Democrat Commissioners, two Republican Commissioners, and one Republican County Judge.[3]

In April 2025, Tarrant County voted to consider redistricting the Commissioners' precincts. Seven maps were proposed, and the County made each proposed map, as well as the Benchmark Map, available online. It also posted information about the redistricting process on the County's website, on its social media sites, and in the local newspapers. The County's website also allowed the public to submit their own maps, comment on proposed maps, and apply overlays of school districts, facilities hubs, roads, zip codes, and other data with each proposed map and the Benchmark Map. Each Commissioner's precinct also held a public meeting where residents could review and comment on proposed maps.[4] Recordings of these meetings were posted on Tarrant County's official website. Following the public input process, two new maps incorporating voter feedback (Map 6 and Map 7) were made available on Tarrant County's official website. On June 3, 2025, the Tarrant County Commissioners Court voted to adopt Map 7. All proposed maps and recordings of these meetings are available at https://www.tarrantcountytx.gov/redistricting.

On June 17, 2025, Plaintiffs filed their amended complaint claiming they were: (1) moved from a majority-minority to majority-Anglo precincts; and (2) disenfranchised by being moved from a precinct with an election in 2026 to one whose election is in 2028. *See* ECF No. 8, at 4-7 (asserting a non-existent right to remain in a precinct in which candidates are elected in 2026 rather than 2028). On this basis, Plaintiffs allege: (1) vote denial or abridgment through disenfranchisement (52 U.S.C. § 10301(a) and (b) and 42 U.S.C. § 1983); (2) an unconstitutional

---

[3] The Democrats hold Commissioner Precincts 1 and 2; the Republicans hold Commissioner Precincts 3 and 4.

[4] Precinct 4's meeting was held on April 13, 2025, Precinct 1's public meeting was held on April 14, 2025, Precinct 2's public meeting was held on April 17, 2025, and Precinct 3's public meeting was held on April 21, 2025.

burden on the right to vote under the First and Fourteenth Amendments to the United States Constitution; (3) intentional racial discrimination under the Fourteenth Amendment to the United States Constitution; and (4) intentional racial discrimination under the Fifteenth Amendment to the United States Constitution. *See* ECF No. 8, at 23-29.

## STANDARD OF REVIEW

I.     **Rule 12(b)(1)**

Plaintiffs bear the burden of proving subject-matter jurisdiction. *In re S. Recycling, L.L.C.*, 982 F.3d 374, 379 (5th Cir. 2020). To evaluate if the party asserting jurisdiction met its burden, courts rely on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 2010) (quotations omitted). Federal district courts have limited jurisdiction; "absent jurisdiction conferred by statute, [they] lack the power to adjudicate claims." *Consensys Software, Inc. v. SEC*, 749 F. Supp. 3d 736, 740 (N.D. Tex. 2024) (quoting *Stockman v. FEC*, 138 F.3d 144, 151 (5th Cir. 1998)). Under Rule 12(b)(1), pleadings that are insufficient to establish jurisdiction (facial attack) or factually insufficient to establish subject-matter jurisdiction (factual attack) are dismissed.[5] *See* Fed. R. Civ. P. 12(b)(1), (h)(3) ("[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action").

---

[5] "A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion. By contrast, a factual attack on a complaint challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony." *Stalley v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232–33 (11th Cir. 2008) (citation modified).

## II.    Rule 12(b)(6)

When evaluating a Rule 12(b)(6) motion, courts consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint," as well as "matters of which a court may take judicial notice." *Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *but see C&C Inv. Props., L.L.C. v. Trustmark Nat'l Bank*, 838 F.3d 655, 660 (5th Cir. 2016) ("a Rule 12(b)(6) motion typically cannot rely on evidence outside the complaint"). Under Rule 12(b)(6) an action that fails "to state a claim upon which relief can be granted" must be dismissed. *See* Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires that a complaint's well-pleaded facts support the reasonable inference that jurisdiction exists, not just the mere possibility that could. *Ghedi v. Mayorkas*, 16 F.4th 456, 464 (5th Cir. 2021) ("the same plausibility standard that applies in Rule 12(b)(6) context also applies to Rule 12(b)(1)"); *Ashcroft*, 556 U.S. at 679. Courts do not "'strain to find inferences favorable to the plaintiffs' or 'accept conclusory allegations, unwarranted deductions, or legal conclusions.'" *Vanskiver v. City of Seabrook*, No. H-17-3365, 2018 U.S. Dist. LEXIS 11618, at *4 (S.D. Tex. Jan. 24, 2018) (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)); *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (courts are not bound to accept as true legal conclusions couched as factual allegations).

## ARGUMENT

I.    **This Court lacks subject-matter jurisdiction.**

A. **Plaintiffs' complaint concerns a non-justiciable political question—partisan redistricting.**

Tarrant County enacted a new plan with the explicit aim of increasing the partisan advantage for Republicans. Plaintiffs' complaint fails to do what the Supreme Court held to be necessary in this circumstance: disentangle race from partisan motives by showing an alternative plan could accomplish the same aim. A plaintiff challenging a new map cannot simply claim race motivated lawmakers instead of partisan aims when the two are highly correlated.

Instead, the plaintiff has the burden to first disentangle race and politics to prove "that the former drove a district's lines[,]" which necessitates "ruling out the competing explanation that political considerations dominated the legislature's redistricting efforts. If either politics or race could explain a district's contours, the plaintiff has not cleared its bar." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 9-10 (2024). It is not enough to claim that race motivated a draw without disentangling partisan voting patterns. Plaintiffs bear this burden, not the defendants.

