**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

WINNIE JACKSON, JARRETT "JAY"
JACKSON, CELINA VASQUEZ, DUANE
BRAZTON, NADIA BHULAR, AMJAD
BHULAR, CHERYL MILLS-SMITH, and
RICHARD CANADA,

        *Plaintiffs*,

        v.                              Civil Case No. 4:25-cv-000587-O

TARRANT COUNTY, TEXAS;
TARRANT COUNTY COMMISSIONERS
COURT; TIM O'HARE, in his official
capacity as Tarrant County Judge,

        *Defendants*.

## DEFFENDANTS' RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs are not entitled to injunctive relief because there is no claim on which Plaintiffs will be successful, Plaintiffs fail to show irreparable harm and seek relief of a political question based predominately on race.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................3

PRELIMINARY INJUCTION STANDARD..................................................................5

ARGUMENT ..............................................................................................................5

I.      Plaintiffs Are Unlikely to Succeed on the Merits. ....................................................6

      A.  Plaintiffs' Section 2 Claim Fails as a Matter of Law, Fact, and Precedent. ......8

          1.  Plaintiffs Do Not Present a Traditional Vote Dilution Claim.....................8

          2.  Plaintiffs Were Not Denied the Right to Vote and Remain Fully Eligible
              to Participate. ...............................................................................9

          3.  Binding Precedents Reject the Claim That Election Cycle Reassignment
              Constitutes Disenfranchisement...............................................................10

          4.  Plaintiffs Reliance on the *Brnovich* Factors is Unavailing. ......................11

      B.  Plaintiffs' Constitutional Claims Fail Under the First and Fourteenth
          Amendments. ..........................................................................................13

          1.  Plaintiffs Fail to Offer any Evidence that the County Violated Equal
              Protection Principles. .............................................................................14

          2.  Plaintiffs Attempt to Reframe a Political Outcome They Disfavor as
              Viewpoint Discrimination.......................................................................14

          3.  Redistricting Inevitably Affects Electoral Timing, Not Rights. ................15

      C.  Plaintiffs' Fail to Plead *Arlington Heights* Factors in Support of an Intent
          Claim under the Fifteenth Amendment.............................................................15

II.     Plaintiffs Fail to Show Irreparable Harm. ...........................................................19

      A.  Plaintiffs Will Be Able to Vote in 2026 and Remain Fully Enfranchised.......19

III.    The Balance of Equities Weighs Against Granting Preliminary Relief. ................21

IV.    Public Interest Would Not Be Served by Judicial Intervention. ...........................22

CONCLUSION...........................................................................................................24

CERTIFICATE OF SERVICE .....................................................................................26

*Cases*

*Abbott v. Perez*, 585 U.S. 579 (2018) ................................................................. 11, 13, 18-19, 23

*Ala. Leg. Black Caucus v. Alabama*, 575 U.S. 254 (2015) ...................................................... 17

*Alexander v. S.C. State Conf. of the NAACP,* 602 U.S. 1 (2024) ...... 1, 7, 11, 14, 17, 18-19, 23

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ......................................................................... 15

*Barnett v. Boyle*, 250 N.W.2d 635 (Neb. 1977) ...................................................................... 10

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) ...................................... 2, 7-12, 17

*Canal Auth. v. Callaway*, 489 F.2d 567 (5th Cir. 1974) ............................................................. 5

*Carr v. Brazoria Cnty.*, 341 F. Supp. 155 (S.D. Tex. 1972) ....................2, 4, 6, 10, 13, 16, 20

*Carr v. Brazoria Cnty.*, 468 F.2d 950 (5th Cir. 1972) ................................................................. 2

*Donatelli v. Mitchell*, 2 F.3d 508 (3d Cir. 1993) ..................................................................... 15

*Easley v. Cromartie*, 532 U.S. 234 (2001).......................................................................... 18-19

*Gaffney v. Cummings*, 412 U.S. 735 (1973) .......................................................................7, 15

*Harding v. Cnty. of Dallas*, 948 F.3d 302 (5th Cir. 2020)....................................................... 16

*Healthy Vision Ass'n v. Abbott*, 138 F.4th 385 (5th Cir. 2025) ...........................................5, 19

*Holder v. Hall*, 512 U.S. 874 (1994) ........................................................................................ 13

*Johnson v DeGrandy*, 512 U.S. 997 (1994)........................................................................... 2-3

*Kentopp v. Anchorage*, 652 P.2d 453 (Alaska 1982).............................................................. 10

*Legislature v. Reinecke*, 516 P.2d 6 (Cal. 1973)...................................................................... 10

*Lopez v. Abbott*, 339 F. Supp. 589 (S.D. Tex. 2018) ............................................................... 19

*LULAC v. Abbott*, 601 F. Supp. 3d 147 (W.D. Tex. 2022)....................................................... 16

*Merrill v. Milligan*, 142 S. Ct. 879 (2022)................................................................................. 3

*Miller v. Johnson*, 515 U.S. 900 (1995)..............................................1, 2, 10-12, 16, 17-18

*Nichols v. Alcatel USA, Inc.*, 532 F.3d 364 (5th Cir. 2008)........................................................ 5

*Pate v. El Paso Cnty.*, 337 F. Supp. 95 (W.D. Tex. 1970) ........................2, 4, 6, 10, 13, 16, 20

*Pate v. El Paso Cnty.*, 400 U.S. 806 (1970)................................................................................. 2

*Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017) .......................................................... 17

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ......................................................17, 16

*Petteway v. Galveston Cnty.*, 111 F.4th 596 (5th Cir. 2024) .......................................... 6, 23-24

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) ................................................. 3, 21-22

*Republican Party of Or. v. Keisling*, 959 F.2d 144 (9th Cir. 1992)........................................15

*Rucho v. Common Cause*, 588 U.S. 684 (2019) ........................................2, 7, 15, 23

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ........................................................18

*Sinkfield v. Kelley*, 531 U.S. 28 (2000)..............................................................19

