**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **WINNIE JACKSON, ET AL.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-CV-00587-O** |
| | § | |
| **TARRANT COUNTY, TEXAS, ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION & ORDER**

Before the Court are Defendants' Motion to Dismiss for Lack of Jurisdiction (ECF No. 22), Plaintiffs' Response (ECF No. 31), and Defendants' Reply (ECF No. 41). Additionally, before the Court are Plaintiffs' Motion for Preliminary Injunction (ECF No. 11), Defendants' Response (ECF No. 28), and Plaintiffs' Reply (ECF No. 33). Also before the Court are Plaintiffs' Motion to Expedite the Preliminary Injunction Hearing (ECF No. 14), Defendants' Response (ECF No. 25), and Plaintiffs' Reply (ECF No. 34). Finally, before the Court are the State of Texas's Brief as Amicus Curiae in Support of Defendants' Motion to Dismiss (ECF No. 37) and Plaintiffs' Response (ECF No. 40).

Having reviewed the briefing and applicable law, the Court **DENIES** Plaintiffs' Motion for a Preliminary Injunction in full. The Court **GRANTS** Defendants' Motion to Dismiss only as to Plaintiffs' First Amendment claims. The Court therefore **DISMISSES with prejudice** Plaintiffs' First Amendment claims. This Order serves to **GRANT** Plaintiffs' Motion to Expedite.

## I.    BACKGROUND

This case arises from a redistricted precinct map that Defendant, the Tarrant County Commissioners Court, adopted in June 2025. Plaintiffs are registered voters who reside in Tarrant

1

County,[1] and allege that the redistricted map—which they call "Map 7"—adversely impacts their opportunity to vote in the November 2026 local county commissioners' election.[2] Specifically, the group of voters allege that the new precinct map violates (1) Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301, (2) the First and Fourteenth Amendments by disenfranchising voters for a period of two years, and (3) the Fourteenth and Fifteenth Amendments by intentional racial vote dilution.[3]

Following the 2020 Census, the Commissioners Court started to conduct a full redistricting process. However, Tarrant County was never redistricted that year, and the Commissioners ultimately decided to keep the precinct boundaries the same.[4] Then, four years later, in April of 2025, the Commissioners Court, under new leadership, voted again to consider redistricting the Commissioners' precincts.[5]

The Commissioners Court is made up of one county-wide presiding County Judge who is elected to a four-year term and four Commissioners who are elected in single-member precincts (districts), also to four-year terms.[6] The election of Commissioners—which is at issue here—is determined by staggered elections in two commissioner precincts each election cycle.[7] Effectively, some precincts have seats up for election in years that others do not.

Plaintiffs allege that the former map—"the Benchmark Map"—included two districts (Precincts 1 and 2) that were majority-minority and elected the minority candidate of choice, while Precincts 3 and 4 elected the Anglo-preferred candidate.[8] In 2022, when the incumbent Tarrant

---

[1] Pls.' First Am. Compl. 4, ECF No. 8
[2] *Id.* at 2.
[3] Pls' Mot. Prelim. Inj. 1, ECF No. 11.
[4] Pls.' First Am. Compl. 10–11, ECF No 8.
[5] *Id.* at 8.
[6] *Id.*
[7] *Id.*
[8] *Id.* at 11.

County Judge, Anglo Republican Glen Whitley, did not run for re-election, he was replaced by Anglo Republican Tim O'Hare.[9] Districts 1 and 2 voted for the Black Democrat, Deborah Peoples, even though Tim O'Hare ultimately won county-wide.[10] Plaintiffs allege that on the day of the redistricting vote, Judge O'Hare said in an interview with NBC 5 that "[t]he policies of Democrats continue to fail Black people over and over, but many of them keep voting them in. It's time for people of all races to understand the Democrats are a lost party, they are a radical party, it's time for them to get on board with us and we'll welcome them with open arms."[11]

Under the new map, "Map 7," several Plaintiffs no longer fall into majority-minority precincts, and now reside in a majority-Anglo precinct. Other Plaintiffs still reside in majority-minority precincts even under the new map. However, their new precinct does not have a seat up for election until November 2028, whereas under the Benchmark map they would have been able to vote for County Commissioner in November 2026.[12] Accordingly, Plaintiffs allege that Black and Latino voters are subject to voting postponement at higher rates than White voters. That is, 5.3% of eligible White voters are impacted; 17% of eligible Black voters are impacted; and 11.8% of eligible Latino voters are impacted.[13]

All Plaintiffs are registered voters residing in Tarrant County, regularly vote in local elections, including County Commission elections, and claim an intent to vote in future elections for County Commission.[14]

On June 17, 2025, Plaintiffs filed their First Amended Complaint alleging: (1) Map 7 violates § 2 of the VRA because it results in a racially discriminatory imposition of a six- rather

---

[9] *Id.*
[10] *Id.*
[11] Pls.' Br. Supp. Mot. Prelim. Inj. 8, ECF No. 12.
[12] Pls.' First Am. Compl. 4–7, ECF No. 8.
[13] Pls.' App. Supp. Mot. Prelim. Inj. 3, ECF No. 13.
[14] Pls.' First Am. Compl. 4–7, ECF No. 8.

than four-year voting cycle for Commissioners Court elections; (2) Map 7 violates the First and Fourteenth Amendments by causing a two-year disenfranchisement period with no legitimate justification and in a manner that discriminates on the basis of race and viewpoint; (3) Map 7 is the product of intentional racial vote dilution in violation of the Fourteenth Amendment; and (4) Map 7 is the product of intentional racial vote dilution in violation of the Fifteenth Amendment.