Plaintiffs' failure to disentangle race and politics is lethal to their claim because jurisdictions may engage in constitutionally permitted partisan gerrymandering even "if it so happens that most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) (emphasis in original); *Miller v. Johnson*, 515 U.S. 900, 916 (1995) ("[r]edistricting legislatures will…almost always be aware of racial demographics"). Redistricting is an "inescapably political enterprise" because the Constitution entrusts State legislatures with drawing district lines. *Alexander*, 602 U.S. at 1 (any claim "that a map is unconstitutional because it was drawn to achieve a partisan end [is nonjusticiable] in federal court").

6

When a legislative body explicitly redistricts to alter partisan composition, it creates a powerful presumption against court scrutiny. Why? According to the Supreme Court, partisan redistricting challenges mean that courts would "make their own political judgment about how much representation political parties *deserve*—based on the votes of their supporters—and to rearrange the [legislatively drawn] challenged districts to achieve that end"—an exclusively legislative authority. *Rucho*, 588 U.S. at 705; *see also Alexander*, 602 U.S. at 21 (finding it impermissible for parties to reverse-engineering partisan data into racial data to sidestep the Supreme Court's holding in *Rucho*).

This deprives partisan redistricting of judicially manageable resolution standards, rendering the issue a non-justiciable political question. *Vieth v. Jubelirer*, 541 U.S. 267, 307 (2004) (without clear, judicially manageable standards, courts "risk assuming political, not legal, responsibility for a process that often produces ill will and distrust"). The political question doctrine prevents judicial evaluation of issues properly assigned to the executive or legislative branches.[6] *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 949 (5th Cir. 2011) ("[a]t its core, the political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution" to other branches); *Rucho*, 588 U.S. at 695-96 (judicial departments may have no business entertaining a claim of unlawfulness "because the question is entrusted to one of the political

---

[6] The Supreme Court held that a prominent feature of any case involving a political question is: (1) a textually demonstrable constitutional commitment of the issue to a political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a prior political decision; or (6) the potentiality of embarrassment from multifarious pronouncements by various department. *See Baker v. Carr*, 369 U.S. 186, 217 (1962).

branches or involves no judicially enforceable rights.'") (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004)); *see e.g. Tex. Democratic Party v. Abbott*, 961 F.3d 389, 398 (5th Cir. 2020) (suggesting that the decision "whether to use electronic voting machines or paper ballots" is a non-justiciable challenge to "the wisdom of [a State's] policy choices").While racial gerrymandering falls within the Fourteenth and Fifteenth Amendments, allocating maximum political power to a party based on a its political support does not. *Rucho*, 588 U.S. at 704-05; *see Gaffney v. Cummings*, 412 U.S. 735, 753 (1973) (stating that partisanship is expected in redistricting).

These constitutional minefields implicate multiple issues, including jurisdiction. Article III of the United States Constitution limits jurisdiction to actual cases and controversies—questions resolvable through judicial processes. *Rucho*, 588 U.S. at 695; U.S. Const. art. III (outlining the structure and powers of the Judicial Branch of the federal government). A court should dismiss a case for lack of subject-matter jurisdiction if the court "lacks the statutory or constitutional power to adjudicate" the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998); *Okpalobi v. Foster*, 244 F.3d 405, 429 (5th Cir. 2001) (claims that do not present a case or controversy must be dismissed for "lack of federal court jurisdiction under Article III of the Constitution").

Despite the Supreme Court's holding in *Rucho* that partisan redistricting creates non-justiciable disputes, Plaintiffs implicate this Court's jurisdiction generally under 28 U.S.C. § 1343 (Civil Rights and Elective Franchise) and 28 U.S.C. § 1357 (Injuries under Federal Law), 42 U.S.C. § 1983 (Civil Action for Deprivation of Rights), and 52 U.S.C. § 1031 *et seq*. (Voting and Elections Law) without providing analysis or identifying which subsection supports subject-matter jurisdiction. Plaintiffs similarly assert jurisdiction under 28 U.S.C. § 1331 (Federal Question Jurisdiction) "because this action arises under the laws and Constitution of the United States" by

ignoring the political motivations behind Map 7. *See* ECF No. 8, at 7. Redistricting efforts aimed at changing the partisan balance on a legislative body cannot create federal jurisdiction.

If the redistricting plan challenged here was enacted for raw partisan purposes, then Plaintiffs cannot prevail. If Plaintiffs have failed to provide an illustrative map that disentangles race from politics, then the Supreme Court holds the motion to dismiss should be granted. *Alexander,* 602 U.S. at 10.

Instead of producing an illustrative map, Plaintiffs fundamentally rely on a retrogression standard. That is, they would immunize minority office holders from the rough and tumble of politics. Any backsliding for a minority candidate or the ability of a minority candidate to win election, would implicate federal civil rights. That is the jurisprudence before 2013 and *Shelby County*. Rough and tumble political wins and losses do not become justiciable as a federal civil rights claim whenever a member of a racial minority loses an election or faces new less favorable district lines. *See LULAC v. Abbott*, 767 F. Supp. 3d 393, 398 (W.D. Tex. 2025); ECF No. 8, at 13 (asserting that, under the Benchmark Map, Precincts 1 and 2 are majority-minority, while Precincts 3 and 4 are majority-Anglo).