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ........................................................6, 8

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009).............................................17

*Vidal v. Elster*, 602 U.S. 286 (2024).................................................................16

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). .......2, 6-7, 17-18

*White v. Regester*, 412 U.S. 755 (1973) .............................................................17

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................5


**Constitutional Provisions**

U.S. Const. amend. I ........................................................................6, 15

U.S. Const. amend. XIV § 1 ............................................................................6

U.S. Const. amend. XV § 1 .............................................................................6

Tex. Const. art. 5, § 18(b) ..............................................................................6

Tex. Const. art. 5, § 18(d) .............................................................3, 6, 9, 13

Tex. Const. art. 16, § 64 ...............................................................................3, 6


**Statutes**

52 U.S.C. § 10301(a) ........................................................................6, 8, 9

52 U.S.C. § 10301(b*)* .................................................................................8

## INTRODUCTION

Plaintiffs seek the extraordinary remedy of a preliminary injunction to upend Tarrant County's redistricting decision. Tarrant County's process was lawful, deliberative, and consistent with both state and federal law. Plaintiffs allege that the newly adopted map (Map 7) constitutes intentional racial vote dilution, unconstitutional disenfranchisement, and unlawful partisan gerrymandering. Their motion fails to meet the high burden required for relief. *Alexander v. S.C. State Conf. of the NAACP,* 602 U.S. 1, 14 (2024) ("to untangle race from other permissible considerations we require the plaintiff to show that race was the 'predominant factor motivation the legislature's decision to place significant number of voters within or without a particular district.'"). They present no compelling legal authority or credible evidence of an unlawful motive to support a right of recovery, as well as no proof of irreparable harm.

The Tarrant County Commissioners Court adopted Map 7 after a months-long public process that included demographer input, community outreach, and countywide public meetings held in every precinct. The resulting map complies with traditional redistricting principles of equal population, compactness, continuity, and respect for communities of interest. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995). However, Plaintiffs attempt to transform routine electoral consequences of redistricting into voting rights issues based solely on speculation in violation of decades of binding redistricting precedent. *See Alexander,* 602 U.S. at 9 ("Proving racial predominance with circumstantial evidence alone is much more difficult.").

Plaintiffs' VRA Section 2 claims do not allege denial of access to the ballot, voter registration, or vote counting. Instead, they object to being moved into precincts not scheduled for a commissioner election in 2026. *See* Pls.' Br. in Supp. of Mot. For Prelim. Inj., ECF No. 12, at 12-14. That is a lawful result of Texas' staggered-term election system, which has been

repeatedly upheld by courts. *Carr v. Brazoria Cnty.*, 341 F. Supp. 155, 160 (S.D. Tex. 1972) (citing *Pate v. El Paso Cnty.*, 337 F. Supp. 95 (W.D. Tex. 1970), *aff'd*, 400 U.S. 806 (1970)), *aff'd*, 468 F.2d 950 (5th Cir. 1972).

Plaintiffs' constitutional claims are similarly flawed. The Supreme Court has held that partisan gerrymandering claims are nonjusticiable, and redistricting plans that consider political dynamics do not become unconstitutional merely because they impact racial outcomes. *Rucho v. Common Cause*, 588 U.S. 684, 718 (2019); *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 671 (2021) ("the mere fact there is some disparity in impact does not necessarily mean that a system is not equally open."). Plaintiffs cannot sidestep *Rucho* by repackaging their claim as "viewpoint discrimination." ECF No. 12 at 12-14. The First and Fourteenth Amendments do not entitle voters to political symmetry, and courts are not empowered to impose it. *See Miller,* 515 U.S. at 915 ([f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions.").

Similarly, a Fifteenth Amendment intent claim requires pleading of facts showing evidence of racial intent. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977). The racial inuendo pleaded in Plaintiffs' Amended Complaint are insufficient direct or circumstantial evidence of racial intent necessary to support a temporary injunction. The *Arlington Heights* factors are absent. *See* Defendant's Memorandum in Support of its Motion to Dismiss ECF No. 22-1, at 24-28.

Further, Plaintiffs pleaded into the County's safe harbor of proportional representation. *Johnson v DeGrandy*, 512 U.S. 997 (1994). "[A]s a matter of law no dilution occurs whenever the percentage of single member districts in which minority voters form an effective majority mirrors voters' percentage of the relevant population. Proportionality so defined … would thus

be a safe harbor for any districting scheme." *DeGrandy* 512 U.S. at 1017. Thus, with 19 percent of the population and 25 percent of the seats on Commissioners Court, there is no legal justification to impose the remedy Plaintiffs seek.

Plaintiffs baselessly ask this Court to discard a lawfully adopted map, interrupt established election procedures, and impose judicial oversight on a local redistricting decision, all without pleading clear evidence of illegality or harm. Plaintiffs' injunction would substantially disrupt preparations for the 2026 election, confuse voters, and sow uncertainty in jurisdictions statewide that rely on staggered election systems.

Courts have long held that judicial interference with elections, especially close to a voting cycle, should be rare and justified only by clear and compelling evidence. *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006) (per curiam). Plaintiffs have not overcome that standard. *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (establishing a four-element test for overcoming *Purcell*). Their request for injunctive relief should be denied.

## FACTUAL BACKGROUND

Tarrant County is governed by a Commissioners Court that includes four commissioners elected from single-member precincts and a county judge elected at-large. Commissioners serve staggered four-year terms. Under this system, two precincts hold commissioner elections during each general election cycle: even-numbered precincts vote in presidential election years (e.g., 2028), while odd-numbered precincts vote in midterm years (e.g., 2026). The Texas Constitution provides that county commissioners serve their full terms regardless of any redistricting. *See* Tex. Const. art. 5, § 18(d); art. 16, § 64. As a result, redistricting may reassign some voters from a precinct voting in an upcoming election to one that will not vote until the following cycle. This

consequence is common, legally permissible, and inherent to staggered election systems. *See Carr*, 341 F. Supp. at 159-60; *see also Pate*, 337 F. Supp. at 98-99.