Plaintiffs filed a Motion for Preliminary Injunction on June 6, 2027, requesting a decision by September 12, 2025. Defendants filed a Motion to Dismiss alleging that, among other things, this case presents a non-justiciable political question.[15] The State of Texas as Amicus Curiae submitted a brief in support of Defendants' Motion to Dismiss.[16] The Motions are ripe for the Court's review.

## II.    LEGAL STANDARDS

### A.  Justiciability

Under Article III of the Constitution, federal courts are limited to deciding "Cases" and "Controversies." This limitation means that federal courts may only address questions that are "historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). "[I]n James Madison's words," cases and controversies are issues "'of a Judiciary Nature.'" *DiamlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (quoting 2 Records of the Federal Convention of 1787, p. 430 (M. Farrand ed. 1966)).

Even though "the province and duty of the judicial department to say what the law is." *Rucho v. Common* Cause, 588 U.S. 684, 695 (2019), sometimes, "the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Vieth v.*

---

[15] Defs.' Mot. Dismiss, ECF No. 22.
[16] Texas's Amicus Br., ECF No. 37.

*Jubelirer*, 541 U.S. 267, 277 (2004) (plurality opinion). In those cases, the claim presented is a nonjusticiable "political question," outside the courts' competence and beyond its jurisdiction. *Baker v. Carr*, 369 U.S. 186, 217 (1962). "Among the political question cases the Court has identified are those that lack judicially discoverable and manageable standards for resolving them." *Rucho*, 588 U.S. at 696 (internal quotation marks and citation omitted).

If the Court does not have jurisdiction to review a particular claim, it need not—indeed it cannot—proceed to the merits of the case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

### B. Preliminary Injunction

To obtain a preliminary injunction, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in the movant's favor; and (4) that issuance of a preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

While the decision to grant or deny injunctive relief is committed to the district court's discretion, such relief is considered an "extraordinary remedy," never awarded as of right. *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (explaining that a court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction").

As movant, the party seeking relief bears the heavy burden of proving all elements of the preliminary injunction. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be

granted. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001). Of these factors, likelihood of success on the merits is the most important. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).

## III.    ANALYSIS

Two theories of harm underlie Plaintiffs' claims. The first is the "temporary disenfranchisement," i.e., two-year voting delay, that Plaintiffs allege disproportionately impacts Black and Latino voters. The second is alleged dilution of the Black and Latino vote because those same voters are unable to vote in this election cycle. Plaintiffs advance these claims under statutory and constitutional authorities, but in light of the record available on this expedited posture, the Court concludes that none have a substantial likelihood of success on the merits.

### A.  Counts 1 and 2: Plaintiffs' Voting-Delay Claims under § 2 of the VRA, the First Amendment, and the Fourteenth Amendment

Plaintiffs' first two Counts are based on a novel theory of harm "that the adoption of Map 7 . . . has disproportionately disenfranchised Black and Latino voters of their right to vote in the November 2026 election—forcing them to wait six rather than four years to cast a ballot for commissioner."[17] Plaintiffs rely on three sources of authority to advance their claim: Section 2 of the VRA, the First Amendment, and the Equal Protection Clause. The Court addresses each in turn, but first, it addresses a threshold issue whether precedent forecloses Plaintiffs' theory of harm, as Defendants argue. Plaintiffs argue that their claims fall within the category of cases that courts have left open. The Court agrees with Plaintiffs.

This is not the first time that redistricting caused some voters to experience an election delay, and the impacted voters challenged the delay in court. In *Pate v. El Paso County, Texas*, the plaintiffs argued that staggered elections created an unconstitutional restriction upon the right to

---

[17] Pls.' Br. Supp. Mot. Prelim. Inj. 9, ECF No. 12.

vote because "a series of realignments of precinct lines" could "effectively prevent certain persons from ever voting by shifting them back and forth between commissioners precincts." 337 F. Supp. 95, 99 (W.D. Tex. 1970) (three-judge panel), *aff'd sub nom. Pate v. El Paso Cnty., Tex.*, 400 U.S. 806 (1970). The three-judge panel noted that "[a]s long as standards and conditions regarding voting are reasonable and non-discriminatory they are permissible." *Id.* at 97. Finding rational justifications for having staggered elections and that plaintiffs did not otherwise allege "arbitrary or invidious discrimination arising from the action of the state," the panel decided the resultant voting delay was constitutional. *Id.* The Supreme Court affirmed. 400 U.S. 806.