Despite alleging Map 7 disenfranchises minority voters, Plaintiffs do not explain how it extinguishes the rights of any minority voter to meaningfully participate in the electoral process—the post-*Shelby County* standard. *See Gomillion v. Lightfoot*, 364 U.S. 339, 340 (1960) (concluding that a 28-sided boundary line entirely excluding black voters from city elections was justiciable).[7]

---

[7] Plaintiffs' also do not reserve their ire exclusively to Map 7; they object to every single proposed redistricting map that retrogresses the number of Democrat Commissioners as "destroy[ing] the relatively compact features of Precincts 1 and 2, intertwining them to remove large minority neighborhoods in Precinct 2 and placing them into Precinct 1, while removing Anglo neighborhoods from Precinct 1 and placing them in Precinct 2." *See* ECF No. 8, at 16.

Plaintiffs advocate a retrogression standard of liability that does not exist in any form after *Shelby County*. Plaintiffs imply that any scenario where Democrats lose power is racially motivated even though Black elected officials still a hold disproportionate number of district seats on Commissioners Court. *See Rucho*, 588 U.S. at 704-05 (there is no constitutional entitlement to proportion based racial composition in elected offices); *Alexander*, 602 U.S. at 4 ("[a] plaintiff's failure to submit an alternative map should be interpreted by courts as an implicit concession that the plaintiff cannot draw a map that undermines the legislature's defense).

It is important to note that the Benchmark Map, and even Map 7, over-represent Black population. Under Map 7, Black voters (19.3 percent of Tarrant's population) are still disproportionately represented on the Commissioners Court. The Amended Complaint alleges that Black Democrat Commissioners were reduced from two to one. This still gives Black Democrat Commissioners 25 percent of the districts on the Commissioners Court yet only representing 19 percent of Tarrant County. The Benchmark Plan would see Black elected officials representing 50 percent of the body while only representing 19 percent of the county population. If anything, the Benchmark Plan is wildly over-representative. *See* 52 U.S.C. § 10301(b).

This over representation has legal significance that supports granting this Motion to Dismiss. The Supreme Court in *Johnson v. DeGrandy*, 512 U.S. 997 (1994) addressed similar over-representation: "as a matter of law no dilution occurs whenever the percentage of single member districts in which minority voters form an effective majority mirrors the minority voters' percentage of the relevant population. Proportionality so defined . . . would thus be a safe harbor for any districting scheme." *Id.* at 1017. Fifty percent of seats when the population is 19 percent is acute over-representation. The *DeGrandy* safe harbor should apply here.

**B. Moving a voter from one staggered district to another does not constitute a constitutional injury.**

Plaintiffs rely heavily on the cycle stagger to create an injury addressable by federal courts. This Motion should be granted because the use of a staggered schedule, including redistricting that has some impact on the pace of the stagger, has been found to be a rational component of election administration. A stagger's impact is not a facially valid constitutional injury. *Heckman v. Williamson Cnty.*, 369 S.W. 3d 137, 153 (Tex. 2012) (courts address standing on a plaintiff-by-plaintiff basis and must dismiss plaintiffs who lack standing).

The Plaintiffs' claim that the stagger is subject to challenge has already been rejected by the United States Supreme Court, the Fifth Circuit, and by other district courts in Texas.

In *Pate*, a three-judge panel ruled that the interplay of new district maps with staggered election cycles complied with federal voting rights, despite some citizens waiting two additional years. *See generally Pate v. El Paso Cnty.*, 337 F. Supp. 95 (W.D. Tex. 1970), *aff'd sub nom. Pate v. El Paso Cnty.*, 400 U.S. 806 (1970); *see also Carr v. Brazoria Cnty.*, 341 F. Supp 155 (S.D. Tex. 1972), *aff'd sub nom. Carr v. Brazoria Cnty.*, 468 F.2d 950 (5th Cir. 1972) (relying on *Pate* in finding that "a two-year postponement of the franchise" is not "a constitutional deprivation").

While Plaintiffs have the right to vote in their precinct's elections, this right is governed by "where" not "when"—Plaintiffs may vote in the election of the precinct in which they reside on the date that election is held. Some Plaintiffs now voting in 2028 instead of 2026 is not only constitutionally permissible but will always happen after redistricting in a jurisdiction with a staggered schedule. Some voters will change precincts and most certainly will also change electoral cycles, always.

The two-year delay in voting for county commissioners is a foreseeable result of Texas' constitutional mandate to periodically redistrict for population changes, coupled with Texas' use

of staggered terms. *See Dollinger v. Jefferson Cnty. Comm'rs Ct.*, 335 F. Supp. 340, 344 (E.D. Tex. 1971) ("it does not follow as a matter of right that the voters transferred from one precinct to another precinct are entitled to vote at the next regular election unless they reside within the commissioners precincts in which such elections are being held."). Texas' Constitution does not afford a right to elect commissioners on a specific date.[8]

Yet, Plaintiffs spool up a novel federal civil rights theory relying on Justice Alito's opinion in *Brnovich*, one that has never been discussed by the Fifth Circuit.[9] Namely, they allege that the staggered elections result in an impermissible racially discriminatory impact. They are wrong. Ultimately, Plaintiffs rely on the disparate impact theory that Justice Alito's opinion for the Court flat rejects.

A slight racial disparity in the stagger does not make a federal cause of action. Plaintiffs claim "Black voters and Latino voters do not have an equal opportunity to elect their candidates of choice because the map results in a massive racial disparity in which voters are disenfranchised

---

[8] In contrast, the Texas Constitution was amended to mandate Senate elections after each redistricting following the Supreme Court's ruling that the one-person, one-vote requirement applied to Texas county commissioner precincts. *See* SJR 4, 53rd Reg. Session (https://lrl.texas.gov/legis/billsearch/amendmentDetails.cfm?amendmentID=206&legSession=53-0&billTypedetail=SJR&billNumberDetail=4); *see generally Avery v. Midland Cnty.*, 390 U.S. 474 (1968). However, the legislature did not apply a similar amendment for county commissioners, indicating a right to an election schedule was not a concern for these elections.