Following the 2020 Census, the Commissioners Court reviewed its 2011 redistricting map, which had a population deviation of only 1.97 percent. The Commissioners Court voted to readopt the 2011 map without changes based on the advice of its counsel ECF No.13-3 at 28. That map, which Plaintiffs refer to as the "Benchmark Map," remained in effect until 2025.

If there was deviation from standard procedures it occurred in 2021 when Tarrant County's Commissioners Court followed bad legal advice and deliberately preserved Precinct 2 as a racial coalition district. ECF No. 13-1, at 45-48. Retrogression was no longer the standard in 2021, but the Commissioners Court was advised to keep a coalition district for the purpose of allowing Precinct 2 to maintain a minority-influenced district. ECF No. 13-1, at 73-74 ("…a jurisdiction that draws a plan that is retrogressive may increase the chance that it will be sued under Section 2."). In the 2021 vote to keep the Benchmark Map, race became a motivating factor. Thus, in violation of Section 2 and the Fifteenth Amendment, Plaintiffs now seek an injunction to preserve a constitutionally suspect map from 2021.

In early 2025, the Commissioners Court began two-month public redistricting process. The process culminated in the adoption of Map 7, which equalizes population across precincts and will very deliberately lead to the election of another Republican to the Commissioners Court, creating a four to one Republican majority on the commissioner court. The new map reflects traditional redistricting principles, including population balance, preservation of communities of interest, and avoidance of incumbent pairing. Plaintiffs do not contest the legitimacy of these redistricting criteria.

Map 7 is the product of a lawful legislative process, carried out by elected officials acting within their constitutional authority. It does not deny any voter the right to participate in elections. Plaintiffs' voting rights and constitutional claims rely on conjecture, rhetorical exaggeration, and selective interpretation—not facts sufficient to justify preliminary injunctive.

## PRELIMINARY INJUNCTION STANDARD

Preliminary injunction is an extraordinary remedy that should be granted only in limited circumstances. *Nichols v. Alcatel USA, Inc*., 532 F.3d 364, 372 (5th Cir. 2008). To obtain such relief, Plaintiffs bear the burden of establishing all four of the following elements:

1. A substantial likelihood of prevailing on the merits;

2. A substantial threat of irreparable injury;

3. That the threatened injury outweighs any to the non-movant if the injunction is granted; and

4. That the injunction will not disserve the public interest.

*Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20-24 (2008); *see also Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 402 (5th Cir. 2025) (citing *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

In this case, Plaintiffs must show that the redistricting plan they challenge is likely to be found unlawful, that it will cause them imminent and irreparable harm, and that blocking the plan now serves both equity and the public interest. As shown below, Plaintiffs do not meet any of these requirements.

## ARGUMENT

Plaintiffs' Motion should be denied because it fails to meet any of the four elements of a Preliminary Injunction.

**I.      Plaintiffs Are Unlikely to Succeed on the Merits.**

Plaintiffs' claims under both the Voting Rights Act (VRA) and the Constitution are unlikely to succeed because they rest on a fundamental misapplication of the law to the facts. To prevail, Plaintiffs must demonstrate that the redistricting plan adopted by the Tarrant County Commissioners Court violates Section 2 of the VRA or deprives them of constitutional rights under the Equal Protection or Free Speech Clauses. 52 U.S.C. § 10301(a); U.S. Const. amend. I; amend. XIV, § 1; amend. XV, § 1.

First, Plaintiffs' Section 2 claim fails because they do not allege or prove the kind of denial or abridgment of voting rights that the statute prohibits. They do not satisfy the elements of a vote dilution claim under *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). There is no majority-minority district to protect. *See Petteway v. Galveston Cnty.*, 111 F.4th 596, 604-05 (5th Cir. 2024) (holding that § 2 of the Voting Rights Act does not authorize race coalition claims to satisfy the first *Gingles* precondition). Instead, they challenge the routine reassignment of voters into precincts with different election schedules, an outcome common in staggered election systems and expressly permitted under federal and state law. *See Carr*, 341 F. Supp. at 159-60; *see also Pate*, 337 F. Supp. at 98-99; Tex. Const. art. 5, § 18(b); Tex. Const. art. 5, § 18(d); Tex. Const. art. 16, § 64. Courts have consistently held that such reassignment does not violate Section 2. *See Pate*, 337 F. Supp. at 96–97.

Second, Plaintiffs' Equal Protection claim under the Fourteenth Amendment is unsupported by the record. There is no evidence that the Commissioners Court acted with racial intent or classified voters based on race. The redistricting process complied with traditional principles and did not involve any procedural irregularities or discriminatory motivations. Plaintiffs do not plead facts sufficient to establish intentional discrimination under the *Arlington*

*Heights* framework. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977) (establishing a five-factor test for determining whether it is appropriate to infer a discriminatory purpose).

Third, Plaintiffs' First Amendment claim fares no better. Plaintiffs' claims of partisan gerrymandering are nonjusticiable under *Rucho*, and there is no basis to reframe a political outcome as viewpoint discrimination. *See Rucho v. Common Cause*, 588 U.S. 684, 708, 714 (2019) (quoting *Gaffney v. Cummings*, 412 U.S. 735, 752 (1973)) (rejecting the theory that partisan redistricting equates to viewpoint discrimination and stating "'[i]t would be idle . . . to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it.'"). The First Amendment does not guarantee political symmetry or protect voters from the consequences of redistricting based on lawful, political considerations. *Id.* at 714.