Since *Pate*, a slew of courts across the country have followed course. A district court in Texas, *Carr v. Brazoria County, Texas*, 341 F. Supp. 155 (S.D. Tex. 1972), *aff'd sub nom. Carr v. Brazoria Cnty., Tex.*, 468 F.2d 950 (5th Cir. 1972), relied on *Pate* to reach the conclusion that redistricting causing "transferred voters to suffer a two-year postponement of the franchise," is "constitutionally valid." *Id.* at 160. Courts outside of the Fifth Circuit agree that postponement of the franchise is a natural consequence of redistricting in a system with staggered elections, and thus constitutional. *See, e.g., Republican Party of Oregon v. Keisling*, 959 F.2d 144 (9th Cir. 1992); *Mader v. Crowell*, 498 F. Supp. 226, 231 (M.D. Tenn. 1980); *see also Pereira v. Town of N. Hempstead*, 682 F. Supp. 3d 234, 244 (E.D.N.Y. 2023) (collecting cases that approve of the inevitable impacts—in addition to voting delays—of redistricting on staggered election terms).

But those courts likewise agree that temporary disenfranchisement would be unconstitutional—or at least subject to heightened scrutiny—if it was the result of invidious discrimination. *See Keisling*, 959 F.2d at 145–46 ("[A] temporary dilution of voting power that does not unduly burden a particular group does not violate the equal protection clause."); *Mader*, 498 F. Supp. at 231 ("Plaintiffs submitted no evidence that the General Assembly made these shifts

for invidious or discriminatory purposes. Rather, this disenfranchisement results simply from the neutral and inoffensive . . . provision for overlapping senatorial terms, [among other reasons].”); *Donatelli v. Mitchell*, 2 F.3d 508, 514 (3d Cir. 1993) (“In contrast . . . the two-year ‘disenfranchisement’ suffered by the plaintiffs here as a result of the 1991 reapportionment . . . was not targeted at a discrete group of voters based on some personal characteristic.”); *Pereira*, 682 F. Supp. 3d at 246 (“Like all other federal courts that . . . hav[e] confronted this issue, the Court concludes that, because McHugh’s alleged discrimination is based on non-suspect classifications, the burden remains on Plaintiffs to ‘negate any reasonably conceivable state of facts that could provide a rational basis for the challenged classification.’”).

To the Court’s knowledge, no sort of claim—postponement based on race—has ever been litigated under the VRA or the Equal Protection Clause. If it has, it has been packaged as a vote-dilution or racial-gerrymandering claim, but Plaintiffs are adamant they do not make those claims under Counts 1 and 2.

In any event, because Plaintiffs allege racial discrimination was behind the two-year voting delay, *Pate*, *Carr*, and their progeny are not dispositive. Below, the Court addresses the merits of each of Plaintiffs’ claims based on the two-year voting delay.

### 1.  Count 1: Section 2 of the VRA

Plaintiffs’ first count is brought under § 2 of the VRA. That statute provides: “No voting . . . standard, practice, or procedure shall be imposed or applied . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.” 52 U.S.C. § 10301(a). Plaintiffs contend that the two-year period of disenfranchisement violates § 2 because it is an abridgement of their right to vote on account of race; particularly, as

a "time, place, or manner restriction" under *Brnovich v. Democatic Nat'l Comm.*, 594 U.S. 647 (2021).

After *Brnovich*, there are, seemingly, two ways of advancing a § 2 claim. *But see Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1206–07 (8th Cir. 2023) (holding that private plaintiffs lack the ability to sue under § 2). The traditional path is to assert a vote-dilution claim challenging "the dispersal of [minorities] into districts in which they constitute an ineffective minority of voters or . . . the concentration of [minorities] into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986) (citation omitted). The new path charted in *Brnovich* is to challenge a restriction on the time, place, or manner of voting. *See Brnovich*, 594 U.S. at 667 (Justice Alito explaining "this is our first § 2 time, place, or manner case").

Regardless of which claim is asserted, § 2 requires "consideration of 'the totality of circumstances' that have a bearing on whether a State makes voting 'equally open' to all and gives everyone an equal 'opportunity' to vote." *Id.* at 674. "[A]ny circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered." *Id.* at 668–69. But some factors are more or less relevant under each approach. *See id.* at 672 ("Some of [the *Gingles*] factors are plainly inapplicable in a case involving a challenge to a facially neutral time, place, or manner voting rule.").

Defendants argue that Plaintiffs seek to use *Brnovich* as a backstop to *Gingles*, a traditional § 2 claim, because Plaintiffs cannot prevail under *Gingles*.[18] Whether or not Plaintiffs could prevail

---

[18] Defendants also argue that "[c]ourts rely on *Gingles* to untangle a redistricting dispute, not *Brnovich*." But given that *Brnovich* is still a relatively recent precedent, Defendants overstate how courts have applied it. In any event, whether *Gingles* must apply to a redistricting factual scenario is an open question this Court does not seek to answer. The Supreme Court said in *Brnovich* "that § 2 applies to a broad range of voting rules, practices, and procedures," and in doing so, it did not specify whether it meant either or both § 2 *Gingles* claims and § 2 *Brnovich* claims.

under *Gingles*, *Gingles* addresses a distinct theory of harm—vote dilution—that Plaintiffs do not advance under Count 1. Instead, Plaintiffs allege that their two-year disenfranchisement period is a restriction on "time." Therefore, the Court only addresses whether Plaintiffs could prevail under *Brnovich*.