[9] The five non-exhaustive factors for courts to consider under *Brnovich* when analyzing a Section 2 challenge to an election administration procedure (as compared to a redistricting plan under *Gingles*) under the totality of the circumstances are: (1) the size of the burden imposed on voters beyond mere inconveniences (extent to which a challenged policy makes it more difficult for voters, particularly minority voters, to cast their ballots); (2) the degree to which the law departs from what was standard practice when Section 2 was amended in 1982 (voting rules with a long history or those in place when Section 2 was last updated are presumptively allowed); (3) Disparities in the law's impact on members of different racial or ethnic groups (whether the law disproportionately affects minority voters); (4) the opportunities provided by a State's entire voting system (the availability of other voting methods and how they might mitigate the burden of the challenged policy); (5) the strength of the State interests served by a challenged policy (this is the most significantly weighted on this factor). *See Brnovich*, 594 U.S. at 668-72.

in the November 2026 election" fails. ECF No. 8, at 25. The redistricting resulted in a map where 19% of Tarrant County's Black population and 12% of its Latino population were moved into precincts whose election is held in 2028, while 81% of Tarrant County's Black population and 88% of its Latino population will vote in their Benchmark election year. *See Id.*, at 23-24.

Slight racial disparities in outcome do not create a federal cause of action. Plaintiffs admit this is not a vote dilution case and then claim that this case is governed by *Brnovich*. *See* ECF No. 12, "*Motion for Preliminary Injunction*," at 13 (stating "Plaintiffs do not raise a Section 2 vote dilution claim but rather contend that the adoption of Map 7 has denied or abridged their right to vote on account of race because it has disproportionately disenfranchised Black and Latino voters of their right to vote in the November 2026 election—forcing them to wait six rather than four years to cast a ballot for commissioner"); *see generally Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) (evaluating a facially neutral rule regarding the time, place, or manner of voting).

*Brnovich* is ill-fit to analyze cases involving challenges to redistricting plans. *Gingles* has been the well-settled authority for resolving redistricting claims. Plaintiffs seem to concede that a *Brnovich* analysis applies to time, place, or manner voting rules while a *Gingles* analysis more properly applies to "the dispersal of [a minority group] into districts in which they constitute an ineffective minority of voters or . . . the concentration of [a minority group] into districts where they constitute an excessive majority." ECF. No. 12, at 13 (citing *Brnovich*, 594 U.S. at 667, 674 and *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986)).

Plaintiffs might not understand what they are bargaining for, as *Brnovich* bars their claims. The Supreme Court placed significant importance on the fact that voting remained equally open to all races and any burden on the franchise was facially neutral. It rejected explicitly disparate impact theories, like the disparate impact theories Plaintiffs advance here. The Supreme Court

13

ruled a law requiring in-person voters to travel to their assigned precinct, did not violate Section 2 even if it had racially disparate impacts, emphasizing the key requirement under Section 2 is "that the political process leading to nomination and election must be equally open to minority and non-minority groups alike." *See Brnovich*, 594 U.S. at 667 (defining equally open as members having no less opportunity than others in the electorate to participate in the political process and elect representatives of their choice).

The stagger here cannot constitute a restriction on the equal opportunity to vote. *See Petteway*, 111 F.4th 596; *Carr*, 468 F.2d 950. Plaintiffs can still vote in every election (national, State, or local) for which they are eligible in 2026 and 2028, even if their commissioner precinct election is now in 2028. Every election schedule necessitates some effort on the part of the electorate to comply with a voting system, even one that is equally open and affords an equal opportunity to cast a ballot. This does not implicate Section 2, it is just part of the usual burdens associated with voting. *Brnovich*, 594 U.S. at 669 (citing *Crawford v. Marion Cnty. Elec. Bd.*, 553 U.S 181, 198 (2008)).

Even if, somehow, *Brnovich* has something to say about Tarrant's redistricting, Plaintiffs fail to satisfy the elements in Justice Alito's opinion for the Court. Plaintiffs have not supported their claim that the burden of voting in a different election following redistricting indicates that elections are not equally open.[10] Plaintiffs also failed to satisfy the first and second *Brnovich* factors because the constitutionally imposed electoral schedule for County Commissioners does not impose a burden on voters beyond having to wait for their precinct's election to vote (a burden shared by the entire electorate). This inconvenience in being in a different precinct cannot

---

[10] The Supreme Court held that "the mere fact that there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote." *Brnovich*, 594 U.S. at 671.

overpower the heavy government interest in preserving power over drawing line, even if for partisan ends. *See Miller*, 515 U.S. at 915 (reapportionment "is primarily the duty and responsibility of the State," and "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions"). The other *Brnovich* factors cannot possibly apply in a redistricting challenge where there has been a parade of district maps over the last four decades when Section 2 was last amended.

This Court should grant Defendants' Rule 12(b)(1) motion to dismiss because subject-matter jurisdiction over Tarrant County's politically motivated redistricting is lacking.

## II.     Plaintiffs failed to state a claim upon which relief can be granted.

### A.  Plaintiffs have not pleaded a claim under Section 2 of the VRA.

#### 1.  A protected majority-minority district under *Gingles* is not implicated.

Plaintiffs here seek to protect a district that does not enjoy protection under the VRA. After *Petteway*, districts that are based on racial coalitions of different minority groups do not enjoy protection as a matter of law. They can be eliminated and deconstructed, including in a redistricting plan seeking to maximize partisan Republican power. Coalition districts that trace their origins to the pre-*Shelby* retrogression standards are especially suspect and liable to justified dismantling if they were created with a racially motivated purpose to create racial coalitions and racially focused outcomes. This is especially so because they were maintained and preserved under the pre-*Shelby* retrogression prohibition against any backsliding that might impair a minority candidate's chance to win.