Finally, even if Plaintiffs' claims are reframed as alleging intentional racial vote dilution, they cannot succeed. They do not plead any direct or circumstantial evidence that race was a motivating factor in the adoption of Map 7. The plan reflects ordinary redistricting considerations, and any statistical disparities are not sufficient to prove unconstitutional intent. *See Brnovich*, 594 U.S. at 650 (stating that § 2(b) of the Voting Rights Act is not a disparate impact test). The Supreme Court has recently reiterated that "to prevail, a plaintiff must 'disentangle race from politics' by proving that 'the former drove a district's lines.'' *Alexander* 602 U.S. at 9. The Court further stated that litigants must "rul[e] out the competing explanation that political consequences dominated the legislature's redistricting efforts." *Id.* at 9-10

Because Plaintiffs have failed to establish any legal or factual basis for their claims, they cannot meet the first and most critical requirement for preliminary relief.

## A. Plaintiffs' Section 2 Claim Fails as a Matter of Law, Fact, and Precedent.

Plaintiffs' claim under Section 2 of the VRA, is both legally defective and factually unsupported. At its core, Section 2 prohibits voting practices or procedures that result in a denial or abridgment of the right to vote on account of race or color. 52 U.S.C. § 10301(a). A plaintiff must show that, under the totality of the circumstances, members of a protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

This statutory standard imposes a significant burden. Plaintiffs must do more than point out disparate outcomes. They must demonstrate that the challenged practice has caused an actual denial or abridgment of the right to vote, and that the cause of that abridgment was racial, not merely political, geographic, or administrative. *Brnovich*, 594 U.S. at 668–69. Here, Plaintiffs fall well short of that mark.

### 1. Plaintiffs Do Not Present a Traditional Vote Dilution Claim.

Plaintiffs do not bring a traditional vote dilution claim under *Gingles* and indeed, they make no effort to satisfy the *Gingles* preconditions. 478 U.S. at 50-51. Under that framework, a plaintiff must demonstrate: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that the group is politically cohesive; and (3) that the majority votes sufficiently as a bloc to usually defeat the minority group's preferred candidate. *Id.* These threshold requirements are necessary to establish that the challenged districting scheme has the effect of diluting minority voting strength.

Plaintiffs admit that there is not a majority-minority district to protect by not bringing a vote dilution claim under *Gingles*. *See* ECF No. 12, at 6. They do not offer a proposed alternative map or any expert analysis identifying such a configuration could reasonably exist. *See* ECF No. 12, at 6 (where Plaintiffs promote the Benchmark Map). Instead, their claim rests entirely on the

assertion that the redistricting plan, by moving certain voters from even-numbered to odd-numbered precincts, has delayed their next opportunity to vote for a county commissioner by two years.

The Supreme Court has been clear that Section 2 protects the ability "to participate in the political process and to elect representatives of [one's] choice," not the timing of any particular election. *See Brnovich*, 594 U.S. at 668–69. Nothing in the VRA guarantees that every voter will have the opportunity to vote for every office in every cycle. Plaintiffs' theory would convert a standard consequence of a constitutionally mandated staggered elections into a presumptive violation of federal law, contrary to both precedent and practice. *See* Tex. Const. art 5, § 18(d).

### 2. Plaintiffs Were Not Denied the Right to Vote and Remain Fully Eligible to Participate.

Section 2 does not prohibit temporary shifts in voting schedules caused by lawful redistricting in staggered election systems. The affected voters remain registered and able to cast ballots in every other race appearing on the 2026 primary and general election ballots, including U.S. Senate, and U.S. House, as well as State and local offices. They will have the opportunity to vote for county commissioner in 2028, in accordance with the regular electoral cycle of their newly assigned precincts.

This is not disenfranchisement. The ability to vote for one local office two years later than expected does not constitute a denial or abridgment of voting rights under any reasonable interpretation of Section 2. *See* 52 U.S.C. § 10301(a). The Supreme Court in *Brnovich* emphasized that Section 2 "does not require proportional outcomes" or eliminate all inconvenience, nor does it create a right to a specific election format or frequency. *Brnovich*, 594 U.S. at 668.

### 3. Binding Precedents Reject the Claim That Election Cycle Reassignment Constitutes Disenfranchisement.

Federal courts in Texas and elsewhere have repeatedly rejected Plaintiffs' disenfranchisement theory. In *Pate v. El Paso County*, a three-judge court upheld a redistricting plan in which some voters were moved from a precinct voting in the next election into one that would not vote for commissioner for two more years. 337 F. Supp. at 100-01. The court held that this delay was a permissible consequence of combining redistricting with staggered terms. *Id.* at 96-97.

Similarly, in *Carr v. Brazoria County*, the court found no constitutional injury where redistricting resulted in a "two-year postponement of the franchise" for some voters. 341 F. Supp. at 160. The court observed that staggered terms necessarily create differences in voting opportunities, and that such differences, even if temporary, are not constitutionally suspect when arising from a facially neutral redistricting process. *Miller*, 515 U.S. at 903.

Federal courts outside of Texas have reached the same conclusion. The Alaska Supreme Court in *Kentopp v. Anchorage*, 652 P.2d 453, 462 (Alaska 1982), held that "temporary disenfranchisement of transferred voters is an inevitable consequence of the reapportionment process … [and] does not constitute invidious discrimination[.]" That court reasoned that such delays are analogous to the wait experienced by voters who move to a new district or turn eighteen shortly after an election. *Id.* at 463. The California Supreme Court reached a similar conclusion in *Legislature v. Reinecke*, 516 P.2d 6, 12 (Cal. 1973), holding that "inequalities among groups of electors" stemming from staggered elections were not unconstitutional because they reflected neutral governance mechanisms.

In *Barnett v. Boyle*, 250 N.W.2d 635, 638 (Neb. 1977), the Nebraska Supreme Court held that staggered elections and related delays do not establish classifications resulting in invidious

discrimination. The court emphasized that some inequality in timing is inherent in any staggered system, and that courts should not interfere unless voters are systematically and intentionally excluded.