In *Brnovich*, the Supreme Court identified five "important" factors in time, place, or manner cases. *Id.* at 669. "First, the size of the burden imposed by a challenged voting rule"—not on race but on the voting franchise itself—"is highly relevant." *Id.* Second, "the degree to which a voting rule departs from what was standard practice when § 2 was amended." *Id.* at 669–70. Third, "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups." *Id.* at 671. Fourth, "the opportunities provided by a State's entire system of voting." *Id.* And fifth, "the strength of the state interests served by a challenged voting rule." *Id.*

The first factor—burden on the right to vote—is resolved by the many courts that have held that temporary postponement of the franchise is not unduly burdensome. *See Keisling*, 959 F.2d at 145 ("Appellants . . . will have an opportunity to vote again for state senate in the next elections scheduled for their districts, . . . . Appellants are not being deprived of a voice in any scheduled election."); *Mader*, 498 F. Supp. at 231 ("[T]he deprivation suffered is de minimis at most . . . . The disenfranchisement is temporary in nature and is no different from that experienced by 'new registrants who reach the age of 18 years shortly after an election and (by) people moving from one area to another.'" (quoting *Ferrell v. State of Okl. ex rel. Hall*, 339 F. Supp. 73, 82 (W.D. Okla. 1972))); *Donatelli*, 2 F.3d at 514 ("Nor has [the two-year 'disenfranchisement'] precluded plaintiffs from voting in any regularly scheduled senate election, for they will have equal access

10

to the ballot in the next regularly scheduled state senate election in 1994."). For the same reasons here, the two-year postponement resulting from the redistricting does not burden the right to vote.[19]

Second, "the degree to which a challenged rule has a long pedigree or is in widespread use in the United States is a circumstance that must be taken into account." *Brnovich*, 594 U.S. at 671. Plaintiffs argue that, traditionally, redistricting occurs following a census to account for changes in population. *See Reynolds v. Sims*, 377 U.S. 533, 568 (1964) (requiring apportionment on a population basis or else "an individual's right to vote . . . is unconstitutionally impaired" because "its weight is in a substantial fashion diluted when compared with votes of citizens living on other parts of the State"). But here, Plaintiffs argue that no population imbalance necessitated redistricting mid-decade. Plaintiffs also cite to an expert report explaining why the "2025 Tarrant County redistricting differed in procedure and substance from the County's prior redistricting processes."[20]

The Court disagrees that these perceived irregularities are indeed irregular. Plaintiffs assume that population is the only driver of redistricting, but that is not so. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006), dealt expressly with the Texas legislature's "mid-decade redistricting for exclusively *partisan* purposes," which is what Defendants claim to have been their motivation here.[21] *Id.* at 420 (emphasis added). And the Supreme Court in *Perry* declined to find mid-decade redistricting for exclusively partisan purposes unconstitutional. *Id.*

---

[19] Plaintiffs also argue that the disenfranchisement affects 150,000 voting-age residents, but if the disenfranchisement is not burdensome on an individual level, it is no more burdensome when viewed on a cumulative scale. *See* Pls.' Br. Supp. Mot. Prelim. Inj. 10, ECF No. 12.

[20] Pls. App. Supp. Mot. Prelim. Inj. 7, ECF No. 13.

[21] The redistricting was not ordered by a court, as Plaintiffs' expert contends—there were many iterations of redistricting, and the legislature's map *overrode* the court-ordered map. *See Perry*, 548 U.S. at 423 ("In sum, we disagree with appellants' view that a legislature's decision to override a valid, court-drawn plan mid-decade is sufficiently suspect to give shape to a reliable standard for identifying unconstitutional political gerrymanders.").

at 423. The "rarity" of this phenomenon is hardly supported when, as the State of Texas points out

in its Amicus Brief, the Supreme Court has considered at least two challenges to redistricting maps

adopted mid-decade and did not take issue with the timing of those maps.[22]

Moreover, there is a Congressional Research Service ("CRS") report dedicated to the

topic.[23] The CRS's "Mid-Decade Congressional Redistricting" report documents several 19th

century examples of redistricting "unrelated to any population shifts," so the phenomenon is not

entirely recent. Either way, "[s]ince the 2000 census, there has been renewed mid-decade

congressional redistricting activity by states."[24] In addition to Texas's 2003 redistricting at issue

in *Perry*, Texas Governor Greg Abbott signed into law a new congressional district map that was

formerly under consideration in a 30-day special session by the Texas legislature.[25] It is expected

to give Republicans five additional opportunities for seats ahead of the 2026 elections.[26] Texas is

not the only culprit—"[s]tate officials in several other states, including California, Florida, New

York, and Missouri, are reportedly considering the possibility of redrawing their congressional

district boundaries before the 2030 census."[27]

Finally, Defendants' departure from their prior redistricting processes has very

little probative value under the second *Brnovich* factor, as that factor requires a benchmark that

shows "a long pedigree or . . . widespread use in the United States." *Brnovich*, 594 U.S. at 671.