To enact a plan in 2025 with the explicit purpose to protect a racial coalition district and to immunize minority candidates from the rough and tumble of politics in 2025 would brazenly violate the VRA and the Fifteenth Amendment. This action effectively seeks to do the same thing.

Courts look at challenges to redistricting plans under the *Gingles* framework. Unfortunately for Plaintiffs, the Fifth Circuit opinion in *Petteway* means that any claim relying on protection of the Benchmark Map must fail. There is no protection for the Benchmark because deliberately drawn racial coalition districts are not protected.

Section 2 of the VRA, forbids "any State" from imposing any qualification or prerequisite to a voting standard, practice, or procedure that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301. To establish a Section 2 violation, a plaintiff must prove that, under the totality of the circumstances, political processes leading to nominations or elections in the State are not equally open to members of a particular racial group, affording them less opportunity to participate in the political process and elect their chosen representatives. 52 U.S.C. § 10301(b); *see Gingles*, 478 U.S. at 43. A court cannot grant Section 2 relief based on unsubstantiated legal conclusions and "threadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678-79 (holding that naked assertions and formulaic recitals of the elements of the cause of action do not establish plausibility).

The three *Gingles* preconditions for a Section 2 violation in a redistricting challenge are: (1) *the minority* group is sufficiently large and compact to constitute *a majority* in a hypothetical alternative district that is reasonably configured; (2) *that minority* group is politically cohesive; and (3) *a majority* group votes sufficiently as a bloc to enable it to usually defeat *the minority* group's preferred candidate. *See Gingles*, 478 U.S. at 50-51.

Once a plaintiff has demonstrated these three preconditions are met, they must demonstrate that, under the totality of the circumstances, the political process is not equally open to minority

voters.[11] *See Allen v. Milligan*, 599 U.S. 1, 2 (2023); *United States v. Brown*, 561 F.3d 420, 432 (5th Cir. 2009) ("the statute is violated if under the totality of the circumstances, it is shown that the political process leading to nomination or election are not equally open to participation by members of a class of citizens").

The Benchmark Map does not enjoy protection because it cannot satisfy the first *Gingles* precondition. Deliberately drawn racial coalition districts are not protected. *Pettaway* changed everything.

In this circuit, *Gingles* requires a *single* minority group to be "sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district," that "the minority group [is] politically cohesive," and that "the white majority votes sufficiently as a bloc to enable it…to defeat" the preferred candidate of a politically cohesive, geographically insular minority group. *See Petteway*, 111 F.4th at 614 (forbidding coalitions of minorities creating a minority-majority district); *see also Allen v. Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 51). For this reason, the Fifth Circuit has held that Plaintiffs' requested relief for a coalition "majority-minority" precinct would "displace the fundamental principle of democratic rule by the majority with balkanized interests." *Petteway*, 111 F.4th at 612.

---

[11] The Senate Judiciary Committee's identified the typical factors ("Senate Factors") of a Section 2 violation used for a totality of the circumstances analysis as: (1) the extent of any history of official discrimination in the political subdivision that touched the right of the members of the subject minority group to participate in the democratic process; (2) the extent to which voting in the political subdivision is racially polarized; (3) the extent to which the political subdivision employs unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting procedures to enhance the opportunity to discriminate against the subject minority group; (4) denying members of the subject minority group access to the candidate slating process; the extent to which members of the subject minority group in the political subdivision bear the effects of discrimination which hinder their ability to participate in the political process; (6) whether political campaigns use overt or subtle racial appeals; and (7) the extent to which members of the minority group have been elected to public office. *See Gingles*, 478 U.S. at 36-37.

Despite *Petteway*'s clear holding, Plaintiffs allege the existence of a "majority-minority" population in a precinct composed of two distinct minority groups—Blacks and Latinos. *See* ECF No. 8, at 3 (asserting that Map 7 eliminates one of the two existing majority-minority precincts).[12] However, neither the Black nor Latino population of Tarrant County is large or geographically compact enough to constitute a majority in a reasonably configured precinct. *See Petteway*, 111 F.4th at 604 (Section 2 does not allow "two minority groups [to] combine forces to pursue a vote dilution claim").

Rather than address the discrepancy between their claims and the controlling Fifth Circuit authority, Plaintiffs chose to ignore *Petteway* and argue this Court should apply the pre-*Petteway* standard. *See* ECF No. 8, at 23-24. Plaintiffs' effort to conjure a disenfranchised class into existence vitiates their *Gingles* analysis—Plaintiffs cannot ignore the lack of compliance with the first precondition, then presume the other two. S*ee* ECF No. 8, at 18 (claiming without statistical evidence that the Benchmark Map contains two "opportunity districts" where minority voters can achieve electoral success because "Black and Latino voters demonstrate strong political cohesion, while White voters consistently vote as a bloc against minority-preferred candidates").

As Plaintiffs cannot prove the first *Gingles* precondition, their claims that Map 7 results in a non-existent group's disenfranchisement along racial lines under Preconditions 2 and 3 are unnecessary. *See* ECF No. 8, at 3 (alleging "Black voters and Latino voters are both disproportionately disenfranchised compared to Anglo voters").