### 4. Plaintiffs' Reliance on the *Brnovich* Factors is Unavailing.

Plaintiffs attempt to support their Section 2 claim by citing raw demographic data indicating that Black and Latino voters were disproportionately reassigned to commissioner precincts voting in 2028. Such statistical disparities do not alone establish a violation of Section 2. *See Brnovich*, 594 U.S. at 668–69. Courts have repeatedly held that disparate impact, standing alone, is insufficient. *Id.* Further, the Court recognized that not all disparities can be seen as racial in nature. The Court said, "[t]o the extent that minority and non-minority groups differ with respect to employment, wealth, and education, even neutral regulations, no matter how crafted, may well result in some predictable disparities in rates of voting and noncompliance with voting rules. But the mere fact there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote." *Id.* at 671.

Plaintiffs do not account for other factors influencing redistricting, including partisanship, population growth, geographic constraints, continuity of representation, and other race-neutral redistricting criteria. The Supreme Court has instructed courts not to infer discrimination from impact alone where the governing body had valid, nonracial justifications for its decisions. *See Abbott v. Perez*, 585 U.S. 579, 602 (2018).

Moreover, Plaintiffs plead no evidence that the Commissioners Court considered race in drawing Map 7, much less that race was the predominant factor. *See Alexander,* 602 U.S. at 7 ("to untangle race from other permissible considerations, we require the plaintiff to show that

race was the 'predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'") (citing *Miller*, 515 U.S. at 915). The fact that some racial groups are more affected than others does not convert a facially neutral and lawfully adopted map into a violation of federal law.

Even assuming the Court were to apply the five "important circumstances" outlined in *Brnovich*, each factor weighs against finding a Section 2 violation here:

**(i) Size of the burden**: The burden Plaintiffs identify is minimal. Voters remain fully eligible to vote and are not denied access to the ballot. The shift in the voting year for one office does not materially hinder political participation.

**(ii) Departure from historical practice**: Plaintiffs argue that the 2025 redistricting was irregular because it occurred mid-decade. But mid-cycle redistricting is not prohibited, and local legislative bodies may revise district lines when they choose. The Supreme Court has never held that redistricting must occur only once per decade, nor that deviation from past timing is presumptively unlawful.

**(iii) Disparities in impact**: The statistical disparities Plaintiffs rely on do not demonstrate that the plan was adopted "on account of race." Disparate outcomes are common in redistricting and are not actionable without proof of discriminatory motive or effect.

**(iv) Availability of alternative voting opportunities**: Plaintiffs remain eligible to vote for all other races in 2026 and for commissioner in 2028. They suffer no loss of franchise, and the system remains fully open to political participation.

**(v) Strength of the state interests served**: The County had legitimate policy reasons for redrawing its map, namely, to rebalance populations, improve precinct continuity, prepare for future growth, as well as elect an additional Republican commissioner. Plaintiffs plead no

evidence of discriminatory intent. Legislative bodies are presumed to act in good faith. *Abbott*, 585 U.S. at 602.

Plaintiffs' theory would render staggered elections unworkable. Under their logic, any redistricting that results in a change to a voter's election year would be a presumptive violation of Section 2. But staggered elections necessarily create cycles of delay and rotation. *See Carr*, 341 F. Supp. at 160. These systems are expressly authorized under Texas law and have been consistently held constitutional by courts. *See* Tex. Const. art. 5, § 18(d); *Pate*, 337 F. Supp. at 100-01. The Constitution and VRA do not require jurisdictions to realign all election dates after every redistricting. Such a requirement would force counties to abandon long-standing governance structures, disrupt terms of office, and invite a flood of litigation based on speculative and partisan claims.

Courts have rejected attempts to use Section 2 to impose rigid structural mandates that are not found in the text of the statute. *See Holder v. Hall*, 512 U.S. 874, 885 (1994) (plurality op.) (rejecting Section 2 claim based on challenge to size of governing body). The same reasoning applies here. Section 2 does not require uniform election cycles or prohibit administrative delays caused by neutral redistricting. *See id.*

### B. Plaintiffs' Constitutional Claims Fail Under the First and Fourteenth Amendments.

Plaintiffs also assert constitutional claims under the Equal Protection Clause of the Fourteenth Amendment and the Free Speech Clause of the First Amendment, arguing that Map 7 was drawn with discriminatory intent or partisan animus. These claims are no more persuasive than their VRA theory. The redistricting plan adopted by Tarrant County complies with longstanding constitutional principles. Plaintiffs fail to allege, much less prove, any unconstitutional classification or burden on protected rights.

1. **Plaintiffs Fail to Offer any Evidence that the County Violated Equal Protection Principles.**

To establish a violation of the Equal Protection Clause, Plaintiffs must show that the redistricting plan intentionally discriminates against a protected class. The Supreme Court found mere disparate impact to be insufficient, stating that "[d]iscriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Plaintiffs do not offer relevant evidence that the Commissioners' Court acted with invidious racial intent. The redistricting process was open, deliberate, and informed by traditional redistricting principles. The Commissioners Court gave the public access to proposed maps, including Map 7, and held public meetings in every precinct. No evidence in the record suggests that the Commissioners' Court departed from standard redistricting practices or sought to disadvantage any racial group. Plaintiffs also fatally do not attempt to disentangle race from politics, as is their burden, by offering an alternative map. *Alexander*, 602 U.S. at 10.

In sum, Plaintiffs cannot meet their burden to show that Map 7 was enacted because of its impact on any racial group. The plan is facially neutral, adopted through a public process, and supported by legitimate governmental objectives. The Equal Protection Clause does not prohibit such legislative acts.

2. **Plaintiffs Attempt to Reframe a Political Outcome They Disfavor as Viewpoint Discrimination**

Plaintiffs argue that Map 7 violates the First Amendment by constituting "viewpoint discrimination" against Democratic voters. *See* ECF No. 12, at 12-14. They assert that the map

was designed to reduce the influence of Democrat-aligned communities by shifting them into precincts that will not vote until 2028. This claim is not actionable.

The Supreme Court has held in *Rucho* that political gerrymandering is not justiciable under the federal Constitution. *See Rucho*, 588 U.S. at 718. Courts cannot impose manageable standards to determine how much partisanship is too much, and the Constitution does not require proportional outcomes or partisan neutrality in redistricting. *See id.* at 714 (quoting *Gaffney v. Cummings*, 412 U.S. 735, 752 (1973)) (rejecting the theory that partisan redistricting equates to viewpoint discrimination and stating "[i]t would be idle . . . to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it.").