In sum, though the Court recognizes that mid-decade redistricting is not the norm, it is not as

"exceedingly uncommon" as Plaintiffs portray.

---

[22] Texas's Amicus Br. 5, ECF No. 37.

[23] SARAH J. ECKMAN & L. PAIGE WHITAKER, CONG. RSCH. SERV., IF13082, MID-DECADE CONGRESSIONAL REDISTRICTING: KEY ISSUES (2025).

[24] *Id.*

[25] Caroline Vakil, *Abbott signs GOP's redrawn Texas map*, THE HILL (Aug. 29, 2025, at 12:06 PM ET), https://thehill.com/homenews/campaign/5467206-greg-abbott-texas-congressional-map-signed/.

[26] *Id.*

[27] *Supra* note 23.

Third, the Court acknowledges there is a disparate impact, in that Black and Latino voters are subject to postponement at higher rates than White voters. That is, based on the evidence Plaintiffs present, 5.3% of eligible White voters are impacted; 17% of eligible Black voters are impacted; and 11.8% of eligible Latino voters are impacted.[28] But "[t]he size of any disparity matters." *Id.* And Plaintiffs provide no metric by which the Court can conclude that the disparity between White voters and Black and Latino voters is large or small. *See id.* ("Small disparities are less likely than large ones to indicate that a system is not equally open."). Even if the disparity were statistically significant, it may be explained by a correlation between race and partisanship, where the impact on racial minorities is incident to the legislature's overtly partisan goals to eliminate a Democrat seat. Thus, this factor bears little weight in light of all the circumstances.

Fourth, zooming out to Plaintiffs' ability to participate in the "entire system of voting," Plaintiffs can hardly, if at all, claim they are "disenfranchised." *Id.* Plaintiffs *will* have an opportunity to exercise their vote for Commissioner in 2028—they are not voiceless. And they are only delayed participation in the County Commissioner election—all other state and national elections remain available to them in 2026.

Fifth—regarding the strength of the state interests—redistricting is an inherently governmental prerogative. *See Rucho*, 588 U.S. at 701 (describing "the Framers' decision to entrust districting to political entities"); *Alexander v. S.C. State Conference of the NAACP*, 602 U.S. 1, 7 (2024) ("Redistricting constitutes a traditional domain of state legislative authority."). So, Defendants' asserted interest in "preserving power over drawing line[s] . . . for partisan ends" is presumptively a strong state interest.[29]

---

[28] Pls.' App. Supp. Mot. Prelim. Inj. 3, ECF No. 13.
[29] Defs.' Br. Supp. Mot. Dismiss 15, ECF No. 22-1.

Moreover, Defendants argue their new map replaces a racially motivated map that was "constitutionally suspect."[30] That is, in 2021, "the Commissioners Court was advised to keep a coalition district for the purpose of allowing Precinct 2 to maintain a minority-influenced district."[31] Presumably, Defendants are referring to the Supreme Court's recent embrace of the question whether the "intentional creation of a second majority-minority congressional district violates the Fourteenth or Fifteenth Amendments to the U. S. Constitution," by making race the focus of redistricting.[32] If indeed race is what motivated the old map, this provides additional justification for Defendants' mid-decade redistricting. Regardless, the state has a presumptively strong interest in redistricting for partisan ends.

Having considered the totality of circumstances given the record available to the Court in this expedited posture, the Court concludes that the voting franchise remains "equally open" to Plaintiffs, and thus, Plaintiffs fail to demonstrate a substantial likelihood of success on the merits of their § 2 claim. The Court **DENIES** Plaintiffs' Motion for a Preliminary Injunction on Count 1.

### 2. Count 2: the First Amendment and the Fourteenth Amendment Equal Protection Clause

Plaintiffs' "Count 2 alleges that Map 7 violates the First and Fourteenth Amendments by unequally treating similarly situated voters for disenfranchisement, including on account of their race and viewpoint."[33] It is unclear why Plaintiffs assert these claims together, as they are separate rights-based theories, so the Court addresses them separately.

---

[30] Defs.' Resp. Mot. Prelim. Inj. 4, ECF No. 28.

[31] *Id.*

[32] Zach Montellaro & Josh Gerstein, *The Supreme Court just dropped a hint about its next big Voting Rights Act case*, POLITICO (Aug. 1, 2025, at 9:41 AM ET) https://www.politico.com/news/2025/08/01/supreme-court-louisiana-redistricting-order-00490390 (citing Miscellaneous Order (08/01/2025)).

[33] Pls.' Resp. Defs.' Mot. Dismiss 16, ECF No. 31.