It gets worse. Plaintiffs' claim relies on rights, such as preserving influence districts, that have no support at all in civil rights jurisprudence. For example, Plaintiffs cite the 2018 election

---

[12] Plaintiffs abandon this claim in their Motion for Preliminary Injunction by stating "Plaintiffs do not raise a Section 2 vote *dilution* claim." ECF No. 12, at 13. Yet they want their cake and eat it too; they want the district to be protected, even though it isn't protected.

in which Democrat Devan Allen defeated Republican Commissioner Andy Nguyen as evidence that the county has a "growing and politically cohesive minority population" in the Benchmark Precinct 2. *See* ECF No. 8, at 10 (claiming the ability of "the minority population in Precinct 2 to elect their candidate of choice was further confirmed in the 2020 elections when the precinct was carried by Joe Biden in the Presidential race and African American Democrat Vance Keyes in the County Sheriff's race"). Plaintiffs also described Precincts 1 and 2 on the Benchmark Map as being "influence" precincts that elected "the minority's candidate of choice," (known as "coalition" districts) while Precincts 3 and 4 elected "the Anglo-preferred candidate." *See* ECF No. 8, at 11. Maintaining influence of racial subgroups is not a protected civil right.

### B. Plaintiffs have failed to state facts supporting racial intent.

#### 1. Plaintiffs have failed to make allegations of relevant evidence suggesting Map 7 was enacted with racial intent in violation of the Fifteenth Amendment.

Plaintiffs assert that Map 7 was enacted with impermissible racial intent and support this claim with racial innuendo, allegations of disparate racial impacts and other statements which as a matter of law do not fit any element to show racial intent. *See* ECF No. 8, at 2.

To evaluate whether it is appropriate to show discriminatory purpose with circumstantial evidence, courts use the *Arlington Heights* factors: (1) discriminatory effect; (2) historical background; (3) the sequence of events leading up to a challenged decision; (4) procedural or substantive departures from normal decision making; and (5) legislative history. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977); *Perez v. Abbott*, 253 F. Supp. 3d 864, 956 (W.D. Tex. 2017) ("[c]onsideration of the *Arlington Heights* factors, when viewed in totality with the entire record evidence, may support a finding of intentional racial discrimination, even where the individual factors considered alone are not compelling").

The burden of establishing racial intent is high, "whenever a challenger claims that a [S]tate law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481 (1997) (asserting that this "rule takes on special significance in districting cases"). Legislators are given the presumption of good faith. *Alexander*, 602 U.S. at 11; *Miller*, 515 U.S. at 903 ("until a claimant makes a showing sufficient to support that allegation the good faith of a state legislature must be presumed"). "This presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10. The Supreme Court has stated district courts should exercise extraordinary caution when adjudicating claims that a State drew district lines based on race because it must distinguish between being aware of racial considerations and being motivated by them. *Id*.

Plaintiffs fail to plead facts which, as a matter of law, cannot fit as *Arlington Heights* factors. The Amended Complaint is simply insufficiently pled and represents an inadequate effort to plead facts to satisfy *Arlington Height*'s elements. For example:

- Plaintiffs plead Judge O'Hare has a history of divisive actions against minority citizens and support this assertion by discussing his initiatives while mayor of Farmers Branch to discourage illegal immigration there. *See* ECF No. 8, at 11-12. Judge O'Hare's policy position regarding illegal immigration cannot translate to relevant evidence whether a map drawn in 2025 was enacted with a racial intent.

- Plaintiffs also allege that "both Black voters and Latino voters in Tarrant County have suffered from past official discrimination in voting, and the effects of that discrimination persist" without any detail. *See* ECF No. 8, at 24 (referencing 2011 and 2013 redistricting decisions that were overturned by the Fifth Circuit).[13] Plaintiffs seek to convert evidence

---

[13] The allegation of racially polarized voting is logically incompatible with Tarrant County's election results. Every county-wide elected official and judge in Tarrant County are Republicans, many of whom won by ten points or more over their Democrat opponent. According to Plaintiffs' complaint, Anglos only compose 42.2% of the county's population. Plaintiffs' allegation of

under Senate Factor One in a Section 2 claim into evidence under *Arlington Heights*. The evidence does not relate to the history of Map 7 and is not relevant to prove discriminatory intent under *Arlington Heights*.

Next, Plaintiffs rely on a stream of character attacks on Judge O'Hare. Some of these attacks, none of which apply to any *Arlington Heights* factors, are:

- In answer to a reporter's question regarding the impact of the redistricting decision of minority voters Judge O'Hare said: "[t]he policies of Democrats continue to fail Black people over and over and over, but many of them keep voting them in. It's time for people of all races to understand the Democrats are a lost party, they are a radical party, it's time for them to get on board with us and we'll welcome them with open arms." *See* ECF No. 12, at 5 (providing the full quote instead of the fragmented quote filed in Plaintiffs' Complaint). The full quote is an appeal by a politician to court minority voters and opine about broader issues touching on race and politics nationwide—not the purpose of Map 7. Plaintiffs would have their political opponents fall silent about broader national issues and race, unless those statements adopted the views of the Plaintiffs. Otherwise, litigants will rely on public policy statements in an attempt to satisfy *Arlington Heights* factors.

- Plaintiffs claim Judge O'Hare's 2022 campaign statement "if you're a Republican officeholder and you haven't been called a racist, then you probably haven't done a thing" as evidence of something. ECF No. 8, at 12. It is not evidence of any of the five *Arlington Heights* elements. It also is a commonly expressed sentiment of conservative figures and politicians and speaks to the tactics of their opponents, not Map 7.