Plaintiffs' attempt to repackage a partisan gerrymandering claim as one of "viewpoint discrimination" does not change the analysis. The First Amendment protects the right to express political views and association for political purposes. U.S. Const. amend. I. It does not guarantee any particular electoral outcome or insulate political factions from the ordinary consequences of redistricting. *See Anderson v. Celebrezze*, 460 U.S. 780, 786–88 (1983). Redistricting may incidentally affect the voting power of certain political groups, but this alone does not burden speech or political association in a constitutional sense.

The Fifth Circuit and other courts have rejected First Amendment claims where voters remain eligible to participate in the political process and have not been excluded from the franchise. *See Republican Party of Or. v. Keisling*, 959 F.2d 144, 146 (9th Cir. 1992) (rejecting First Amendment claim based on temporary voting delays under staggered system); *see also Donatelli v. Mitchell*, 2 F.3d 508, 514-516 (3d Cir. 1993) (temporary disenfranchisement does not violate the Equal Protection Clause).

Plaintiffs cite *Vidal v. Elster*, 602 U.S. 286, 293 (2024), for the proposition that viewpoint discrimination is especially disfavored. But that case concerned trademark law and the federal government's direct regulation of expressive content. It has no application to neutral redistricting decisions made by a local legislative body through a lawful and open process. There is no evidence that Map 7 was designed to suppress expression, target political speech, or burden any particular viewpoint.

### 3. Redistricting Inevitably Affects Electoral Timing, Not Rights.

Plaintiffs' constitutional claims rest on a faulty premise: that reassignment to a different election cycle, standing alone, is a constitutional injury. As discussed above, staggered elections necessarily result in some voters waiting longer than others to vote for specific offices. Courts have uniformly held that such delays, absent actual exclusion from voting, do not rise to the level of a constitutional violation.

In both *Carr* and *Pate*, courts recognized that staggered systems serve important governmental interests, such as continuity in office and administrative efficiency. *See Carr*, 341 F. Supp. at 159-60; *see also Pate*, 337 F. Supp. at 98-99. Any incidental delay in voting is outweighed by these legitimate objectives.

The Equal Protection Clause does not require that all voters vote at the same time, nor does the First Amendment guarantee uniform electoral impact.

### C. Plaintiffs' Fail to Plead *Arlington Heights* Factors in Support of an Intent Claim under the Fifteenth Amendment.

Plaintiffs have insufficiently supported their allegations that Map 7 was intentionally racially drawn to disenfranchise a coalition of minority groups under a vote dilution or racial gerrymandering theory. *See LULAC v. Abbott*, 601 F. Supp. 3d 147, 160 (W.D. Tex. 2022) (citing *Harding v. Cnty. of Dallas*, 948 F.3d 302, 313 n.47 (5th Cir. 2020) (intentional vote

dilution claims are more difficult to prove than effects-only claims). To prevail, Plaintiffs must

show that the County acted at least in part because of its adverse effects on minority voters. *See*

*Feeney*, 442 U.S. at 279; *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009).

Plaintiff's Fourteenth Amendment claims also lack merit. "A vote-dilution plaintiff

[must] show that 'the political process leading to nomination and election were not equally open

to participation by the group in question—that its members had less opportunity than did other

residents in the district to participate in the political process and to elect legislators of their

choice.'" *Brnovich*, 594 U.S. at 657 (quoting *White v. Regester*, 412 U.S. 755, 766 (1973)).

To prevail on a racial gerrymandering claim, Plaintiffs must show, either through

circumstantial or direct evidence, that race was the predominant factor in redistricting. *Ala. Leg.*

*Black Caucus v. Alabama*, 575 U.S. 254, 260 (2015) (noting that Alabama's policy of

prioritizing race targets over all other criteria provided evidence that race motivated redistricting

decisions); *Miller*, 515 U.S. at 916 (requiring Plaintiffs to show that traditional criteria—such as

compactness, incumbency protection, communities of interest, and partisanship—were

subordinated to race); *Alexander,* 602 U.S. at 7 ("to untangle race from other permissible

considerations, we require the plaintiff to show that race was the 'predominant factor motivating

the legislature's decision to place a significant number of voters within or without a particular

district.'").

A mere disparate impact does not prove a system is not equally open or that minority

voters were denied equal opportunity. *Brnovich*, 594 U.S. at 649. Courts evaluating

discriminatory purpose look to the *Arlington Heights* factors: (1) discriminatory effect; (2)

historical background; (3) sequence of events; (4) procedural or substantive departures; and (5)

legislative history. *Arlington Heights*, 429 U.S. at 266–68; *Perez v. Abbott*, 253 F. Supp. 3d 864,

956 (W.D. Tex. 2017) (noting that while individual factors may not be compelling, they may support a finding of discriminatory purpose when viewed in totality); *Abbott*, 585 U.S. at 581 (even when Plaintiffs allege a history of discrimination, legislative action is presumed to be in good faith).

Plaintiffs have not provided *Arlington Heights* evidence showing that race predominated over conventional redistricting factors. On the contrary, they seek to restore a constitutionally suspect Benchmark Map. ECF. No. 8, at 31; *see Miller*, 515 U.S. at 915; *see also Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013) (holding the historic preclearance review unconstitutional).

In the absence of probative evidence, Plaintiffs resort to vague allusions and rhetoric. For example, they cite former Commissioner Andy Nguyen's statement: "If being called a racist is the price I have to pay to preserve America, I am willing to pay 100-fold." *See* ECF No. 8, at 9, 11. Likewise, Plaintiffs claim that Judge O'Hare has a "noted history of divisive actions against minority citizens," citing only his opposition to illegal immigration, criticism of the 2020 election, and questioning of Tarrant County Elections Administrator Heider Garcia. *See* ECF No. 8, at 11. These points are speculative and unrelated to the adoption of Map 7.