###### i.    First Amendment

Plaintiffs' First Amendment theory appears to be some hybrid of "disenfranchisement"—denial (or delay) of the franchise itself—and "viewpoint discrimination"—targeting Plaintiffs for their views.[34] In their Motion to Dismiss, Defendants argue that (1) Plaintiffs raise a nonjusticiable political question of partisan gerrymandering and (2) there is no First Amendment claim from the County subjecting voters to a two-year disenfranchisement period. The Court agrees with Defendants on both counts.

*Rucho v. Common Cause* marked the end of the Supreme Court adjudicating partisan gerrymandering claims. 588 U.S. 684 (2019). In *Rucho*, the Supreme Court held that partisan gerrymandering raises a non-justiciable political question. *Id.* at 703–10. In addition to asserting a pure partisan gerrymandering claim, the plaintiffs asserted a First Amendment claim, arguing that "partisanship in districting should be regarded as simple discrimination against supporters of the opposing party on the basis of political viewpoint." *Id.* at 714. The Supreme Court held that the plaintiffs' "First Amendment" claim was indistinct from a partisan gerrymandering claim and thus was nonjusticiable. *Id.*

Plaintiffs' First Amendment claim here is identical to that in *Rucho*. Plaintiffs challenge "the configuration of lines in a manner that disenfranchises over 150,000 voters from voting in the election in which they were next eligible to cast a ballot" "*because the County disagrees with their political views*."[35] Like that in *Rucho*, Plaintiffs' viewpoint-discrimination claim "simply describes the act of districting for partisan advantage," which legislatures are authorized to do and courts are unauthorized to question. *Id.*

---

[34] Pls.' Br. Supp. Mot. Prelim. Inj. 12–15, ECF No. 12.
[35] Pls.' First Am. Compl. ¶¶ 106, 111, ECF No. 8 (emphasis added).

Even if the Court were to cast aside Plaintiffs' viewpoint-discrimination theory and focus only on the two-year voting delay resulting from the redistricting, Plaintiffs do not have a First Amendment right to assert on account of the two-year delay. In a similar case in which certain persons were subject to voting delays following reapportionment in a staggered district, the Ninth Circuit refused "to hold that there is a first amendment right to vote for state representatives on a particular schedule." *Keisling*, 959 F.2d at 145; *see also Donatelli*, 2 F.3d at 515 n.10 (agreeing with the Ninth Circuit that "[n]o such restriction on plaintiffs' First Amendment rights is involved" where voters were temporarily disenfranchised after reapportionment). Plaintiffs provide no sound reason to depart from these circuits. Even if the redistricting was pretext for racial discrimination, as Plaintiffs argue, Plaintiffs still would have no *First Amendment* right to assert on account of the delay.

In sum, the Court **GRANTS** Defendants' Motion to Dismiss with respect to Plaintiffs' First Amendment claims. Because there is no possibility of recovery, the Court **DISMISSES with prejudice** Plaintiffs' First Amendment claims.

### ii.    Fourteenth Amendment Equal Protection Clause

Plaintiffs contend that their equal protection claim is based on the "racially discriminatory two-year disenfranchisement period occasioned by Map 7."[36] Defendants argue this is a racial gerrymandering claim in all but name, and thus, the showing for racial gerrymandering claims—that "race predominated in the drawing of a district"—should be required here.[37] *Alexander*, 602 U.S. at 38. The Court agrees with Defendants.

The Supreme Court has said that to prevail on a racial gerrymandering claim "when race and partisan preference are highly correlated," the plaintiff "must disentangle race and politics if

---

[36] Pls.' Reply Mot. Expedite 3, ECF No. 34.
[37] Defs.' Resp. Mot. Prelim. Inj. 14, ECF No. 28.

it wishes to prove that the legislature was motivated by race as opposed to partisanship." *Id.* at 6. Otherwise, a court has no authority to question a plausible case of *partisan* gerrymandering.[38] In response to Defendants' argument, Plaintiffs argue that this requirement does not apply to their intentional racial vote-dilution claims, because vote-dilution and racial gerrymandering claims are "analytically distinct."[39] But Plaintiffs are adamant that *this* claim is *not* premised on a theory of vote dilution, and Plaintiffs do not otherwise explain why *this* claim is analytically distinct from a racial gerrymandering claim.

At bottom, Plaintiffs cannot articulate their theory of harm without making an allegation of racial gerrymandering. The harm they assert—the "racially discriminatory two-year disenfranchisement period"—is simply the effect of redistricting. Even Plaintiffs acknowledge this "harm" is only "occasioned by Map 7."[40] Thus, at its core, Plaintiffs' Equal Protection claim in Count 2 is a racial gerrymandering claim, and Plaintiffs "must disentangle race and politics if [they] wish[] to prove that the legislature was motivated by race as opposed to partisanship." *Id.* at 6.

This is especially so, as Plaintiffs elsewhere present evidence that Tarrant County is racially polarized.[41] That is, "the Black and Hispanic electorate tends to vote Democrat, while Anglos tend to vote Republican." *League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 164 (W.D. Tex. 2022). Because of the strong correlation between race and politics, and because Defendants assert in defense that they were motivated by partisan goals, it would be wrong

---

[38] The Court acknowledges the confusion around whether disentanglement is a pleading or evidentiary requirement, but it does not attempt to resolve that confusion.