- Plaintiffs attempt to smear Judge O'Hare by claiming he once "formed an alliance" with True Texas Project. *See* ECF No. 8, at 12. "Forming an alliance," whatever that means, with whatever group this is, is not evidence of racial intent under *Arlington Heights*. Guilt by association is not an element under *Arlington Heights.*

Plaintiffs again attack Judge O'Hare by referencing a Commissioners Court meeting in April, 2024, in which he told commissioner Simmons "I'm the one talking now, so you'll sit there and be quiet and listen to me talk." ECF No. 8, at 13. This is an example of a presiding judge enforcing the parliamentary rules in which the Commissioner's time had expired. Enforcement of time limits in a parliamentary body is not an element under *Arlington Heights*.

---

racially polarized voting defies logic and the County's electoral reality. The only explanation for this 15–20-point swing in favor of Republicans is that a large percentage of Black, Hispanic, and Asian voters support Republican candidates.

Instead of pleading evidence of procedural deviation, Plaintiffs claim that Tarrant County's procedural or substantive redistricting departed from "normal decision making." For example:

- Plaintiffs allege that the redistricting timeline was expedited by voting on new maps just *two months* following initiation of the process, which was more compressed than the redistricting timelines during the COVID pandemic. ECF No. 8, at 14. Two months? Would three months be a timeline that would not constitute evidence under *Arlington Heights*? Four? A two-month process is long enough to enact a plan and is not evidence under *Arlington Heights*.

- Plaintiffs use resolutions passed by the Fort Worth and Arlington city councils, requesting the Commissioners Court refrain from adopting new maps until 2030 as evidence of a departure from normal decision making. *See* ECF No. 8, at 18. These are mere public political statements and do not translate to evidence under the elements in *Arlington Heights*.

- Plaintiffs quote Commissioner Ramirez response to a reporter: "I've heard a lot about the process; and I will agree with a lot of what folks have said. I think the process, it had flaws. It could have been a lot more comprehensive." ECF No. 8, at 18. This is hardly evidence under *Arlington Heights*.

- Plaintiffs claim that four public community meetings were held three weeks after the first five proposed maps were released and before the last two proposed maps were made public indicates that these maps were not available for public release until the June 3, 2025, meeting as evidence that there was a procedural departure. ECF No. 8, at 17. However, as Plaintiffs are aware, Map 7's release prior to the vote was the result of applying public comment to the original five maps. This does not represent a procedural deviation, it reflects that public input and concerns were addressed, and the county performed its required parliamentary process.

The Fifteenth Amendment's command that a map may "deny or abridge the right to vote on account of race" surely cannot be supported by gripes about a two-month process, quips about a lack of perfection in the process, what someone did as mayor years ago, and statements about the state of national politics. *See Rice v. Cayetano*, 528 U.S. 495, 512 (2000) (denying an electoral scheme that was restricted to native Hawaiian voters). Plaintiffs' factual allegations to establish racial intent are weak tea. So weak, that this Court should grant the Motion to Dismiss because the factual allegations simply do not fit with the relevant legal elements in *Arlington Heights*. As a

matter of law, Plaintiffs have failed to sufficiently plead the existence of an impermissible racial intent to enact Map 7.

> **2. Plaintiffs have failed to provide any evidence suggesting that Map 7 was enacted for the purpose of vote dilution or racial gerrymandering under the Fourteenth Amendment.**

Plaintiffs have insufficiently supported their allegations that Map 7 was intentionally racially drawn to disenfranchise a coalition of minority groups under a vote dilution or racial gerrymandering standard. *See LULAC v. Abbott*, 601 F. Supp. 3d 147, 160 (W.D. Tex. 2022) (citing *Harding v. City of Dallas*, 948 F.3d 302, 313 n.47 (5th Cir. 2020)) (intentional vote dilution claims are more difficult to prove than effects-only claims).

Perhaps the Plaintiffs' awareness of this insufficiency was the reason they abandoned both claims in favor of a novel *Brnovich*-based claim in their Motion for Preliminary Injunction. *See* ECF No. 12, at 13, 20.

To succeed in a claim of vote dilution, Plaintiffs must show Tarrant County "acted at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identified group." *See LULAC*, 601 F. Supp. 3d at 160 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)); *Brown*, 561 F.3d at 433 (plaintiffs must plead facts supporting racial discrimination being one purpose of the challenged act). "A vote-dilution plaintiff [must] show that 'the political process leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political process and to elect legislators of their choice.'" *Brnovich*, 594 U.S. at 657 (quoting *White v. Regester*, 412 U.S. 755, 766 (1973)). The *DeGrandy* safe harbor would support granting the Motion to Dismiss. *DeGrandy,* 512 U.S. at 1017.

Plaintiffs have a higher burden to demonstrate racial gerrymandering than intentional vote dilution. *See LULAC*, 601 F. Supp. 3d at 160; *Ala. Leg. Black Caucus v. Alabama*, 575 U.S. 254, 267 (2015). To prove racial gerrymandering, Plaintiffs bear the burden of showing, either through circumstantial or direct evidence of legislative purpose, race was the *predominant* factor motivating a redistricting. *Id.* ("Alabama expressly adopted and applied a policy of prioritizing mechanical race targets above all other districting criteria (save one-person[-]one-vote) provides evidence that race motivated the drawing of particular lines in multiple districts in the State"); *Miller*, 515 U.S. at 916 (Plaintiffs must plead that Defendants subordinated all other redistricting criteria—compactness, avoiding contests between incumbents, maintaining communities of interest, partisanship—to race); *see also LULAC v. Abbott*, 604 F. Supp. 3d 463, 510 (5th Cir. 2022) (denying a 12(b)(6) motion because the committee chairman stressed the number of majority-minority districts and the legislatures' desire to keep certain racial groups above 50% in irregularly shaped districts—a practice advanced by Plaintiffs' effort to preserve a preclearance era Benchmark Map).