Plaintiffs' repeated insinuations of racial motive are a distraction from what was an explicit partisan decision: the drawing of district lines to create an additional Republican-leaning precinct. *See Easley v. Cromartie*, 532 U.S. 234, 258 (2001) (when race and partisanship correlate, Plaintiffs must show that legitimate political goals could have been achieved through race-neutral means equally consistent with traditional redistricting criteria). They offer no alternative map or modeling to show that the Commissioners Court could have accomplished its political objectives while achieving significantly greater racial balance. *See Alexander*, 602 U.S. at 10 ("plaintiffs failed to meet the high bar for a racial-gerrymandering claim by failing to

produce, among other things, an alternative map showing that a rational legislature sincerely driven by its professed partisan goals would have drawn a different map with greater racial balance") Nor do they demonstrate that the plan subordinates traditional principles.

This omission is fatal. Courts require Plaintiffs to show that the challenged districting decision was not just politically motivated, but that it used partisanship as a proxy for race or subordinated neutral redistricting goals to racial classifications. *See Sinkfield v. Kelley*, 531 U.S. 28, 30 (2000); *Lopez v. Abbott*, 339 F. Supp. 3d 589, 603 (S.D. Tex. 2018) ("vote dilution claim is a mere euphemism for political defeat at the polls"). Without that showing, Plaintiffs cannot overcome the presumption of legislative good faith or prove that race—not politics—drove the design of Map 7. *See Abbott*, 585 U.S. at 602; *see also Easley*, 532 U.S. at 258; *see also Alexander*, 602 U.S. at 7.

## II.     Plaintiffs Fail to Show Irreparable Harm.

Even if Plaintiffs could show a likelihood of success on the merits, which they cannot, they still must establish that they face a substantial threat of irreparable harm in the absence of preliminary relief. This is a required element under the preliminary injunction standard and failure to establish it independently warrants denial of the motion. *See Healthy Vision Ass'n*, 138 F.4th at 402.

### A.  Plaintiffs Will Be Able to Vote in 2026 and Remain Fully Enfranchised.

The only harm Plaintiffs allege is that some voters will not be able to vote for a county commissioner in 2026 because they have been reassigned to odd-numbered precincts that will vote next in 2028. But these voters remain fully eligible to vote in the 2026 general election. These voters can vote for U.S. Senate, U.S. House, and numerous other State and local offices.

They have not been removed from the voter rolls, denied the ability to register, or prevented from participating in elections. In short, they have not lost the right to vote.

This kind of scheduling-based delay is not irreparable harm. It is a routine and lawful consequence of staggered election systems, which have existed in Texas for decades and have been upheld time and again by both federal and State courts. *See Carr*, 341 F. Supp. at 159-60; *see also Pate*, 337 F. Supp. at 98-99. In those cases, voters brought the same kind of challenge Plaintiffs bring here, arguing that being moved into a district not scheduled to vote in the next election was disenfranchisement requiring immediate relief. The courts rejected those claims, concluding that the mere postponement of an opportunity to vote for a specific office does not violate constitutional rights or amount to irreparable harm.

A fundamental distinction exists between the denial of the right to vote and a delayed opportunity to vote for a particular office. Courts recognize this distinction and routinely reject claims of irreparable harm in the latter context.

Here, Plaintiffs face no barrier to political participation. They are not disenfranchised. They are not denied representation. The structure of staggered terms necessarily results in some voters casting ballots for a given office in different cycles. This is not a defect. It is an accepted and judicially sanctioned method of governance.

Another reason to reject Plaintiffs' request for immediate injunctive relief is that their alleged injury, even if cognizable, is not irreparable because it is fully remediable at the conclusion of the case. If Plaintiffs ultimately prevail at trial, the Court could order appropriate relief, including a declaratory judgment, injunctive relief applicable to future cycles, or even remedial elections if truly warranted. The availability of post-trial remedies weighs against the Court granting emergency relief now.

This principle has potent force in election cases. The Supreme Court has cautioned district courts to be reluctant to enter preliminary injunctions that disrupt election administration in the absence of irreversible harm. *See Purcell*, 549 U.S. at 4-5. As the Supreme Court has emphasized, the closer a court is to an election, the more cautious it must be in granting relief that alters established procedures or introduces uncertainty into the process.

### III. The Balance of Equities Weighs Against Granting Preliminary Relief.

Even if Plaintiffs could establish a likelihood of success on the merits and demonstrate some measure of harm, the Court must still consider whether the balance of equities tips in their favor. This requires weighing the claimed injury to Plaintiffs against the harm that would result to Defendants and others if an injunction were granted. Courts must deny preliminary relief when the requested injunction would inflict greater harm than it prevents. *See* ECF No. 12, at 23.

Here, the equities weigh heavily against Plaintiffs. Their asserted injury is a two-year delay in voting for one local office, a result that stems from lawful redistricting in a staggered-term system. They do not claim that they have lost the right to vote. They do not allege that they have been deprived of representation on the Commissioners Court. They do not contend that they face any barrier to political participation. They are merely dissatisfied with the timing of a commissioner election in their new precinct. Dissatisfaction alone does not outweigh the disruption their requested injunction would cause.

In contrast, the harm to the County, its officials, and the public would be substantial if Plaintiffs' Motion is granted. If the Court were to enjoin Map 7, Tarrant County would need to scrap its adopted precinct boundaries, revive a constitutionally suspect map or adopt an entirely new map and reorganize voter block assignments.

These burdens are not speculative. They would be immediate, costly, and disruptive. Voters would be confused about which precinct they reside in, when they vote for commissioner, and who their elected representatives are. Local officials would face legal uncertainty about which districts to administer.

Courts are not empowered to impose equitable relief simply because a party is unhappy with the outcome of a legislative process. The Commissioners Court adopted Map 7 after months of public engagement, legal consultation, and deliberation. The balance of harms does not favor Plaintiffs, who seek to overturn that policy choice without clear evidence of illegality. The equities weigh decisively against judicial intervention.