[39] Pls.' Resp. Defs.' Mot. Dismiss 4, ECF No. 31 (quoting *Alexander*, 602 U.S. at 38).

[40] Pls.' Reply Mot. Expedite 3, ECF No. 34.

[41] Pls.' Br. Supp. Mot. Prelim. Inj. 20, ECF No. 12; Pls.' App. Supp. Mot. Prelim. Inj. 7, ECF No. 13.

to allow Plaintiffs to escape the heavy burden associated with racial gerrymandering claims just by concocting a novel harm theory.

Construing Plaintiffs' Equal Protection claim in Count 2 as a racial gerrymandering claim, the Court finds that Plaintiffs do not meet their heavy burden of disentangling race from politics.[42] Therefore, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction as to Count 2.

## B. Counts 3 and 4: Plaintiffs' Vote-Dilution Claims under the Fourteenth and Fifteenth Amendments

Plaintiffs' Counts 3 and 4 allege two ways in which their vote is diluted on account of race. First, they allege Map 7 has "reduc[ed] from two to one the number of precincts in which minority voters can elect their candidate of choice."[43] That is, Map 7 "pack[ed] minority voters into a single precinct and crack[ed] the remaining minority population across the other precincts in which they will be subsumed by Anglo voters, in order to dilute their voting strength on account of race."[44] This elimination of a majority-minority precinct from two out of four precincts to one out of four, Plaintiffs allege, occurred despite the fact that "minorities are the majority of residents in the County and just shy of half of eligible voters in Tarrant County."[45] Second, apart from the elimination of a majority-minority precinct, Plaintiffs allege their vote is diluted by virtue of not voting in the 2026 election for commissioner.[46]

There are two authorities under which a plaintiff may assert a vote-dilution claim: the Constitution and § 2 of the VRA. Here, Plaintiffs explicitly do not press a statutory vote-dilution

---

[42] Even if the Court construed Plaintiffs' claim as an intentional-discrimination claim, Plaintiffs do nothing to show the Court why they succeed on the merits. They do not apply the *Arlington Heights* factors to this claim to persuade the Court that the county intended to cause the voting delays. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977).

[43] Pls.' First Am. Compl. ¶ 119, ECF No. 8.

[44] *Id.*

[45] *Id.* ¶ 114.

[46] *Id.* ¶¶ 115, 119.

claim; rather, they advance their vote-dilution claims under constitutional sources: the Fourteenth and Fifteenth Amendments. Because the analytical frameworks for intentional vote dilution cases are roughly the same under both the Fourteenth and Fifteenth Amendments, the Court addresses them together. *See Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481 (1997) ("Since 1980, a plaintiff bringing a constitutional vote dilution challenge, whether under the Fourteenth or Fifteenth Amendment, has been required to establish that the State or political subdivision acted with a discriminatory purpose." (citations omitted)).

To succeed on their intentional vote dilution claims under the Constitution, Plaintiffs "must show that the [County's] districting plan 'has the purpose *and* effect' of diluting the minority vote." *Alexander*, 602 U.S. at 39 (quoting *Shaw v. Reno*, 509 U.S. 630, 649 (1993)). "[P]urpose means more than awareness of a discriminatory effect"—it requires an affirmative intent to dilute the minority vote. *Abbott*, 601 F. Supp. 3d at 160 (citing *Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Moreover, race does not have to be the only or even the predominant purpose—purpose can be established by showing merely "that race was *part* of Defendants' redistricting calculus." *Id.* at 161.

The Court holds that Plaintiffs fail to establish a purpose to dilute the minority vote. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The Supreme Court in *Arlington Heights* provided "five factors that courts may look to in drawing such inferences: (1) discriminatory effect, (2) historical background, (3) the sequence of events leading up to a

challenged decision, (4) departures from normal procedure, and (5) legislative history."[47] *Abbott*, 601 F. Supp. 3d at 160. The Court addresses Plaintiffs' arguments for each in turn.

First, to show a discriminatory effect in the context of intentional vote dilution, Plaintiffs must demonstrate that the redrawing of Map 7 "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 243 (1976)). A three-judge panel, including a Fifth Circuit judge, has explained that the *Gingles* preconditions for establishing racial vote dilution are not implicated by constitutional vote-dilution claims. *Abbott*, 601 F. Supp. 3d at 162–64. Therefore, the test is reduced to a comparison between different rates of impact—is the minority group impacted at higher rates?