While Plaintiffs imply racially motivated intent, the evidence fails to satisfy the heavy factual burden to establish racial intent. *See Easley v. Cromartie*, 532 U.S. 234, 258 (2001) (when a jurisdiction claims a political motive and is one "where racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional redistricting principals" and "must also show that those districting alternatives would have brought about significantly greater racial balance"); *Sinkfield v. Kelley*, 531 U.S. 28, 30 (2000) (holding that members of a bloc-voting racial minority had no standing to challenge their district as an unconstitutional racial gerrymander under the

Fourteenth Amendment); *see Lopez v. Abbott*, 339 F. Supp. 3d 589, 603 (S.D. Tex. 2018) (when partisanship explains the block voting, a "vote dilution claim is a mere euphemism for political defeat at the polls"). While Plaintiffs allege racial motives premised on racial identification correlating with political affiliation, they categorically discount the Supreme Court mandated presumption of good faith on the part of the legislature and made no effort to show "the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles." *See Easley*, 532 U.S. at 258; *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (even when plaintiffs allege a history of discrimination, legislature's actions are still presumed to be in good faith); *Alexander*, 602 U.S. at 2, (without an alternative map showing a legislature driven by its professed partisan goals could achieve greater racial balance, it is difficult for plaintiffs to defeat the starting presumption of legislative good faith).

## CONCLUSION

The Motion to Dismiss should be granted. Plaintiffs rely on jurisprudence that is no longer controlling, or applicable only to time, place, manner election laws. Plaintiffs saturate their complaint with factual allegations that, as a matter of law, do not satisfy elements to establish racial intent. Plaintiffs seek to maintain 2 Democrat seats on the Tarrant County Commissioners Court and the Defendants voted to create a 4 to 1 Republican majority. This dispute is not justiciable in federal court and, therefore, Plaintiffs complaint falls short of the standards mandated by Rule 12(b)(1) and12(b)(6).

For the foregoing reasons, this Court should dismiss Plaintiffs' complaint for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted. Respectfully submitted,

25

For the Defendants

*/s/ Joseph M. Nixon*
Joseph M. Nixon
PUBLIC INTEREST LEGAL FOUNDATION
107 S. West Street
Alexandria, VA 22413
Tel: (703) 745-5870
 jnixon@publicinterestlegal.org

J. Christian Adams*
PUBLIC INTEREST LEGAL FOUNDATION
107 S. West Street
Alexandria, VA 22413
Tel: (703) 745-5870
 adams@publicinterestlegal.org
*Motions for Pro Hac Admission forthcoming*

Kaylan Phillips*
PUBLIC INTEREST LEGAL FOUNDATION
107 S. West Street
Alexandria, VA 22413
Tel: (703) 745-5870
 kphillips@publicinterestlegal.org
*Motions for Pro Hac Admission forthcoming*

Jewel M. Lightfoot
PUBLIC INTEREST LEGAL FOUNDATION
107 S. West Street
Alexandria, VA 22413
Tel: (703) 745-5870
 jlightfoot@publicinterestlegal.org

Stephen A. Lund
State Bar No. 24086920
Tarrant County District Attorney's Office
401 W. Belknap St., 9th Floor
Fort Worth, TX 76196
Tel: (817) 884-1400
Fax: (817) 884-1475
SALund@tarrantcountytx.gov

Katherine E. Owens
State Bar No. 24081683
Tarrant County District Attorney's Office
401 W. Belknap St., 9th Floor

26

Fort Worth, TX 76196
Tel: (817) 884-1400
Fax: (817) 884-1475
KEOwens@tarrantcountytx.gov

Omar J. Famada
State Bar No. 24144940
Tarrant County District Attorney's Office
401 W. Belknap St., 9th Floor
Fort Worth, TX 76196
Tel: (817) 884-1400
Fax: (817) 884-1475
OJFamada@tarrantcountytx.gov

## CERTIFICATE OF SERVICE

I, Joseph M. Nixon, do hereby certify that service of a true and correct copy of this document has been forwarded to all counsel of record via electronic notification and sent to non-parties via regular and/or certified mail.

DATED: August 1, 2025                 For the Defendants

                                      */s/ Joseph M. Nixon*
                                      Joseph M. Nixon
                                      PUBLIC INTEREST LEGAL FOUNDATION
                                      107 S. West Street
                                      Alexandria, VA 22413
                                      Tel: (703) 745-5870
                                       jnixon@publicinterestlegal.org

27

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

WINNIE JACKSON, JARRETT "JAY"
JACKSON, CELINA VASQUEZ, DUANE
BRAZTON, NADIA BHULAR, AMJAD
BHULAR, CHERYL MILLS-SMITH, and
RICHARD CANADA,

       *Plaintiffs*,

       v.                            Civil Case No. 4:25-cv-000587-O

TARRANT COUNTY, TEXAS;
TARRANT COUNTY COMMISSIONERS
COURT; TIM O'HARE, in his official
capacity as Tarrant County Judge,

       *Defendants*.

## ORDER

       AND NOW, on this _____ day of _____, 2025, it is **ORDERED** that Plaintiffs'

Motion to Dismiss is **GRANTED**.

**ORDERED** on this ___ day of August 2025.

                              BY THE COURT:

                           _____
                           **HON. REED C. O'CONNOR**

28