## IV. Public Interest Would Not Be Served by Judicial Intervention.

The final prong of the preliminary injunction standard requires the Court to consider whether granting relief would serve the public interest. In election-related cases, this factor carries increased weight, as courts must be mindful of the broader systemic consequences of disrupting an election process. *See Purcell*, 549 U.S. at 4-5.

Granting Plaintiffs' requested injunction would be a disservice to the public interest in at least three significant ways.

First, it would undermine the stability and predictability of the 2026 election. Tarrant County adopted its redistricting plan in early June 2025. That plan has been publicly available for months, and election officials have been preparing for its implementation. Judicial invalidation of the map at this stage would create confusion, reduce voter confidence, and risk electoral errors. Courts have consistently cautioned against such disruption. *See Purcell*, 549 U.S. at 4–5.

Second, granting this injunction would set a dangerous precedent for jurisdictions across Texas and beyond. All 254 Texas counties use staggered election systems like Tarrant County's. If Plaintiffs' theory that any change in voting schedule caused by redistricting violates federal law were accepted, it could expose these counties to immediate litigation and threaten to upend dozens of lawful election plans. No court has ever recognized such a sweeping theory, and this Court should not be the first.

Third, the injunction would inject the judiciary into a role the Constitution does not assign it: the oversight of ordinary local policymaking. Plaintiffs ask this Court not just to review a legal claim, but to override the Commissioners' Court's decision, discard a map adopted after a public process, and manage local election design. That level of judicial intervention into electoral administration is inconsistent with principles of federalism and separation of powers. *See Rucho*, 588 U.S. at 707; *Abbott*, 585 U.S. at 602 (holding that courts must presume legislative good faith and avoid imposing premature remedies). The Supreme Court has reaffirmed this principle in *Alexander* where it said "inferring bad faith based on the racial effects of a political gerrymander in a jurisdiction in which race and partisan preference are very closely correlated—would, if accepted, provide a convenient way for future litigants and lower courts to sidestep our holding in *Rucho* that partisan gerrymandering claims are not justiciable in federal court." 602 U.S. 1, 21. The Court further opined that without this presumption, "a litigant could repackage a partisan-gerrymandering claim as a racial gerrymandering claim by exploiting the tight link between race and political preference. Instead of claiming that a State impermissibly set a target Republican-Democratic breakdown, a plaintiff could simply reverse-engineer the partisan data into racial data and argue that the State impermissibly set a particular BVAP target. Our decisions cannot be evaded with such ease. *Id.* As the Fifth Circuit said in *Petteway*, "[t]his court will not remain in

the forefront of authorizing litigation, not compelled by law or the Supreme Court, whose principal effects are to (a) supplant legislative redistricting by elected representatives with judicial fiat; (b) encourage divisively counting citizens by race and ethnicity; and (c) displace the fundamental principle of democratic rule by the majority with balkanized interests)." *Petteway,* 111 F.4th at 612.

The public has a strong interest in orderly, transparent, and democratically accountable elections. That interest is not advanced by judicially rewriting election rules at Plaintiffs' urging, especially in the absence of any constitutional or statutory violation. The public interest would be harmed by the preliminary injunction Plaintiffs seek.

## CONCLUSION

Plaintiffs' motion fails every prong of the preliminary injunction standard. Their claims are legally deficient, factually unsupported, and contrary to the established framework governing staggered elections and redistricting. The Court should deny the motion for preliminary injunction in its entirety.

Respectfully submitted,

For the Defendants

*/s/ Joseph M. Nixon*
Joseph M. Nixon
PUBLIC INTEREST LEGAL FOUNDATION
107 S. West Street
Alexandria, VA 22413
Tel: (703) 745-5870
 jnixon@publicinterestlegal.org

J. Christian Adams*
PUBLIC INTEREST LEGAL FOUNDATION
107 S. West Street
Alexandria, VA 22413
Tel: (703) 745-5870
 adams@publicinterestlegal.org

*Motions for Pro Hac Admission forthcoming*

Kaylan Phillips*
PUBLIC INTEREST LEGAL FOUNDATION
107 S. West Street
Alexandria, VA 22413
Tel: (703) 745-5870
 kphillips@publicinterestlegal.org
*Motions for Pro Hac Admission forthcoming*

Jewel M. Lightfoot
PUBLIC INTEREST LEGAL FOUNDATION
107 S. West Street
Alexandria, VA 22413
Tel: (703) 745-5870
 jlightfoot@publicinterestlegal.org

Stephen A. Lund
State Bar No. 24086920
Tarrant County District Attorney's Office
401 W. Belknap St., 9th Floor
Fort Worth, TX 76196
Tel: (817) 884-1400
Fax: (817) 884-1475
SALund@tarrantcountytx.gov

Katherine E. Owens
State Bar No. 24081683
Tarrant County District Attorney's Office
401 W. Belknap St., 9th Floor
Fort Worth, TX 76196
Tel: (817) 884-1400
Fax: (817) 884-1475
KEOwens@tarrantcountytx.gov

Omar J. Famada
State Bar No. 24144940
Tarrant County District Attorney's Office
401 W. Belknap St., 9th Floor
Fort Worth, TX 76196
Tel: (817) 884-1400
Fax: (817) 884-1475
OJFamada@tarrantcountytx.gov

## CERTIFICATE OF SERVICE

I, Joseph M. Nixon, do hereby certify that service of a true and correct copy of this Motion has been forwarded to all counsel of record via electronic notification and sent to non-parties via regular and/or certified mail.


DATED: August 4, 2025                    For the Defendants

*/s/ Joseph M. Nixon*
Joseph M. Nixon
PUBLIC INTEREST LEGAL FOUNDATION
107 S. West Street
Alexandria, VA 22413
Tel: (703) 745-5870
jnixon@publicinterestlegal.org