As the Court acknowledged previously, Black and Latino voters are subject to postponement at higher rates than White voters. That is, Plaintiffs' expert contends that 5.3% of eligible White voters are impacted, while 17% of eligible Black voters and 11.8% of eligible Latino voters are impacted.[48] But, as the three-judge panel noted in *Abbott*, "given that race and partisanship correlate"—here, around 70% of Latino and 90% of Black voters cast ballots for the same candidates—"almost every reallocation of voting power at the hands of either party will tend to bear more heavily on some races and less on others." *Id.* at 169. So, there is "a serious line-drawing problem in the redistricting context." *Id.* Not "every redistricting gives rise to discriminatory effect of constitutional dimensions," even if it appears that way under a disparate impact test. *Id.*

Second, none of Plaintiffs' evidence suggesting a *history* of discriminatory intent is persuasive. Plaintiffs quote the three-judge panel's decision in *Perry* that "[i]n every decade since

---

[47] Because discriminatory effect is circumstantial evidence of discriminatory purpose, the Court does not address discriminatory effect as a separate prong,
[48] Pls.' App. Supp. Mot. Prelim. Inj. 3, ECF No. 13.

. . . 1965, federal courts have held that Texas violated the VRA."[49] *Id.* at 170. But the Court declines to impart the discriminatory conduct of Texas state legislatures onto county commissioners who played no role in those redistricting decisions. Nor will it impart the remarks of a previous commissioner onto those who drew the current map.

Moreover, the fact that "a predecessor version of Map 7" was rejected in 2021 by legal advisors is not evidence that the predecessor map was discriminatory.[50] It merely is evidence of a legal *opinion* that the predecessor map "was potentially unlawful because of the large number of minority voters it shifted from Precinct 2 to Precinct 1."[51] And Defendants contend that because they followed the advice of legal counsel to preserve a majority-minority district, they ended up with a "constitutionally suspect" map in 2021.[52] *See Louisiana v. Callais*, 145 S. Ct. 2608 (2025) (Thomas, J., dissenting from Supreme Court's decision to defer deciding) ("[D]ue to our Janus-like election-law jurisprudence, States do not know how to draw maps that 'survive both constitutional and VRA review.'"). As Justice Thomas has argued, far from ameliorating concerns about discrimination, the requirement of majority-minority districts creates constitutional concerns. *See generally id.*

Third and fourth, the Court disagrees with Plaintiffs that "the sequence of events, together with the procedural and substantive departures from the norm, support an inference of intentional discrimination."[53] As the Court has already explained, and as Texas's amicus brief likewise explains, the mid-decade redistricting was not "exceedingly unusual." Similarly, the rushed timeline to adopt Map 7, the lack of community input, and the failure to secure outside counsel in

---

[49] Pls.' Br. Supp. Mot. Prelim. Inj. 20, ECF No. 12.
[50] *Id.*
[51] *Id.* at 20–21.
[52] Defs.' Resp. Mot. Prelim. Inj. 4, ECF No. 28.
[53] Pls.' Br. Supp. Mot. Prelim. Inj. 21, ECF No. 12.

the usual manner are at most indicators of politics—not race discrimination. Finally, the Court declines to read a racist intent into a legal counsel's statement that he would fear for his life if he were to answer questions at a public meeting.

Fifth, Plaintiffs present no evidence of legislative history for the Court to consider. Nevertheless, Plaintiffs highlight one piece of evidence, which they believe is direct evidence of discriminatory intent. In a television interview on the day Judge O'Hare cast the decisive third vote in favor of adopting Map 7, an interviewer asked Judge O'Hare about the impact the redistricting would have on minority voters, and Judge O'Hare responded:

> The policies of Democrats continue to fail Black people over and over and over, but many of them keep voting them in. It's time for people of all races to understand the Democrats are a lost party, they are a radical party, it's time for them to get on board with us and we'll welcome them with open arms.[54]

This statement is not the smoking gun Plaintiffs think it is. Judge O'Hare was *prompted* by a reporter to answer a racially charged question. His answer observes the correlation between race and partisan preference, which is consistent with Plaintiffs' own evidence that racial minorities vote cohesively. Plaintiffs cannot now suggest Judge O'Hare was making an unfair racial assumption, when the very same assumption underlies Plaintiffs' claims. The second half of the statement is addressed to "people of all races" to "get on board" with the Republican party. All this indicates is that Judge O'Hare wants to garner more Republican support. This expressly partisan motive conforms with what Defendants have represented all along in their briefing.

Given the dearth of evidence on this record to support a finding of discriminatory intent, the Court concludes that Plaintiffs fail to demonstrate a likelihood of success on the merits of their intentional racial vote-dilution claims. Plaintiffs' Motion for Preliminary Injunction as to Counts 3 and 4 is **DENIED**.

---

[54] *Id.* at 8.

\*      \*      \*

Because Plaintiffs do not demonstrate a likelihood of success on the merits of any of their claims, the Court does not address the other considerations for a preliminary injunction. *See Bell*, 248 F.3d at 419 n.15.

## IV.     CONCLUSION

Having reviewed the briefing and applicable law, the Court **DENIES** Plaintiffs' Motion for a Preliminary Injunction in full. The Court **GRANTS** Defendants' Motion to Dismiss only as to Plaintiffs' First Amendment claims. The Court therefore **DISMISSES with prejudice** Plaintiffs' First Amendment claims. This Order serves to **GRANT** Plaintiffs' Motion to Expedite.

**SO ORDERED** on this **12th day** of **September, 2025**.

Reed O'Connor
**CHIEF UNITED STATES DISTRICT JUDGE**